## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DAVID EGOLF, | |
| *Plaintiff*, | Case No. 1:25-cv-03439-UNA |
| v. | |
| GEORGETOWN UNIVERSITY; ROBERT GROVES; ROSEMARY KILKENNY; OLABISI LADEJI OKUBADEJO; and SAMANTHA BERNER, | |
| *Defendants*. | |

|  |
|---|
| GEORGETOWN UNIVERSITY, |
| *Counter-Plaintiff*, |
| v. |
| DAVID EGOLF, |
| *Counter-Defendant*. |

**DEFENDANTS GEORGETOWN UNIVERSITY, ROBERT GROVES, ROSEMARY KILKENNY, OLABISI LADEJI OKUBADEJO, AND SAMANTHA BERNER'S ANSWER TO THE OPERATIVE COMPLAINT [ECF NO. 8] AND GEORGETOWN UNIVERSITY'S COUNTERCLAIM**

Defendants Georgetown University ("Georgetown" or "the University"), Robert Groves,

Rosemary Kilkenny, Olabisi Ladeji Okubadejo, and Samantha Berner ("Defendants"), by counsel,

submit the following Answer in response to Plaintiff David Egolf's operative Complaint[1] (ECF

---

[1] By Memorandum Opinion and Order, dated October 6, 2025, the Court ordered Plaintiff to re-file his original Complaint, ECF No. 1, using his real name, and requiring all parties to refer to the former student referenced therein as "Robert Roe" in all documents filed in this action. *See* ECF No. 3.

No. 8). All allegations in the Complaint not otherwise specifically admitted, denied, qualified or otherwise responded to below are denied.

## INTRODUCTION

1.    Defendants admit that plaintiff seeks compensatory and punitive damages from Georgetown for alleged retaliation under Title IX, breach of contract, breach of the covenant of good faith and fair dealing, and negligent supervision. Defendants deny the remaining allegations of paragraph 1 of the Complaint.

2.    Defendants admit that plaintiff seeks compensatory and punitive damages from Defendants Groves, Kilkenny, Okubadejo, and Berner for alleged tortious interference with prospective economic advantage, tortious interference with contractual relations, and civil conspiracy. Defendants deny the remaining allegations of paragraph 2 of the Complaint.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.    The allegations of paragraph 3 of the Complaint assert a conclusion of law to which no response is required. To the extent a response is required, Defendants deny the allegations set forth in paragraph 3 of the Complaint.

## PARTIES

4.    Defendants admit that Plaintiff is currently a tenured Associate Professor at Georgetown. Upon information and belief, Defendants admit the remaining allegations set forth in paragraph 4 of the Complaint.

5.    Defendants admit the allegations contained in paragraph 5.

6.    Defendants admit the allegations contained in paragraph 6.

7.    Defendants admit the allegations contained in paragraph 7.

8.    Defendants admit the allegations contained in paragraph 8.

9.    Defendants admit the allegations contained in paragraph 9.

10.      Defendants deny that either Defendant Berner or Okubadejo is an officer of

Georgetown University. Defendants admit the remaining allegations contained in paragraph 10.

## JURISDICTION & VENUE

11.      Defendants admit that this Court has subject matter jurisdiction pursuant to 28

U.S.C. § 1331. Defendants deny the remaining allegations contained in paragraph 11 of the

complaint.

12.      The allegations of paragraph 12 assert a conclusion of law to which no response is

required.

13.      Defendants deny the allegations contained in paragraph 13 of the Complaint.

14.      The allegations of paragraph 14 assert a conclusion of law to which no response is

required.

15.      The allegations of paragraph 15 assert a conclusion of law to which no response is

required.

## FACTUAL ALLEGATIONS

16.      Defendants admit the allegations contained in paragraph 16.

17.      Defendants admit the allegations contained in paragraph 17.

18.      Defendants deny that Plaintiff was not Roe's supervisor during his post-

baccalaureate fellowship. Defendants admit the remaining allegations contained in paragraph 18.

19.      Defendants lack knowledge or information sufficient to form a belief about the truth

of the allegations set forth in paragraph 19 of the Complaint and therefore deny them.

20.      Defendants admit, on or about July 19, 2023, Robert Roe raised concerns with the

Office of Institutional Diversity, Equity, and Affirmative Action's ("IDEAA"), Office of Title IX

Compliance regarding alleged misconduct by Plaintiff. Defendants deny the remaining allegations

set forth in paragraph 20 of the Complaint.

3

21.     Defendants deny the allegations of paragraph 21.

22.     Defendants deny the allegations of paragraph 22.

23.     Defendants deny the allegations of paragraph 23.

24.     Defendants deny the allegations of paragraph 24.

25.     Defendants deny the allegations of paragraph 25.

26.     Defendants deny the allegations of paragraph 26.

27.     Defendants admit the allegations of paragraph 27.

28.     Defendants admit the allegations of paragraph 28.

29.     Defendants admit the allegations of paragraph 29.

30.     Defendants aver that the federal regulations promulgated pursuant to Title IX are public records and subject to numerous judicial interpretations and amendments. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 30 of the Complaint and therefore deny them.

31.     Defendants admit the allegations of paragraph 31.

32.     Defendants admit that Georgetown has internal policies and procedures which speak for themselves and deny Plaintiff's interpretation to the extent it is contrary. Defendants deny the remaining allegations set forth in paragraph 32 of the Complaint.

33.     Defendants admit that Georgetown has internal policies and procedures which speak for themselves and deny Plaintiff's interpretation to the extent it is contrary. Defendants deny the remaining allegations set forth in paragraph 33 of the Complaint.

34.     Defendants admit that Georgetown has alleged that Plaintiff engaged in acts of sexual misconduct with respect to Robert Roe. The remaining allegations of paragraph 34 are incomprehensible to Defendants and/or legal conclusions, and they are therefore denied.

35.      Defendants deny the allegations of paragraph 35.

36.      Defendants deny the allegations of paragraph 36.

37.      Defendants deny the allegations of paragraph 37.

38.      Defendants deny the allegations of paragraph 38.

39.      Defendants admit the allegations of paragraph 39.

40.      Defendants admit that the 2013 Complaint included allegations that Plaintiff engaged in sexual harassment. Defendants deny the remaining allegations of paragraph 40.

41.      Defendants deny the allegations of paragraph 41.

42.      Defendants admit that, in response to the University's findings after investigation of the 2013 Complaint, Dr. Groves found just cause for revocation of Plaintiff's tenure and termination. Defendants deny the remaining allegations of paragraph 42.

43.      Defendants admit the allegations of paragraph 43.

44.      Defendants admit that, after conciliation pursuant to the Faculty Grievance Procedures, the University entered into a Confidential Settlement Agreement and Release with Plaintiff in 2015 ("2015 Agreement"), in which Plaintiff agreed to various restrictions on his contact and activities with students and supervisees as a direct result of the University's findings of misconduct on his part, which he expressly acknowledged he understood to be a form of sanctions for his misconduct in the Provost Letter attached to the 2015 Agreement. Defendants deny the remaining allegations of paragraph 44.

45.      Defendants aver that the 2015 Agreement speaks for itself, and Defendants specifically deny that the releases contained in the 2015 were "unconditional," in light of the numerous express conditions imposed upon the Plaintiff in the 2015 Agreement. Defendants deny the remaining allegations of paragraph 45.

46.     Defendants deny the allegations of paragraph 46.

47.     Defendants deny the allegations of paragraph 47.

48.     In response to the allegations of paragraph 48, Defendants state that the 2015 Agreement speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

49.     In response to the allegations of paragraph 49, Defendants state that the 2015 Agreement speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

50.     Defendants admit that a letter written by Dr. Groves, referred to in the 2015 Agreement as the "Provost Letter," was attached to the 2015 Agreement as Attachment B and incorporated therein by reference. In response to the remaining allegations of paragraph 50 of the Complaint, Defendants state that the 2015 Agreement, including the Provost Letter, speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

51.     In response to the allegations of paragraph 51, Defendants state that the Provost's Letter speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

52.     Defendants deny the allegations of paragraph 52.

53.     In response to the allegations of paragraph 53, Defendants state that the Provost's Letter speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

54.     In response to the allegations of paragraph 54, Defendants state that the 2015 Agreement speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

55.     In response to the allegations of paragraph 55, Defendants state that the 2015 Agreement, the Provost Letter, and the 2013 Complaint speak for themselves and deny Plaintiff's interpretation or characterization to the contrary.

56.     In response to the allegations of paragraph 56, Defendants state that the 2015 Agreement speaks for itself and deny Plaintiff's interpretation to the extent it is contrary..

57.     In response to the allegations of paragraph 57, Defendants state that the 2015 Agreement speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

58.     Defendants deny the allegations of paragraph 58.

59.     Defendants deny the allegations of paragraph 59.

60.     Defendants deny the allegations of paragraph 60

61.     Defendants admit that the University tasked the investigators it retained to investigate the allegations concerning Plaintiff's misconduct made by Mr. Roe with making factual findings as to whether the conduct reported to IDEAA implicated Sections 2.a through 2.f of the 2015 Agreement, regarding "Requirements upon Returning to Georgetown." Defendants further admit, as expressly noted by the investigators in their May 6, 2024 Confidential Report, that "[t]he Investigators were provided only that portion of the Confidential Settlement Agreement necessary to review this Issue..." Defendants deny the remaining allegations of paragraph 61.

62.     Defendants deny that the University disclosed any information in violation of the 2015 Agreement and therefore deny the remaining allegations of paragraph 62.

63.     Defendants deny the allegations of paragraph 63.

64.     Defendants admit that Egolf had not yet been formally found to be in violation of the 2015 Agreement or the Faculty Handbook when the University investigated whether he was in violation of the 2015 Agreement or the Faculty Handbook. Defendants deny that their actions violated the 2015 Agreement and therefore deny the remaining allegations set forth in paragraph 64 of the Complaint.

65.     Defendants deny the allegations of paragraph 65.

66.     Defendants deny the allegations of paragraph 66.

67.     Defendants deny the allegation of paragraph 67.

68.     Defendants deny the allegations of paragraph 68.

69.     Defendants deny the allegations of paragraph 69.

70.     Defendants deny the allegations of paragraph 70.

71.     Defendants deny the allegations of paragraph 71.

72.     Defendants deny the allegations  of paragraph 72.

73.     Defendants deny the allegations of paragraph 73.

74.     Defendants deny the allegations of paragraph 74.

75.     Defendants deny the allegations of paragraph 75.

76.     Defendants deny the allegations of paragraph 76.

77.     Defendants deny the allegations of paragraph 77.

78.     Defendants admit the allegations of paragraph 78.

79.     The allegations of paragraph 79 are legal conclusions to which no response is required. To the extent a response is required, upon information and belief, Defendants admit the allegations set forth in paragraph 79 of the Complaint.

80.     Defendants admit the allegations of paragraph 80.

81.     In response to the allegations of paragraph 81, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

82.     In response to the allegations of paragraph 82, Defendants state that the Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

83.     In response to the allegations of paragraph 83, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

84.     In response to the allegations of paragraph 84, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

85.     In response to the allegations of paragraph 85, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

86.     In response to the allegations of paragraph 86, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

87.     Defendants deny the allegations of paragraph 87.

88.     Defendants deny the allegations of paragraph 88.

89.     Defendants admit that the "investigative process" began with the interview of Robert Roe and proceeded through an administrative review to investigate the issues presented, and the "investigative process" therefore did not "commence with the Step II phase" as alleged in paragraph 89 of the Complaint.

90.     Defendants deny the allegations of  paragraph 90.

91.     In response to the allegations of paragraph 91, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

92.     In response to the allegations of paragraph 92, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

93.     In response to the allegations of paragraph 93, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

94.     In response to the allegations of paragraph 94, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants deny the remaining allegations set forth in paragraph 94 of the Complaint.

95.     In response to the allegations of paragraph 95, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

96.     In response to the allegations of paragraph 96, Defendants state that the Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

97.     Defendants admit that Mr. Roe chose not to make a formal complaint. Defendants deny the remaining allegations set forth in paragraph 97.

98.     In response to the allegations of paragraph 98, Defendants state that the Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

99.     Defendants admit the allegation of paragraph 99.

100.    Defendants state that Georgetown sent Plaintiff a letter, dated August 9, 2023, in which it informed him "that concerns were raised with IDEAA's Office of Title IX Compliance regarding alleged misconduct by [Plaintiff]," and that "the University's Provost has requested that IDEAA conduct an administrative review to investigate the issues." Defendants deny the remaining allegation set forth in paragraph 100 of the Complaint.

101.    In response to the allegations of paragraph 101, Defendants state that the August 9 Letter speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants further deny that the August 9 Letter did not satisfy the requirements of Georgetown policy and Title IX.

102.    Defendants admit the allegations of paragraph 102.

103.    In response to the allegations of paragraph 103, Defendants state that the August 9 Letter speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants

further deny that the August 9 Letter did not provide fair notice to Plaintiff of the allegations against him, as the August 9 Letter, on its face, includes, as "Attachment 1," a detailed 5-page listing of the concerns raised about Plaintiff's conduct that were subject to investigation in the administrative review.

104.    Defendants deny the allegations set forth in paragraph 104 of the Complaint and aver that the University provided Plaintiff with both a detailed 5-page listing of the concerns raised about Plaintiff's conduct that were subject to investigation in the administrative review as part of the August 9 Notification Letter, as well as the detailed, 35-page long May 6, 2024 Confidential Investigative Report ("Report") setting forth the basis for Georgetown's conclusions concerning Plaintiff's misconduct.

105.    In response to the allegations of paragraph 105, Defendants state that the Report speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants deny the remaining allegations set forth in paragraph 105 of the Complaint..

106.    Defendants deny the allegations of paragraph 106.

107.    In response to the allegations of paragraph 107, Defendants state that the Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

108.    Defendants admit the allegations of paragraph 108.

109.    Defendants admit that Georgetown has not provided copies of its agents' and employees' confidential notes to Plaintiff. Defendants deny the remaining allegations of paragraph 109.

110.    Defendants admit the allegations of paragraph 110.

111.    Defendants admit the allegations of paragraph 111.

112.     In response to the allegations of paragraph 112, Defendants state that the email correspondence reporting the results of the *in camera* review from the Faculty Grievance Committee speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants further deny that IDEAA failed to disclose "potentially exculpatory information to Professor Egolf" because, as Plaintiff expressly alleges in paragraph 112 of the Complaint, the Report did not include any finding that Plaintiff had "any physical contact of a sexual nature" with Mr. Roe or that Mr. Roe ever claimed that Plaintiff ever overtly "propositioned him for sexual or romantic contact." Defendants deny the remaining allegations set forth in paragraph 112 of the Complaint.

113.     In response to the allegations of paragraph 113, Defendants state that the email correspondence reporting the results of the *in camera* review from the Faculty Grievance Committee speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants deny the remaining allegations set forth in paragraph 113 of the Complaint.

114.     Defendants deny the allegations of paragraph 114.

115.     Defendants admit the allegations of paragraph 115.

116.     In response to the allegations of paragraph 116, Defendants state that Title IX speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

117.     Defendants admit that Georgetown hired attorneys Stephanie K. Baron and Sasha E. Hodge-Wren to conduct the investigation. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 117 of the Complaint and therefore deny them

118.     Defendants deny the allegations of paragraph 118.

119.     Defendants deny the allegations of paragraph 119.

120.    Defendants aver that the scope of the investigation directed by Defendant Groves is set forth in the August 9 Notification Letter, which speaks for itself, and Defendants deny Plaintiff's interpretation to the extent it is contrary. Defendants deny the remaining allegations set forth paragraph 120 of the Complaint.

121.    In response to the allegations of paragraph 121, Defendants state that Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

122.    Defendants deny the allegations of paragraph 122.

123.    Defendants deny the allegations of paragraph 123.

124.    Defendants deny the allegations of paragraph 124.

125.    Defendants deny the allegations of paragraph 125.

126.    In response to the allegations of paragraph 126, Defendants state that Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

127.    In response to the allegations of paragraph 127, Defendants state that Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

128.    In response to the allegations of paragraph 128, Defendants state that August 9 Notification Letter speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

129.    Defendants deny the allegations of paragraph 129.

130.    Defendants admit that its investigators did not substantiate a finding that male students generally experienced favoritism from Plaintiff because of their gender. Defendants deny the remaining allegations of paragraph 130.

131.    Defendants deny the allegations of paragraph 131.

132.    Defendants deny the allegations of paragraph 132.

133.    Defendants admit that the facts listed in paragraph 133 of the Complaint were included in the University's investigation and contributed, in varying degrees, to its conclusions. Defendants deny that the University's conclusion were solely based on the facts listed in paragraph 133.

134.    In response to the allegations of paragraph 134, Defendants state that Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

135.    Defendants admit the allegation of paragraph 135.

136.    Defendants admit that Plaintiff spent a very large amount of time with Mr. Roe for various reasons. The remaining allegations of paragraph 136 are mere argument of counsel, to which no response is required. To the extent a response is required, Defendants deny that Plaintiff's conduct did not create an inappropriate relationship with a student in violation of Georgetown's policies and the 2015 Agreement.

137.    Defendants deny the allegations of paragraph 137.

138.    Defendants deny the allegations of paragraph 138.

139.    Defendants deny the allegations of paragraph 139.

140.    Defendants deny the allegations of paragraph 140.

141.    In response to the allegations of paragraph 141, Defendants state that the Report speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

142.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 142 of the Complaint and therefore deny them.

143.    Defendants admit that "[e]ating meals together, with or without other students at the table, is not a sexual act." Defendants further admit, upon information and belief, that Plaintiff often offered to take students out for pizza. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 143 of the Complaint and therefore deny them.

144.    In response to the allegations of paragraph 144, Defendants state that the Report speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 144 of the Complaint and therefore deny them.

145.    In response to the allegations of paragraph 145, Defendants state that the Report speaks for itself and deny Plaintiff's interpretation to the extent it is contrary. Defendants admit, upon information and belief, that Plaintiff treated Mr. Roe, an undergraduate student, to at least three musicals at the Kennedy Center with no other students or faculty present. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 145 of the Complaint and therefore deny them.

146.    Defendants deny the allegations of paragraph 146.

147.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 147 of the Complaint and therefore deny them.

148.    Defendants deny the allegations of paragraph 148.

149.    Defendants deny the allegations of paragraph 149.

150.    Defendants deny the allegations of paragraph 150.

151.    Defendants deny the allegations of paragraph 151.

152.     Defendants admit that there was an inherently unequal power dynamic between Plaintiff and Mr. Roe which impacted Mr. Roe's ability to freely give consent  Defendants deny the remaining allegations of paragraph 152.

153.     Defendants deny the allegations of paragraph 153.

154.     Defendants deny the allegations of paragraph 154.

155.     Defendants deny the allegations of paragraph 155.

156.     Defendants deny the allegations of paragraph 156.

157.     Defendants deny the allegations of paragraph 157.

158.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 158 of the Complaint and therefore deny them.

159.     In response to the allegations of paragraph 159, Defendants state that the Faculty Handbook speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

160.     Defendants deny both the premise and substance of the allegations of paragraph 160.

161.     Defendants deny both the premise and substance of the allegations of paragraph 161.

162.     Defendants deny both the premise and substance of the allegations of paragraph 162.

163.     Defendants deny both the premise and substance of the allegations of paragraph 163.

164.     In response to the allegations of paragraph 164, Defendants state that the Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

165.    Defendants admit that IDEAA based its review under a preponderance of the evidence standard. Defendants deny the remaining allegations of paragraph 165.

166.    Defendants deny the allegations of paragraph 166.

167.    Defendants deny the allegations of paragraph 167.

168.    Defendants deny the allegations of paragraph 168.

169.    In response to the allegations of paragraph 169, Defendants state that the Faculty Handbook and Title IX speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

170.    Defendants deny the allegations of paragraph 170.

171.    Defendants deny the allegations of paragraph 171.

172.    In response to the allegations of paragraph 172, Defendants state that the Report speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

173.    In response to the allegations of paragraph 173, Defendants state that Mr. Roe's text messages with Plaintiff speak for themselves and deny Plaintiff's out of context interpretation to the extent it is contrary.

174.    Defendants deny the allegations of paragraph 174.

175.    Defendants admit that Mr. Roe's fellowship involved performing computational research with Plaintiff. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 175 of the Complaint and therefore deny them.

176.    Defendants admit that Mr. Roe's fellowship involved performing computational research with Plaintiff using Georgetown's computing resources. Defendants lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations set forth in paragraph 176 of the Complaint and therefore deny them.

177.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning computer records. Defendants deny the remaining allegations set forth in paragraph 177 of the Complaint.

178.    Defendant deny the allegations of paragraph 178.

179.    Defendants deny the allegations of paragraph 179.

180.    Defendants deny the allegations of paragraph 180.

181.    The allegations in paragraph 181 are a conclusion of law to which no response is required. To the extent a response is required, Defendant Georgetown denies that it failed to use reasonable care in supervising its employees.

182.    Defendants admit that Georgetown had numerous opportunities to ensure compliance with the Faculty Handbook (and did so), but deny that Title IX applies to this case.

183.    Defendants deny the allegations of paragraph 183.

184.    Defendants deny the allegations of paragraph 184.

185.    The allegations of paragraph 185 are mere argument of counsel, to which no response is required. To the extent a response is required, Defendants deny both the premise and substance the allegations of paragraph 185.

186.    The allegations of paragraph 186 are mere argument of counsel, to which no response is required. To the extent a response is required, Defendants state that both the Faculty Handbook and Title VII speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

187.    Defendants deny the allegations of paragraph 187.

188.    Defendants deny the allegations of paragraph 188.

189.    Defendants deny the allegations of paragraph 189.

190.    Defendants admit the allegations of paragraph 190.

191.    In response to the allegations of paragraph 191, Defendants state that the findings of the Faculty Grievance Committee speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

192.    In response to the allegations of paragraph 192, Defendants state that the findings of the Faculty Grievance Committee speak for themselves and deny Plaintiff's interpretation to the extent it is contrary.

193.    Defendants deny the allegations of paragraph 193.

194.    Defendants deny that it has ever been required to reinstate Plaintiff by the Faculty Grievance Committee; to the contrary, the Faculty Grievance Committee unanimously agreed that it lacked the authority to require reinstatement of Plaintiff. Defendants deny the remaining allegations of paragraph 194.

195.    Defendants deny the allegations of paragraph 195.

## COUNT ONE
### RETALIATION IN VIOLATION OF TITLE IX
### Against Defendant Georgetown University

196.    Defendants incorporate by reference their responses to paragraphs 1-195 above.

197.    In response to the allegations of paragraph 197, Defendants state that Title IX speaks for itself and deny Plaintiff's interpretation to the extent it is contrary.

198.    Defendants admit that a complaint of sexual misconduct was filed against Plaintiff in 2013. Defendants deny the remaining allegations of paragraph 198.

199.    Defendants admit that Plaintiff opposed the 2013 complaint and deny the remaining allegations of paragraph 199.

200.    Defendants deny the allegations of paragraph 200.

201.    Defendants deny the allegations of paragraph 201.

202.    Defendants deny the allegations of paragraph 202.

**COUNT TWO**
**BREACH OF CONTRACT**
**Against Defendant Georgetown University**

203.    Defendants incorporate by reference their responses to paragraphs 1-202 above.

204.    Defendants admit the allegations of paragraph 204.

205.    Defendants admit the allegations of paragraph 205.

206.    Defendants deny the allegations of paragraph 206.

207.    Defendants deny the allegations of paragraph 207.

**COUNT THREE**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**Against Defendant Georgetown University**

208.    Defendants incorporate by reference their responses to paragraphs 1-207 above.

209.    The allegations of paragraph 209 are legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 209 of the Complaint and therefore deny them.

210.    Defendants deny the allegations of paragraph 210.

211.    Defendants deny the allegations of paragraph 211.

212.    Defendants deny the allegation of paragraph 212.

**COUNT FOUR**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**
**Against Defendants Groves, Kilkenny, Okubadejo, and Berner**

213.     Defendants incorporate by reference their responses to paragraphs 1-212 above

214.     Defendants deny the allegations of paragraph 214.

215.     Defendants deny the allegations of paragraph 215.

216.     Defendants deny the allegations of paragraph 216.

217.     Defendants deny the allegations of paragraph 217.

**COUNT FIVE**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE ECONOMIC ADVANTAGE**
**Against Defendants Groves, Kilkenny, Okubadejo, and Berner**

218.     Defendants incorporate by reference their responses to paragraphs 1-217 above

219.     Defendants deny the allegations of paragraph 219.

220.     Defendants deny the allegations of paragraph 220.

221.     Defendants deny the allegations of paragraph 221.

222.     Defendants deny the allegations of paragraph 222.

**COUNT SIX**
**NEGLIGENT SUPERVISION**
**Against Defendant Georgetown University**

223.     Defendants incorporate by reference their responses to paragraphs 1-222 above

224.     Defendants admit the allegations of paragraph 224.

225.     Defendants deny the allegations of paragraph 225.

226.     Defendants deny the allegations of paragraph 226.

227.     Defendants deny the allegations of paragraph 227.

228.     Defendants deny the allegations of paragraph 228.

229.     Defendants deny the allegations of paragraph 229.

230.     Defendants deny the allegation of paragraph 230.

Defendants deny Plaintiff is entitled to any of the relief requested in the Complaint.

## **GENERAL AND AFFIRMATIVE DEFENSES**

1.     Plaintiff has failed to state a claim upon which relief can be granted.

2.     Plaintiff has failed to state a claim for attorneys' fees or costs.

3.     Plaintiff has failed to state a claim for punitive damages.

4.     The Defendants did not engage in any unlawful or wrongful conduct with respect to Plaintiff, is not liable to Plaintiff in any manner or under any theory, and Plaintiff is not entitled to any relief or damages.

5.     Plaintiff has failed to exhaust his contractual remedies.

6.     Plaintiff's claims may be barred, in whole or in part, by the applicable statutes of limitations.

7.     Plaintiff's claims are not ripe.

8.     Without conceding that Plaintiff has suffered any damages as a result of any purportedly wrongful act by the University, upon information and belief, Plaintiff failed to reasonably mitigate his damages.

9.     Plaintiff's claims are barred by the doctrines of waiver, estoppel, and release.

10.    Plaintiff's claims are barred by prior material breach.

11.    Plaintiff's claims are barred by the doctrine of unclean hands.

12.    Plaintiff is the proximate cause of any harm he claims to have suffered.

13.    The University acted reasonably and in good faith at all times with regard to the decisions at issue in the Complaint.

14.    The University complied at all times with its written policies and procedures and the law.

22

15.    Upon information and belief, Plaintiff's claims may be barred or limited under the doctrine of after-acquired evidence.

16.    The University reserves the right to assert additional defenses if any become evident through discovery or investigation.

## DEFENDANT GEORGETOWN UNIVERSITY'S COUNTERCLAIM

### Introduction

1.    Georgetown University ("Georgetown" or the "University") asserts this Counterclaim against Professor David Egolf ("Egolf") arising out of Egolf's material breaches of a written settlement agreement dated October 15, 2015 (the "2015 Agreement"), which governed the terms and conditions of Egolf's reinstatement and continued employment as a faculty member following a sexual harassment complaint against Egolf by an undergraduate student.

2.    The 2015 Agreement imposed strict and express conditions on Egolf's conduct, including requirements that he maintain professional, non-personal relationships with students; avoid one-on-one meetings with students in private or residential settings; refrain from inappropriate, sexualized, or boundary-crossing communications or behavior; comply with University alcohol policies; and promptly disclose to University administrators any questionable student relationship.

3.    Notwithstanding those restrictions, Georgetown has learned that Egolf repeatedly engaged in and attempted to conceal conduct that violated both the letter and purpose of the 2015 Agreement. Over an extended period, Egolf cultivated and concealed a personal and social relationship with a student he advised, taught, mentored, and supervised, including through extensive non-academic communications, frequent late-night and weekend text messaging, and repeated one-on-one social meetings outside an academic context.

4.      During these interactions, Egolf made sexualized and inappropriate comments to Robert Roe[2], including comments about sexual topics, intimate experiences, and anatomy; told stories involving nudity and sexualized conduct; discussed his own romantic and sexual interests; and otherwise introduced sexual subject matter into a faculty–student relationship in direct contravention of the professional boundaries the 2015 Agreement was designed to enforce.

5.      Egolf also engaged in private, non-academic social interactions with the student involving alcohol, including arranging social outings and gatherings where alcohol was consumed, and inviting the student to private and residential settings – conduct expressly prohibited by the 2015 Agreement and inconsistent with University policy.

6.      Egolf failed to disclose this conduct or the nature of his relationship with the student to his Department Chair, Dean, or other appropriate University officials, depriving Georgetown of the opportunity to intervene earlier and prevent further violations.

7.      Egolf's claims in this action arise directly from Georgetown's response to and enforcement of the 2015 Agreement and related University policies after these violations were reported to the University by the student. Georgetown's actions were undertaken to address Egolf's contractual breaches, protect students, and fulfill the very safeguards that formed the basis for Egolf's reinstatement.

8.      As a direct and proximate result of Egolf's repeated breaches – including his sexualized comments, boundary-crossing conduct, and failure to disclose – Georgetown has incurred substantial damages, including the costs of internal investigation and disciplinary proceedings, administrative disruption, reputational harm, goodwill, and legal expenses.

---

[2] By Memorandum Opinion and Order, dated October 6, 2025, the Court ordered all parties to refer to the former student referenced in Plaintiff's complaint by the pseudonym "Robert Roe" in all documents filed in this action. *See* ECF No. 3.

## PARTIES

9.      Counterclaim-Plaintiff Georgetown University ("Georgetown" or the "University") is a nonprofit institution of higher education established by Act of Congress and organized under the laws of the District of Columbia, with its principal place of business at 3700 O Street NW, Washington, DC 20057. Georgetown is authorized to do business in the District of Columbia and operates undergraduate, graduate, and professional academic programs.

10.      Counterclaim Defendant David Egolf ("Egolf") is, and at all relevant times was, employed by Georgetown University as a tenured Associate Professor in the Department of Physics. Egolf's employment and reinstatement following prior disciplinary proceedings were governed by the Georgetown University Faculty Handbook and a written settlement agreement executed by Egolf and Georgetown in October 2015.

## JURISDICTION AND VENUE

11.      This Court has supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367(a) because the claims asserted herein form part of the same case or controversy as the claims asserted in Plaintiff's Complaint and arise from a common nucleus of operative facts, including Professor Egolf's conduct toward a Georgetown student, the University's investigation and enforcement actions, and the 2015 Agreement governing Egolf's reinstatement and continued employment. The Court has original subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. § 1331.

12.      The Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the University is a citizen of the District of Columbia, Plaintiff is a citizen of the State of Maryland, no non-diverse defendants in this action have been properly joined, and the amount in controversy far exceeds the sum of $75,000.00, exclusive of interest and costs.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this Counterclaim occurred in the District of Columbia, including Egolf's employment as a Georgetown faculty member, his interactions with students enrolled at Georgetown University, and the University's investigation, disciplinary proceedings, and enforcement of the 2015 Agreement. Venue is also proper because Georgetown University is located in, and maintains its principal place of business within, the District of Columbia.

## FACTUAL BACKGROUND

### A.     The 2013 Allegations of Sexual Harassment and the 2015 Agreement

14.     On September 20, 2013, a Georgetown undergraduate student filed a formal sexual-harassment complaint against Egolf, alleging that Egolf engaged in conduct which the student contended constituted sexual harassment and retaliatory conduct.

15.     On November 12, 2013, Georgetown's Provost, Robert Groves, placed Egolf on administrative leave with pay during the University's review of the Complaint.

16.     On May 9, 2014, following an investigation, Georgetown's Office of Institutional Diversity, Equity and Affirmative Action ("IDEAA") issued its Notice of Findings in which it found, *inter alia*, that Egolf: "violated the University's Policy Statement on Harassment and Sexual Harassment by making unwelcome sexual advances and engaging in unwelcome conduct of a sexual nature in violation of the policy;" "engaged in prohibited retaliation" against the student; and "failed to recognize and ignored the principle underlying [the University's Policy on Consensual Sexual Relationships], which prohibits participation in a professional relationship with a student where there is a conflict of interest."

17.     IDEAA also made the following factual findings related to the University's alcohol policy and the Faculty Handbook: (1) "Dr. Egolf served, offered, gave, purchased, and provided alcohol on multiple occasions to [the student] and his roommate, both of whom were underage," and (2) "Dr. Egolf engaged in unfair treatment of [the student], engaged in unprofessional conduct; abused his academic authority over [the student]; engaged in a personal relationship for his own gratification; improperly shared other student information with [the student]; and allowed his objectivity as a professor to be compromised."

18.     Based on its findings, IDEAA recommended that the Provost and Dean of Georgetown College consider "the most serious academic and employment sanctions."

19.     In addition, IDEAA recommended that the previously issued no-contact directive issued by the Office of the Provost between Egolf and the student remain in effect and that Egolf remain off-campus and have no contact with Georgetown University students until a determination is made by the Provost and the Dean of the College of Arts and Sciences on possible academic and employment sanctions.

20.     Egolf appealed IDEAA's findings on May 30, 2014.

21.     On September 12, 2014, the Grievance Panel of Georgetown's Equal Opportunity Examining Board upheld the findings and recommendations set forth in IDEAA's May 9, 2014 Notice of Findings, in their entirety.

22.     On October 14, 2014, Provost Groves found just cause for revocation of tenure and termination of Egolf, and issued a Termination Letter.

23.     On December 3, 2014, Egolf filed a Notice of Grievance under the Faculty Code challenging the IDEAA's Findings, and challenging the Provost's recommendation for tenure revocation and termination.

24.     Georgetown and Egolf thereupon engaged in a closed and confidential conciliation process pursuant to the Faculty Grievance Procedures and, on October 15, 2015, entered into the 2015 Agreement with respect to the Provost's recommendation for tenure revocation and termination, permitting Egolf's reinstatement only subject to strict and continuing behavioral restrictions.

25.     A true and correct copy of the 2015 Agreement, redacted to conceal the name of the complaining student, is attached hereto as **Exhibit A** and incorporated herein by reference.

26.     The 2015 Agreement permitted Egolf to return to teaching only subject to strict, express conditions designed to protect students, preserve professional faculty-student boundaries, and safeguard the University's academic and institutional integrity.

27.     Among other things, the 2015 Agreement required Egolf to undergo training sessions "covering Georgetown's policies and procedures related to (i) student-faculty relations, (ii) professionalism, and (iii) harassment."

28.     The 2015 further required that, before returning to campus, Egolf had to be evaluated by an independent forensic psychologist, who had to "confirm to Georgetown in writing that he believes to a reasonable degree of certainty that it is safe to have Egolf return to Georgetown, that Egolf poses no danger to students, and that Egolf has the ability to respect and conform to professional boundaries."

29.     Most importantly, the 2015 Agreement imposed mandatory, specific restrictions and requirements on Egolf "for so long as Egolf is employed by Georgetown."

30.     Paragraph 2(b) of the 2015 Agreement required Egolf to "maintain a professional faculty-student relationship with students" and prohibited him from engaging in "a relationship with a student or supervisee that might affect Egolf's impartiality with that student."

31.     Paragraph 2(a)(ii) of the 2015 Agreement required Egolf to "use his best efforts to avoid meeting one-on-one with any Georgetown student in a private space (such as his office, a meeting room, or a laboratory) with the door closed."

32.     Under paragraph 2(a)(ii) of the 2015 Agreement Egolf was strictly prohibited from "meet[ing] one-on-one in any residence or place of accommodations with any undergraduate student, any Georgetown student in the Department of Physics, or any student with whom he had a supervisory relationship."

33.     Paragraph 2(d) of the 2015 Agreement prohibited Egolf from making "any sexual advances, comments or statements about genitalia, jokes of a sexual nature, or sex-related teasing to any Georgetown student," and from making "any comment of a sexual nature that is of a lewd or lascivious nature" when "any Georgetown student" could reasonably overhear them.

34.     The 2015 Agreement required Egolf to comply with Georgetown's alcohol policies and not provide alcohol to any student under the age of 21.

35.     Paragraph 2(f) of the 2015 Agreement required Egolf to "comply with all policies in the Faculty Handbook, including all policies that are under the purview of the Office of Institutional Diversity, Equity and Affirmative Action."

36.     The 2015 Agreement further provided, in paragraph 11, that Georgetown retained the authority to investigate suspected breaches of the Agreement, issue formal notices of breach, and pursue corrective or disciplinary action as a penalty for the breach, including termination, based on violations of its terms.

37.     A letter from Georgetown's Provost ("Provost Letter"), setting forth the Provost's findings relating to the allegations made against Egolf, signed by Egolf as an acknowledgement that he received it, reviewed it, and understood it – expressly including the restrictions imposed

upon him in the 2015 Agreement as "sanctions" – was attached to the 2015 Agreement as Attachment B, and expressly incorporated therein by reference. See Exhibit A at 15.

38.     The Provost Letter expressly stated that "Any future findings of violation of the Faculty Handbook or of the Confidential Settlement Agreement may result in further discipline, up to and including tenure revocation, if appropriate."

39.     These restrictions and requirements set forth in the 2015 Agreement were material to the 2015 Agreement and formed the express basis on which Georgetown permitted Egolf to return to Georgetown's campus and resume teaching and supervisory responsibilities.

40.     As set forth in detail below, and as established by the investigative record, Egolf materially breached the 2015 Agreement, including the restrictions and requirements set forth in Sections 2(a)(i), 2(a)(ii), 2(b), 2(d), and 2(f) therein.

**B.    The 2023 Allegations of Sexual Harassment and Ensuing Investigation**

41.     In May 2023, Robert Roe graduated from Georgetown University. While in school, Mr. Roe took several classes taught by Egolf, served as Egolf's Research Assistant during the summer following his junior year, and, upon graduation, started a postbaccalaureate program at Georgetown under the direct supervision of Egolf. Egolf also served as a formal academic advisor to Mr. Roe during various periods.

42.     On or about July 19, 2023, Mr. Roe, unprompted, contacted Samantha Berner to raise serious concerns regarding alleged misconduct by Egolf, which he referred to as "grooming" behavior. Mr. Roe had a follow-up discussion with Ms. Berner and another IDEAA employee on July 23, 2023.  Following a review of the individual's concerns, the University's Provost requested that IDEAA conduct an administrative review to consider the issues raised, determine if there were violations of IDEAA's policies, make factual findings as to whether Egolf engaged in misconduct

that may be reviewed under the Faculty Handbook and whether Egolf engaged in conduct that violated the 2015 Agreement.

43.    IDEAA interviewed Mr. Roe on August 8, 2023.

44.    On August 9, 2023, IDEAA provided Egolf with a Letter Notice of the Administrative Review, which included, as Attachment A thereto, a "Summary of the Allegations" ("Summary") under review. A true and correct copy of this Letter with the attached Summary of Allegations is attached hereto as **Exhibit B** and incorporated herein by reference.

45.    In the August 9, 2023 Notice, the University advised Egolf of his opportunity to respond in writing and to identify relevant witnesses. Egolf provided a written response on September 15, 2023.

46.    IDEAA interviewed Egolf on December 18, 2023. Following the interview, the Investigators provided Respondent a written summary of the interview, and Respondent provided his additions and corrections to that summary on January 17, 2024, and thereafter also provided supplemental productions of documents.

47.    The IDEAA Investigators held a second interview with Mr. Roe on March 15, 2024 and a second interview with Egolf on March 26, 2024. Egolf was again provided a written summary of the interview, and Egolf provided certain additions and corrections to that summary on April 3, 2024. The Investigators reviewed the documents and information provided by Egolf and Mr. Roe.

48.    In addition, as part of its investigation, IDEAA interviewed 12 other individuals.

49.    On May 6, 2024, IDEAA issued a confidential investigative report concluding that "there is sufficient evidence under a preponderance of the evidence standard to substantiate a finding that [Egolf] engaged in sexual harassment as defined in the University's Policy on Sexual

Misconduct, resulting in a violation of this Policy and the Policy on Equal Opportunity and Non-Discrimination in Education." IDEAA further "provided factual findings with respect to conduct that may implicate certain provisions of the Faculty Handbook and certain provisions of the October 2015 settlement agreement between [Egolf] and the Provost."

50.    A true and correct copy of IDEAA's May 6, 2024 investigative report is attached hereto as **Exhibit C** and incorporated herein by reference.

51.    On May 7, 2024, IDEAA sent a letter Provost Groves recommending that the University terminate Egolf's employment. This letter attached IDEAA's investigative report.  A true and accurate copy of that letter is attached hereto as **Exhibit D** and incorporated herein by reference.

52.    Egolf formally appealed IDEAA's findings through the IDEAA grievance process, submitting a 70-page Appeal, along with additional attachments ("Egolf's Appeal"). Egolf's Appeal was reviewed, in accordance with University policies, and denied, in its entirety, on July 30, 2024, and IDEAA's findings remained in effect.

53.    By letter dated October 28, 2024, Provost Groves formally notified Egolf that he was in material breach of the 2015 Agreement, in accordance with paragraph 11 of the 2015 Agreement. A true and correct copy of the Notice of Breach of Settlement Agreement, dated Oct. 28, 2024, redacted to shield Mr. Roe's real name, is attached hereto as **Exhibit E** and incorporated herein by reference.

54.    In the Notice of Breach, Provost Groves concluded: "You have breached the Agreement in several serious ways. Termination of employment is the appropriate penalty for such breaches. However, prior to imposing such a penalty, I will request input from the Faculty Responsibilities Committee on the appropriate corrective or disciplinary action, provided such

input can be provided in a timely manner. While I would appreciate the Committee's input, I am not waiving my right to take action without the Committee's input. The University does not waive any rights to assert breach of the Agreement on other bases or based on additional facts. The University does not waive any other rights under the Agreement or under law."

55.     By letter dated October 28, 2024, Provost Groves sought input from the Faculty Responsibilities Committee ("FRC") prior to taking any corrective or disciplinary action with respect to his finding that Egolf was in breach of the 2015 Agreement and the violations of the Policy on Sexual Misconduct and the Policy on Equal Opportunity and Non-Discrimination in Education found by IDEAA. In so doing, Provost Groves made clear that his determination Egolf breached the 2015 Agreement was final. To date, the FRC has not issued its final recommendations with respect to the appropriate disciplinary action for Egolf's misconduct, and Egolf remains on a paid leave of absence from the University.

**C.     Egolf's Material Breaches of the 2015 Agreement.**

56.     Paragraph 2(b) of the 2015 Agreement provides that "Egolf will maintain a professional faculty-student relationship with students and will not engage in a relationship with a student or supervisee that might affect Egolf's impartiality with that student."

57.     As established in the 2023 IDEAA investigative report – and as admitted by Egolf in his appeal of that report – Egolf engaged in an extensive personal and social relationship with a student he advised and supervised, including frequent non-academic communications, social outings, private meetings, and sustained personal involvement extending beyond appropriate faculty-student boundaries.

58.    In his appeal of the IDEAA investigative report, Egolf admitted the truth of numerous factual findings by expressly stating, "This statement is true." Among those admissions, Egolf wrote:

a.    "Beginning during Mr. [Roe]'s junior year, the two met, spoke, and texted regularly, including on nights and weekends and on and off-campus. This statement is true." (Appeal, p. 16).

b.    "Dr. Egolf became well-acquainted with numerous aspects of Mr. [Roe]'s life, including his family, his mental health, and certain other personal matters. This statement is true." (Appeal, p. 17).

c.    "Dr. Egolf and Mr. [Roe] had multiple meals together. This statement is true." (Appeal, p. 18). Egolf further admitted: "Beginning sometime in Mr. [Roe]'s junior year, they had meals together about once a month at a nearby restaurant in Georgetown. Most of the time they ate at Pizzeria Paradiso – a bright and open space popular among students and faculty. They discussed research, classes, and health issues, as well as books, movies, and sports. Initially, their meals often included other students or alumni, though as Mr. [Roe]'s senior year went on and his health issues intensified, the meals were more often one-on-one." (Appeal, p. 18).

d.    "Dr. Egolf paid for all meals he had with Mr. [Roe]. This statement is true." (Appeal, p. 19).

e.    "Dr. Egolf paid for tickets at the Kennedy Center three times over approximately a six-month period. This statement is true." (Appeal, p. 20).

     f.   "Dr. Egolf paid for tickets at the movies twice over approximately a 6-month period. This statement is true." (Appeal, p. 21).

     g.   "Dr. Egolf and Mr. [Roe] exchanged thousands of text messages, often on a daily basis. This statement is true." (Appeal, p. 22).

     h.   "Dr. Egolf repeatedly extended invitations to Mr. [Roe] to attend out-of-school events. This statement is true." (Appeal, p. 23).

     i.   "Dr. Egolf changed his shirt in front of Mr. [Roe]. This statement is true." (Appeal, p. 25).

     j.   "Dr. Egolf drove Mr. [Roe] around in his personal vehicle. This statement is true." (Appeal, p. 25).

     k.   "Dr. Egolf hosted Mr. [Roe] overnight for a graduation celebration. This statement is true." (Appeal, p. 27).

59.    With respect to the overnight "graduation celebration," which was only attended by Egolf and Roe, Egolf further admitted: "Dr. Egolf invited Mr. [Roe] to spend the night at his house after their celebration of Mr. [Roe]'s graduation, since they expected to drink and it would be late. . . . Dr. Egolf invited Mr. [Roe] to spend the night at his house after they went to see the Lion King so that he would not have to drive to Mr. [Roe]'s home in Reston and back the night immediately preceding when Mr. [Roe] was already slated to go to Dr. Egolf's home for their graduation celebration." (Appeal, p. 26).

60.    Egolf further admitted: "It is undisputed that Dr. Egolf and Mr. [Roe] together consumed 3½ bottles of champagne at a fairly consistent rate over the course of about 11 hours." (Appeal, p. 28).

61.     In describing his conduct during that gathering, Egolf admitted: "It is correct to say that Dr. Egolf left the door slightly ajar when he went into the bathroom because Mr. [Roe] had continued talking." (Appeal, p. 30).

62.     With respect to the stories he told Roe during his overnight "celebration" in his personal residence, Egolf wrote in his appeal: "[Dr. Egolf] told Mr. [Roe] about his horror at being propositioned by a student and he told a story of a student whom he found naked on his couch. The latter led to Dr. Egolf and Mr. [Roe] having a discussion of how views of nakedness had changed through the years. Dr. Egolf told Mr. [Roe] that when he was growing up students routinely showered together, especially if they played sports, so nakedness was not really a big deal to him. And during that back-and-forth, Dr. Egolf made an off-hand joke about the size of a college friend's penis." (Appeal, p. 31).

63.     Egolf further admitted conduct related to a drinking game: "Mr. [Roe] used the restroom at some point during which a bottle was taped to his hand. He removed the bottle and Dr. Egolf teased him about cheating. . . . Dr. Egolf retaped the bottle to his hand." (Appeal, pp. 32–33).

64.     These admitted facts establish that Egolf engaged in a sustained personal, social, and alcohol-infused relationship with Mr. Roe, who was under his academic supervision, that went far beyond a professional faculty-student relationship and "might affect [his] impartiality" within the meaning of Paragraph 2(b) of the 2015 Agreement.

65.     Egolf's conduct therefore constituted a material breach of Paragraph 2(b) of the 2015 Agreement by his own admissions.

66.    In addition, IDEAA's factual findings, which were supported by substantial evidence, establish that Egolf engaged in conduct constituting a clear and material breach of Paragraph 2(b) of the 2015 Agreement.

67.    Paragraph 2(a)(i) of the 2015 Agreement provides that Egolf "shall use his best efforts to avoid meeting one-on-one with any Georgetown student in a private space (such as his office, a meeting room, or a laboratory) with the door closed."

68.    Paragraph 2(a)(ii) of the 2015 Agreement provides that Egolf "shall not meet one-on-one in any residence or place of accommodation" with any undergraduate student, any Georgetown student in the Department of Physics, or any student with whom he has a supervisory relationship.

69.    The investigative record and Egolf's admissions on appeal establish that Egolf repeatedly violated both provisions by engaging in one-on-one meetings with a student under his supervision in private spaces and at his personal residence, and by failing to use "best efforts" to avoid such encounters.

70.    As Egolf admitted on appeal, he repeatedly met one-on-one with Mr. Roe in private, non-academic contexts and extended invitations for out-of-school events, stating: "Dr. Egolf repeatedly extended invitations to Mr. [Roe] to attend out-of-school events. This statement is true." (Appeal, p. 23).

71.    Egolf also admitted that he transported Mr. Roe in his personal vehicle, stating: "Dr. Egolf drove Mr. [Roe] around in his personal vehicle. This statement is true." (Appeal, p. 25).

72.    Egolf further admitted: "Dr. Egolf hosted Mr. [Roe] overnight for a graduation celebration. This statement is true." (Appeal, p. 27).

73.     These residential meetings occurred while Mr. Roe was under Egolf's academic supervision and in connection with a continuing relationship, including during Mr. Roe's post-baccalaureate period under Egolf's direct oversight.

74.     These admissions establish that Egolf did not use "best efforts" to avoid one-on-one meetings in private spaces, and instead repeatedly initiated, encouraged, and participated in such meetings, in violation of Paragraph 2(a)(i).

75.     They further establish that Egolf met one-on-one with a postbaccalaureate scholar under his supervision at his personal residence and hosted that student overnight, in direct violation of the absolute prohibition set forth in Paragraph 2(a)(ii).

76.     Egolf provided this student with private study sessions outside normal academic channels.

77.     Egolf issued inflated grades to the student that were inconsistent with objective academic evaluation.

78.     Egolf drafted or substantially assisted in drafting portions of the student's undergraduate thesis and a grant application, exceeding the bounds of appropriate faculty supervision.

79.     Egolf's conduct therefore constituted material breaches of Paragraphs 2(a)(i) and 2(a)(ii) of the 2015 Agreement.

80.     Furthermore, pursuant to Paragraph 2(c) of the 2015 agreement, if Egolf had "any questions as to whether a relationship with a student is appropriate," he was required to "immediately disclose the relationship to his chair or dean."

81.    Despite engaging in extensive personal, social, and non-academic interactions with a student under his supervision, Egolf failed to disclose the nature or extent of that relationship to any University administrator.

82.    Egolf knew his relationship was problematic, and when he met privately with Roe in his office, Egolf joked about needing to keep the door "partially open" so "people don't get suspicious."

83.    Egolf's failure to disclose deprived Georgetown of the opportunity to intervene earlier and independently constituted a violation of the conditions governing his reinstatement.

84.    Paragraph 2(d) of the 2015 Agreement provides that "Egolf will not make any sexual advances, comments or statements about genitalia, jokes of a sexual nature, or sex-related teasing to any Georgetown student," and further prohibits him from making any sexual comment "of a lewd or lascivious nature when he knows or reasonably should know that any Georgetown student is close enough that he or she might reasonably be able to overhear such comment."

85.    The investigative record and Egolf's admissions on appeal establish that Egolf violated this provision by making sexualized comments, telling stories involving nudity, genitalia, and sexual propositions, and engaging in sex-related joking with a postbaccalaureate scholar under his supervision.

86.    In his appeal, Egolf admitted that, prior to the student's graduation, he had alluded to telling the student sexually explicit stories, and that he did so after graduation. As Egolf admitted, on May 18, 2023, he texted the student: "Well, I can finally tell you all of the crazy stories I've hinted at." (Appeal, p. 31).

87.    Egolf further admitted that he in fact told the student stories involving sexual propositions and nudity, writing: "[Dr. Egolf] told Mr. [Roe] about his horror at being

propositioned by a student and he told a story of a student whom he found naked on his couch." (Appeal, p. 31).

88.    Egolf admitted that these stories led to a discussion of nudity and sexual topics, stating: "The latter led to Dr. Egolf and Mr. [Roe] having a discussion of how views of nakedness had changed through the years. Dr. Egolf told Mr. [Roe] that when he was growing up students routinely showered together, especially if they played sports, so nakedness was not really a big deal to him." (Appeal, p. 31).

89.    During that same exchange, Egolf admitted that he made a joke involving genitalia, stating: "And during that back-and-forth, Dr. Egolf made an off-hand joke about the size of a college friend's penis." (Appeal, p. 31).

90.    Egolf repeatedly asked the student about his romantic and intimate life, including questions about whether he was seeing anyone and inquiries such as "any girls?"

91.    Egolf told the student that people are "too sensitive" and that professors "used to go to parties with students," statements that normalized inappropriate faculty-student conduct.

92.    Egolf also admitted engaging in sex-related teasing and physical conduct in connection with alcohol consumption during a private, overnight graduation celebration held at Egolf's home, writing: "Mr. [Roe] used the restroom at some point during which a bottle was taped to his hand. He removed the bottle and Dr. Egolf teased him about cheating. . . . Dr. Egolf retaped the bottle to his hand." (Appeal, pp. 32–33).

93.    As part of that "teasing," Egolf offered to help Roe remove his pants while saying that he had "seen everything." Later that evening he followed Roe into the guest room and sat beside him on the bed.

94.    The next day, Egolf told Roe that "we should do this more often."

95.     These admissions and the facts uncovered during the investigation establish that Egolf made comments and jokes involving sexual subject matter and genitalia to Mr. Roe, a postbaccalaureate scholar under his supervision, and that he engaged in sex-related teasing in the context of private, alcohol-fueled interactions.

96.     The conduct admitted by Egolf falls squarely within the prohibitions of Paragraph 2(d), which was expressly designed to prevent precisely this type of sexualized speech and conduct in faculty-student relationships.

97.     Egolf's conduct therefore constituted a material breach of Paragraph 2(d) of the 2015 Agreement.

98.     Paragraph 2(f) of the 2015 Agreement provides that "Egolf shall comply with all policies in the Faculty Handbook, including all policies that are under the purview of the Office of Institutional Diversity, Equity, and Affirmative Action."

99.     IDEAA conducted an administrative review to determine whether Egolf engaged in conduct violating the University's Policy on Sexual Misconduct and the Policy on Equal Opportunity and Non-Discrimination in Education and to make factual findings concerning whether Egolf engaged in professional misconduct that may be reviewed under the Faculty Handbook.

100.    After investigation, IDEAA found that there was sufficient evidence under a preponderance of the evidence standard to substantiate a finding that Respondent engaged in sexual harassment as defined in the University's Policy on Sexual Misconduct, resulting in a violation of this Policy and the Policy on Equal Opportunity and Non-Discrimination in Education. In addition, IDEAA made express findings of fact concerning whether Egolf engaged in professional misconduct that may be reviewed under the Faculty Handbook.

101.    Following IDEAA's investigation, Provost Groves referred review of Egolf's professional conduct obligations under the Faculty Handbook to Egolf's Unit Head pursuant to Section 6(a) of the Faculty Responsibilities Code.

102.    On September 23, 2024, Andrew Sobanet, Interim Dean, College of Arts & Sciences, filed a formal charge with the Faculty Responsibilities Committee pursuant to Section 7 of the Faculty Responsibilities Code, initiating an independent disciplinary mechanism distinct from both the IDEAA administrative review and the breach-of-contract determination.

103.    Egolf's failure to comply with Faculty Handbook provisions and IDEAA-enforced policies, as established through IDEAA's investigative findings and confirmed on appeal, constituted a direct violation of Paragraph 2(f) of the 2015 Agreement.

104.    Egolf's conduct therefore materially breached Paragraph 2(f), in addition to his breaches of Paragraphs 2(a)(i), 2(a)(ii), 2(b), and 2(d).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT (2015 SETTLEMENT AGREEMENT)

105.    Georgetown realleges and incorporates by reference Paragraphs 1 through 104 as fully set forth herein.

106.    The 2015 Agreement is a valid and binding contract between Georgetown and Egolf, supported by adequate consideration, including Georgetown's agreement to reinstate Egolf to a faculty position subject to express conditions governing his conduct.

107.    Georgetown fully performed its obligations under the 2015 Agreement, including reinstating Egolf and permitting him to resume teaching and supervisory responsibilities subject to the Agreement's restrictions.

108.    Beginning no later than 2021 and continuing through 2023, Egolf materially breached the 2015 Agreement by engaging in conduct that violated multiple express provisions of the Agreement, including but not limited to:

      a.    Paragraph 2(b), by failing to maintain a professional faculty-student relationship and instead cultivating a personal, social, and alcohol-infused relationship with a student under his supervision;

      b.    Paragraph 2(a)(i), by failing to use best efforts to avoid one-on-one meetings with a student in private spaces, and instead repeatedly initiating and participating in such meetings;

      c.    Paragraph 2(a)(ii), by meeting one-on-one with a student under his supervision at his personal residence and hosting that student overnight;

      d.    Paragraph 2(d), by making sexualized comments, jokes, and statements involving genitalia and sexual subject matter to a student under his supervision; and

      e.    Paragraph 2(f), by failing to comply with Faculty Handbook provisions and IDEAA-enforced policies governing sexual misconduct, professional conduct, and faculty–student boundaries.

109.    Each of Egolf's breaches was material and went to the core purpose of the 2015 Agreement, which was to permit Egolf's continued employment only under strict safeguards designed to protect students and the University.

110.    Pursuant to Paragraph 11 of the 2015 Agreement, Georgetown provided Egolf with written notice of breach on October 28, 2024, following completion of the administrative review process.

111.    Egolf's breaches were established through IDEAA's investigative findings and Egolf's own admissions on appeal, which confirmed the factual basis for the breach determination.

112.    As a direct and proximate result of Egolf's breaches of the 2015 Agreement, Georgetown has suffered and continues to suffer damages, including but not limited to:

    a.   The costs of conducting IDEAA's investigation and related administrative proceedings;

    b.   The costs of convening and participating in grievance, appeal, and Faculty Responsibilities Code proceedings;

    c.   The expenditure of administrative resources and faculty time;

    d.   Disruption to departmental operations and academic programs; and

    e.   Legal fees and costs incurred in enforcing the Agreement and defending against this action, which arises directly from Egolf's contractual breaches.

113.    Georgetown's damages were foreseeable at the time the 2015 Agreement was executed and were proximately caused by Egolf's failure to comply with its express terms.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

114.    Georgetown realleges and incorporates by reference Paragraphs 1 through 104 as fully set forth herein.

115.    The 2015 Agreement contained an implied covenant of good faith and fair dealing, requiring Egolf to act honestly, fairly, and in a manner that would not deprive Georgetown of the benefit of its bargain.

116.    Egolf's conduct undermined the safeguards that formed the basis for his reinstatement and deprived Georgetown of the benefit of its bargain.

117.    As a direct and proximate result of Egolf's breach of the implied covenant of good faith and fair dealing, Georgetown suffered the same categories of damages described above.

## PRAYER FOR RELIEF

**WHEREFORE,** Counterclaim-Plaintiff Georgetown University respectfully requests that the Court enter judgment in its favor and against Counterclaim-Defendant David Egolf, and grant the following relief:

A. Compensatory damages in an amount to be proven at trial, but in excess of $75,000, including but not limited to:

    a. The costs of the IDEAA investigation and related administrative proceedings;

    b. The costs of grievance, appeal, and disciplinary processes;

    c. Legal and administrative costs incurred to enforce the 2015 Agreement and defend against this action; and

    d. Any other damages proximately caused by Egolf's breaches;

B. A declaratory judgment pursuant to 28 U.S.C. §§ 2201, declaring that:

    a. Egolf materially breached the 2015 Agreement;

    b. Georgetown acted within its contractual authority in investigating, disciplining, and enforcing the Agreement; and

    c. Georgetown is not liable for damages arising from those enforcement actions;

C. Pre- and post-judgment interest as permitted by law;

D. Costs and reasonable attorneys' fees of this action, to the extent recoverable under applicable law; and

E. Such other and further relief as the Court deems just and proper.

December 19, 2025

*/s/ Henry A. Platt*
Henry A. Platt (DC Fed. Bar No. 425994)
Saul Ewing LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, DC 20006
(202) 342-3447 - Telephone
(202) 338-8085 - Telefax
henry.platt@saul.com

*Counsel for Defendants*
*Georgetown University, Robert Groves, Rosemary*
*Kilkenny, Olabisi Ladeji Okubadejo, and Samantha*
*Berner*

## CERTIFICATE OF SERVICE

I certify that on this 19th day of December, 2025, a true and correct copy of the foregoing **DEFENDANTS GEORGETOWN UNIVERSITY, ROBERT GROVES, ROSEMARY KILKENNY, OLABISI LADEJI OKUBADEJO, AND SAMANTHA BERNER'S ANSWER TO THE OPERATIVE COMPLAINT [ECF NO. 8] AND GEORGETOWN UNIVERSITY'S COUNTERCLAIM** was filed and served via the Court's electronic filing system upon:

Micah Salb
Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road Suite 1100
Bethesda, MD 20814
*Counsel for Plaintiff*

/s/ Henry A. Platt
Henry A. Platt

*Counsel for Defendants*
*Georgetown University, Robert Groves, Rosemary Kilkenny, Olabisi Ladeji Okubadejo, and Samantha Berner*