# EXHIBIT B



GEORGETOWN UNIVERSITY

*Office of Institutional Diversity, Equity, and Affirmative Action*

August 9, 2023

*Via Email*

David Egolf
Associate Professor and Director of Undergraduate Studies
Department of Physics

    Re:    IDEAA Administrative Review

Dear Dr. Egolf,

The Office of Institutional Diversity, Equity, and Affirmative Action (IDEAA) is responsible for assessing and investigating allegations of discrimination and harassment. We write to inform you that concerns were raised with IDEAA's Office of Title IX Compliance regarding alleged misconduct by you. After carefully reviewing the concerns, the University's Provost has requested that IDEAA conduct an administrative review to investigate the issues described below.

**Scope of Review**

**Issue 1**: **Whether you engaged in sex- or gender-based harassment in violation of the University's** *Policy on Sexual Misconduct* **and policies on** *Equal Opportunity and Non-Discrimination in Education and Employment*

Pursuant to IDEAA's *Grievance Procedures to Investigate Allegations of Harassment and Discrimination* (available at ideaa.georgetown.edu/policies/), IDEAA will review whether you engaged in harassment based on sex/gender by targeting a male student who is now an alumnus and subjecting him to unwelcome conduct of a sexual or gender-based nature that had the purpose or effect of interfering with his work or academic performance, denying or limiting his ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment. The specific conduct at issue includes conduct alleged to have occurred during the 2021-2022 and 2022-2023 academic years, as well as in summer 2023, and is set forth in detail in Attachment 1 to this letter.

**Issue 2: Whether you engaged in sex- or gender-based discrimination in violation of the University's policies on** *Equal Opportunity and Non-Discrimination in Education and Employment*

Pursuant to IDEAA's *Grievance Procedures to Investigate Allegations of Harassment and Discrimination* (available at ideaa.georgetown.edu/policies/), IDEAA will review whether you engaged in discrimination based on sex/gender by demonstrating favoritism toward male students and/or employees in terms of the amount of attention, degree of personal interest, and interest in their academic development, which resulted in disparate educational and/or employment opportunities. The specific conduct at issue includes conduct alleged to have occurred during the 2021-2022 and 2022-2023 academic years, as well as in summer 2023, and is set forth in detail in Attachment 1 to this letter.

**Issue 3: Whether you engaged in professional misconduct that may be reviewed under the Faculty Handbook**

The conduct reported to IDEAA, and described further in Attachment 1 to this letter, may also implicate Section III.C.11 of the Faculty Handbook, regarding professional conduct of faculty members. As such, the Provost has requested that IDEAA gather information and make findings of fact related to the reported conduct. At the conclusion of the administrative review, IDEAA will share its factual findings with the Provost to support his decision making regarding appropriate next steps.

**Issue 4: Whether you engaged in conduct that violated an October 2015 confidential settlement agreement between you and the Provost**

The Provost has requested that IDEAA review whether the conduct reported to IDEAA implicates Sections 2.a. through 2.f. of the October 2015 Confidential Settlement Agreement, regarding "Requirements upon Returning to Georgetown." Sections 2.a. through 2.f. of the Confidential Settlement Agreement and the Provost's letter to you signed October 15, 2015, will be shared with the investigator reviewing this matter.

Please note that IDEAA's decision to review these issues does not mean that IDEAA has made a determination regarding whether a violation of policy or the settlement agreement has occurred. IDEAA will conduct a prompt, fair, and impartial review, consistent with IDEAA's *Grievance Procedures*. Additionally, be advised that you are not treated as responsible for the alleged conduct until and unless a determination regarding responsibility is made at the conclusion of the process.

**Information about the Process**

IDEAA's *Grievance Procedures to Investigate Allegations of Harassment and Discrimination* outline the administrative review process. IDEAA has retained the services of external investigators to conduct this review.

As part of the process, you may have an advisor of your choice, who may be, but is not required to be, an attorney, and may review and inspect evidence.

Please be aware that you have the opportunity to identify relevant witnesses and provide any relevant supporting documentation throughout this investigation. You may also choose to submit

a written response to the allegations set forth above, within 20 days of the date of this letter (i.e., **by August 29, 2023**).

Additionally, please note that the *Policy on Sexual Misconduct* states that knowingly making a materially false statement or submitting false information in bad faith during the grievance process is prohibited. As explained in the *Policy*, however, a determination regarding responsibility, alone, is not sufficient to conclude that any party made a materially false statement in bad faith.

### Next Steps

You may meet with Samantha Berner, University Title IX Coordinator, and Kay Bhagat-Smith, Senior Civil Rights Investigator and Compliance Manager, to discuss the grievance process, resources, and supportive measures available to you. You may contact Ms. Berner at samantha.berner@georgetown.edu. The meeting will take place via Zoom video conference.

### Supportive Resources

Georgetown University makes available to faculty and staff supportive resources, including the Faculty and Staff Assistance Program (FSAP), which provides confidential counseling, consultation, and educational services to eligible employees, and their immediate family members. More information about FSAP is located at https://hr.georgetown.edu/fsap/, and you can contact FSAP at fsap@georgetown.edu or at (202) 687-2409. Additional information about supportive resources is available on the University's *Every Hoya Cares* website at https://www.georgetown.edu/everyhoyacares/.

### Non-Retaliation and Confidentiality

This letter serves as a reminder that our institutional policies prohibit retaliation, harassment, or other adverse actions against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment or discrimination, or otherwise exercising rights protected by law. Please immediately inform our office if you believe you were subjected to retaliation at any point during this investigation. Likewise, we ask that you do not take any adverse actions against any individuals who may participate in this investigation or who otherwise assert rights protected by law.

For further information on IDEAA's grievance process, including the principles of confidentiality and non-retaliation, please note that IDEAA's *Grievance Procedures to Investigate Allegations of Discrimination and Harassment* are available at: https://ideaa.georgetown.edu/policies/. If you have any questions or require additional information, please contact Bisi Okubadejo at (202) 365.6013 or via email at olabisi.okubadejo@georgetown.edu.

Sincerely,


Bisi Ladeji Okubadejo
Associate Vice President for Equal Opportunity, Affirmative Action, and Compliance

Samantha Berner
Title IX Coordinator and Director of Title IX Compliance

cc: Robert Groves, Provost

**Attachment 1:**     **Summary of Concerns Raised**

Below is a summary of the concerns raised with the Office of Title IX Compliance, within the Office of Institutional Diversity, Equity, and Affirmative Action (IDEAA). IDEAA staff and the investigators met with Witness 1, a recent Georgetown alumnus and current postbaccalaureate scholar of Professor David Egolf. Witness 1 reportedly worked with Professor Egolf during his junior year (2021-2022 academic year) and senior year (2022-2023 academic year). Following his May 2023 graduation, Witness 1 began conducting grant-sponsored research under the supervision of Professor Egolf as a postbaccalaureate scholar.

I. Alleged Conduct while Witness 1 was a Student (during the 2021-2022 and 2022-2023 academic years)
    A. Professor Egolf asked about Witness 1's relationship status and intimate relationships with other people. Professor Egolf asked Witness 1 whether he had "any girls?" and Professor Egolf shared that he once had a crush on a female celebrity.
    B. Professor Egolf often referred to his relationship with Witness 1 as being friends and stated that they would be friends after Witness 1 graduated.
    C. Professor Egolf made comments about certain stories that he wanted to tell Witness 1 but said that he would have to wait until Witness 1 graduated before he could tell Witness 1 the details. Professor Egolf told Witness 1 to come to his apartment after he graduates so that they can drink champagne together and Professor Egolf can tell him "the stories." The stories often seemed connected to drinking and/or sexual conduct.
    D. Professor Egolf would take Witness 1 to one-on-one dinners off-campus about once every 2 weeks during Witness 1's senior year; Witness 1 and Professor Egolf went to one-on-one dinners off-campus multiple times during his junior year as well. On other occasions, Professor Egolf and Witness 1 would go to dinner off-campus with other students and/or with alumni. Professor Egolf would always pay for Witness 1's meals and alcoholic beverages served during the dinners; Witness 1 was of legal drinking age during all of these meals.
    E. Professor Egolf bought a subscription to the Kennedy Center explicitly for Witness 1 and Professor Egolf to attend shows together, and took Witness 1 to approximately 3 shows, including Wicked; Les Mis; and Into the Woods.
    F. Professor Egolf arranged and paid for the Ubers to take him and Witness 1 to two of the shows at the Kennedy Center; for the other show, they met up at or near Georgetown's campus and walked to and from the Kennedy Center.
    G. Professor Egolf paid for alcoholic beverages for Witness 1 at the Kennedy Center.
    H. Professor Egolf texted Witness 1 on an almost daily basis, including asking Witness 1 numerous personal questions, about his family; his friends; and what he

was doing with his free time and repeatedly asked Witness 1 to make plans (movies, dinner, etc.). Professor Egolf regularly texted Witness 1 on weekends and late into the evening. Some examples include:
1. Doing anything exciting tonight?
2. How's everything going besides work?
3. Up to anything fun tonight?
4. Think about cool places you might want to take a trip to (although it's sounding like it won't be easy for you to escape to Georgetown for part of a day, much less somewhere fun for us to explore for a trip)
5. How was the birthday evening?
6. What movie are you seeing tonight?

I. Professor Egolf met with Witness 1 in his office and often made references to keeping the door partially open; he would make comments like "with the way things are now, you don't want someone to get suspicious" or "you don't want people to think stuff."
J. Professor Egolf made comments to Witness 1 about people being too sensitive and shared that "professors used to go to parties" with students.
K. Professor Egolf told Witness 1 that he had a medical procedure, and described needing a catheter, how uncomfortable it was, and shared and discussed information about his genitals.
L. Professor Egolf picked up and/or dropped off Witness 1 from the Georgetown campus in Professor Egolf's personal vehicle on numerous occasions, including to go to dinner.
M. Professor Egolf offered preferential assistance to Witness 1, including private study sessions, during the 2021-2022 academic year; Professor Egolf met regularly with Witness 1 in person or via Zoom, including in advance of exams in Professor Egolf's courses.
N. Professor Egolf issued preferential grades to Witness 1, including issuing grades that may not have been wholly accurate and more favorable for Witness 1 during the 2021-2022 academic year. Professor Egolf made comments to Witness 1 like "You know if you take my class, you'll get a good grade."
O. Professor Egolf drafted a significant portion of Witness 1's draft thesis during the 2022-2023 academic year.
P. Professor Egolf drafted the entire application for the Cottrell Scholar grant, including Witness 1's designated portion, during the 2022-2023 academic year.

II. Alleged Conduct during Witness 1's tenure as a Postbac
   A. Professor Egolf bought a subscription to the Kennedy Center explicitly for Witness 1 and Professor Egolf to attend together, and took Witness 1 to the Lion

King show (in addition to the three shows they attended when Witness 1 was a student).
B. Professor Egolf changed his clothing in his office in front of Witness 1, removing his shirt.
C. Professor Egolf picked up Witness 1 from his parents' home in Reston, Virginia to drive him to and from the Kennedy Center for the Lion King.
D. On June 29, 2023, Professor Egolf drove to Witness 1's parents' home in Reston, Virginia to drive Witness 1 back to Professor Egolf's house in Rockville, Maryland for a private "graduation party" for the two of them (no other individuals were present).
E. In advance of the June 29, 2023 party, Professor Egolf arranged with Witness 1 that they would be consuming alcohol and that, as a result, Witness 1 should sleep over at Professor Egolf's home. Professor Egolf texted Witness 1 including the following messages:
    1. Do you want to just crash in one of my extra bedrooms both Weds after the musical and thurs after the drinking
    2. Okay. I guess we'll stay up really late since you don't like to sleep with too much alcohol in your system. :)
F. Professor Egolf purchased multiple bottles of champagne for him and Witness 1 to consume at the June/July 2023 party.
G. At the June 29, 2023 party, Professor Egolf shared stories with Witness 1 that often included references to genitals.
    1. Professor Egolf told Witness 1 that he and other guys used to shower together when he was in college and now kids are "weird" about that.
    2. Professor Egolf talked with Witness 1 about a friend with large genitalia and made a comment that compared the size of the genitalia to someone that was Black.
    3. Professor Egolf shared with Witness 1 that he used to have a student, Witness 2, with whom he went to bars. Professor Egolf told Witness 1 that Witness 2 would consume alcohol and would fall asleep naked at Professor Egolf's house on his couch.
        a) Professor Egolf told Witness 1 that Witness 2 would be embarrassed about falling asleep naked on Professor Egolf's couch.
        b) Professor Egolf told Witness 1 that he would go downstairs and work in the same room as Witness 2 who was asleep and naked.
        c) When telling this story, Professor Egolf made a comment to Witness 1 stating "I didn't know [a person] could drink that much and still get morning wood."
    4. Professor Egolf asked Witness 1 if he was dating anyone.

    5. Professor Egolf used the restroom multiple times with the door open while Witness 1 was in the same room as the bathroom.
    6. Professor Egolf encouraged Witness 1 to leave the door open when Witness 1 was using the restroom.
    7. Professor Egolf made comments to Witness 1 alleging that he's "seen everything," referring to naked men.
    8. Professor Egolf presented a "hypothetical" where he told Witness 1 that he was previously accused of "having feelings" for a student, Witness 3. He advised Witness 1 that as a result of Witness 3's claims, he was required to remain off campus for two years.
        a) Professor Egolf became emotional during this discussion, requiring Witness 1 to comfort him.
        b) Professor Egolf told Witness 1 that his lawyers recommended that he sue Witness 3, and claimed that he had the resources to do so, but ultimately decided not to.
    9. After telling a story referencing male genitalia, Professor Egolf offered, unprompted, that he was not gay; Professor Egolf also referenced not being gay when he described the allegations involving Witness 3, detailed above.
    10. Professor Egolf suggested that he and Witness 1 play a drinking game called "Edward 40 hands" where they each tape a bottle of alcohol to each of their hands; Witness 1 stated that he did not want to consume a lot of alcohol and proposed that one of the "bottles" be a bottle of water.
        a) Witness 1 went to use the restroom and began removing one of the bottles; Professor Egolf walked up to or near the bathroom door and began accusing Witness 1 of cheating because he removed a bottle from his hands.
        b) Professor Egolf made comments alleging that Witness 1 was being "weird" for removing the tape and not keeping the door open when he used the restroom.
        c) Professor Egolf offered to help Witness 1 remove his pants and use the restroom, repeating comments that he's "seen everything" referring to naked men.
        d) Professor Egolf showed Witness 1 the guest room; after Witness 1 walked in, Professor Egolf followed him into the room and proceeded to sit on the bed next to Witness 1.

H. Professor Egolf dropped Witness 1 off at his parents' home the following day; on the way to Witness 1's residence, Professor Egolf asked if Witness 1 had fun and said "we should do this more often."

    I. On July 13, Witness 1 told Professor Egolf that he is unsure if he can continue working as his Postbac; Professor Egolf responded by sending multiple text messages and emails, some very late at night.
        1. Professor Egolf discouraged Witness 1 from quitting and made comments regarding negative impacts on Witness 1's future.
        2. Professor Egolf also made references to Witness 1 struggling with mental health concerns.

III. Allegations of Discrimination based on Sex/Gender (2021-2022 and 2022-2023 academic years)

    A. Professor Egolf engages more with men than women in his classes.
    B. Professor Egolf "plays favorites" and has exhibited a pattern of preferring to work with men over women outside of class; this includes developing mentor/mentee-like relationships with male students and continuing those relationships beyond their graduation. These relationships with male students/alumni include private or small group study sessions in advance of Professor Egolf's exams; going to dinner; taking them to shows at the Kennedy Center; having them over to his home; letting them sleep over at his home; and, at times, providing them with alcohol.

**Attachment 2:**     **Excerpts from Policies and Procedures**

a. **IDEAA's *Grievance Procedures***: https://ideaa.georgetown.edu/policies/

b. **Policy on Sexual Misconduct:** https://ideaa.georgetown.edu/policies/

c. **Relevant Definitions**

*Sexual Harassment:* Any unwelcome conduct of a sexual nature, including sexual advances, request for sexual favors, or other verbal or physical conduct of a sexual or gender-based nature when:
1. Submission to such conduct is made explicitly or implicitly a term or condition of an individual's employment or academic relationship; or
2. Submission to or rejection of such conduct is used as a basis for making an employment or academic decision affecting an individual; or
3. Such conduct has the purpose or effect of interfering with an individual's work or academic performance, denying or limiting an individual's ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment.[1]

---

[1] Interpretive guidance:
- A hostile or offensive environment exists when conduct is severe or pervasive. Factors to be considered in determining whether conduct is severe or pervasive include the nature, scope, frequency, and duration of the conduct and the number of persons involved. Simple teasing, offhand comments, or isolated incidents that are not severe or pervasive do not create a hostile or offensive environment.
- If an issue of sexual harassment is raised in strictly academic areas, such as coursework, the matter will be handled in consultation and coordination between the Title IX Coordinator and the Executive Vice President or Dean of the faculty member's school because such matters may also implicate issues of academic freedom.
- To constitute sexual harassment, the conduct in question must be objectively intimidating, hostile or offensive, and must interfere with a person's ability to participate in employment or educational programs or activities of the University. The victim's perception of the offensiveness of the alleged conduct, standing alone, is not sufficient by itself to constitute sexual harassment.
- Sexual harassment is especially serious when it occurs between teachers and students or supervisors and subordinates. In such situations, sexual harassment unfairly exploits the power inherent in a faculty member's or supervisor's position. Although sexual harassment often occurs when one person takes advantage of a position of authority over another, the University recognizes that sexual harassment may also occur between people of equivalent status. This includes peer sexual harassment. Regardless of the form it may take, the University will not

GEORGETOWN UNIVERSITY

***Office of Institutional Diversity, Equity, and Affirmative Action***

tolerate unwelcome conduct of a sexual nature that creates an unacceptable working or educational environment.