# EXHIBIT C



**Office of Institutional Diversity, Equity, and Affirmative Action**

*CONFIDENTIAL REPORT*

**Stephanie K. Baron, Esq.**
**Sasha E. Hodge-Wren, Esq.**
**External Investigators**

**Date of Report: May 6, 2024**

## I.      INTRODUCTION

On or about July 19, 2023, an individual raised concerns with the Office of Institutional Diversity, Equity, and Affirmative Action's ("IDEAA"), Office of Title IX Compliance regarding alleged misconduct by Associate Professor and Director of Undergraduate Studies, David Egolf ("Respondent" or "Prof. Egolf"). Following a review of the individual's concerns, the University's Provost requested that IDEAA conduct an administrative review to consider the issues raised, determine if there were violations of IDEAA's policies, make factual findings as to whether Prof. Egolf engaged in misconduct that may be reviewed under the Faculty Handbook and whether Prof. Egolf engaged in conduct that violated an October 2015 confidential settlement agreement that Prof. Egolf had entered with the University.[1]

IDEAA asked external investigators, Stephanie Baron and Sasha Hodge-Wren ("Investigators"), to review the issues raised pursuant to IDEAA's *Grievance Procedures*, as described below.

The Investigators interviewed the individual who raised concerns on August 8, 2023 and again on March 15, 2024[2] to get a better understanding of the concerns. On August 9, 2023, the Investigators initiated a review of the following issues:[3]

> **Issue 1:** Whether Prof. Egolf engaged in sex- or gender-based harassment in violation of the University's *Policy on Sexual Misconduct* and policies on *Equal Opportunity and Non-Discrimination in Education and Employment*.

Specifically, the Investigators were asked to review whether Prof. Egolf engaged in harassment based on sex/gender by targeting a male student who is now an alumnus and subjecting him to unwelcome conduct of a sexual or gender-based nature that had the purpose or effect of interfering with his work or academic performance, denying or limiting his ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment.

---

[1] Between September and December 2023, Prof. Egolf raised various objections to IDEAA's review of this matter in numerous emails and other written exchanges between his advisor, IDEAA, the Investigators, and/or the General Counsel's office. Despite these objections, after repeated requests and several delays, on December 12, 2023, Prof. Egolf agreed to meet with the Investigators and participated in an interview on December 18, 2023. Prof. Egolf thereafter provided additional information to the Investigators and a supplemental production of 187 pages of documents on January 23, 2024.  At the request of the Investigators, Prof. Egolf also participated in a follow-up interview with the Investigators on March 26, 2024.

[2] The Investigators sought to conduct a follow-up interview of Witness 1 following the December 18, 2023 interview of Prof. Egolf.  Witness 1 had relocated for personal reasons and the Investigators were unable to schedule a follow up meeting with him until March 15, 2024.

[3] Each of the "Issues" listed in this Report were provided to the Respondent in an August 9, 2023 Notice letter from IDEAA.  The August 9, 2023 letter included an Attachment detailing more specific allegations that were also examined as part of this review.

**Issue 2:**  Whether Prof. Egolf engaged in sex- or gender-based discrimination in violation of the University's policies on *Equal Opportunity and Non-Discrimination in Education and Employment*.

Specifically, the Investigators were asked to review whether Prof. Egolf engaged in discrimination based on sex/gender by demonstrating favoritism toward male students and/or employees in terms of the amount of attention, degree or personal interest, and interest in their academic development, which resulted in disparate educational and/or employment opportunities.

**Issue 3:**  Whether Prof. Egolf engaged in professional misconduct that may be reviewed under the Faculty Handbook.

Specifically, the Investigators were asked to review whether the conduct reported to IDEAA may also implicate Section III.C.11 of the Faculty Handbook, regarding professional conduct of faculty members.

**Issue 4:**  Whether Prof. Egolf engaged in conduct that violated an October 2015 confidential settlement agreement between Prof. Egolf and the Provost.

Specifically, the Investigators were asked to review whether the conduct reported to IDEAA implicates Sections 2.a through 2.f of the October 2015 Confidential Settlement Agreement, regarding "Requirements upon Returning to Georgetown."

Our findings and conclusions are below.

## II.    RELEVANT POLICY AND INVESTIGATION STANDARD

The scope of the review was to determine whether, by a preponderance of the evidence, the Respondent violated the *Policy on Sexual Misconduct*, or the *Equal Opportunity and Non-Discrimination in Education and Employment Policy*. The Investigators were also tasked with making factual findings which may implicate certain provisions of the Faculty Handbook and certain provisions of the October 2015 settlement agreement between Respondent and the Provost.

The University's *Policy Statement on Sexual Misconduct* (the "Policy") prohibits sexual misconduct, which includes sexual harassment.  The University's policies on *Equal Opportunity and Non-Discrimination in Employment and Education* prohibit discrimination based on sex.

### *Policy on Sexual Misconduct*

The *Policy on Sexual Misconduct* defines sexual harassment as "any unwelcome conduct of a sexual nature, including . . . verbal or physical conduct of a sexual or gender-based nature when . . . such conduct has the purpose or effect of interfering with an individual's work or academic performance, denying or limiting an individual's ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment."  The Policy offers interpretive guidance, which states that a hostile environment exists when "conduct is severe or pervasive."  Determining whether conduct is severe or pervasive includes a review of the "nature, scope, frequency, and duration of the conduct and the number of

3

persons involved." The Policy further instructs that the conduct must be both "objectively intimidating, hostile or offensive and must interfere with a person's ability to participate in employment or educational programs or activities." In addition, the Policy states that "[s]exual harassment is especially serious when it occurs between teachers and students or supervisors and subordinates" because "sexual harassment unfairly exploits the power inherent in a faculty member's or supervisor's position." An individual's "perception of the offensiveness of the alleged conduct, standing alone, is not sufficient by itself to constitute sexual harassment."

### _Policy on Non-Discrimination in Employment:_

> Georgetown University provides equal opportunity in employment for all persons and prohibits unlawful discrimination and harassment in all aspects of employment because of age, color, disability, family responsibilities, gender identity or expression, genetic information, marital status, matriculation, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, veteran's status or any other factor prohibited by law.

### _Policy on Non-Discrimination in Education:_

> [Georgetown University] provides educational opportunities without regard to, and does not discriminate on the basis of, age, color, disability, family responsibilities, familial status, gender identity or expression, genetic information, marital status, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, source of income, veteran's status or any other factor prohibited by law in its educational programs and activities.

To establish a _prima facie_ case of sex- or gender-based discrimination in violation of the University's _Policy on Nondiscrimination in Education or Employment_, the available information must show by a preponderance of the evidence that: (a) the Complainant suffered an adverse educational or employment action by the Respondent; and (b) the adverse action was based on his status in the protected class. Once this is established, the Investigators then consider whether Respondent has provided a legitimate, non-discriminatory reason for the adverse action or whether Respondent's reason is pretext (or an excuse) for discrimination.

### _Handbook Section III.C.11_

(a) **Compliance** - Faculty members must comply with all applicable department, program, school, campus, and University policies, and with applicable law.

(b) **Fair Treatment** - Every member of the University has the right to be treated fairly, courteously, and professionally by students, colleagues, the Department Chair and by all members of the University administration, and to be protected from arbitrary or capricious action on the part of any such persons. Every member has a correlative responsibility to treat other members accordingly. Faculty members are to be free from arbitrary or capricious action on the part of the University Administration with respect to the determination of his or her own individual annual compensation. In this regard, faculty members have the

4

right to receive full information concerning all factors material to the determination of his or her own individual annual compensation, provided that an individual is not entitled to receive any information concerning the salaries or the factors material to the salaries of others, nor may the faculty member by this provision be entitled to receive any information received by the University in confidence relevant to initial appointment, the grant of tenure, promotion or retention. Faculty members must refrain from committing or inciting to acts of physical violence against individuals or property, or acts which interfere with the academic freedom of other persons within the University, or interfere with the freedom of speech or movement of such persons.

* * *

(e) **Academic Authority, Supervisory Responsibility, and Impartiality** – Faculty members, by virtue of their status in the University, wield significant power and authority over their students and supervisees.

   (iii) *Personal Relationships in General* - If a faculty member has any relationship with a colleague, student, or supervisee outside of the professional relationship that might affect the faculty member's impartiality, the faculty member shall disclose the relationship to his or her own chair or dean, and may be required to recuse him or herself from certain supervisory and academic responsibilities with respect to that colleague, student, or supervisee. (See also the "Policy on Consensual Sexual or Romantic Relationships," Section IV.G).

### *October 2015 Confidential Settlement Agreement Provisions*[4]

Lastly, the Investigators were tasked with examining whether Respondent violated an October 2015 confidential settlement agreement with the Provost. The relevant provisions of that agreement state the following:

**2. Requirements upon Returning to Georgetown**. The following provisions shall apply for so long as Egolf is employed by Georgetown.

   **a.  Meetings with Students**

      **i.  In Private Spaces.** Egolf shall use his best efforts to avoid meeting one-on-one with any Georgetown student in a private space (such as his office, a meeting room, or a laboratory) with the door closed. After the passage of one year following Egolf's Return Date, Egolf may submit a request to the Provost to vacate or modify this requirement, which shall be subject to the Provost's sole discretion.

---

[4] The Investigators were provided only that portion of the Confidential Settlement Agreement necessary to review this Issue and the language is taken directly from that Agreement.

    **ii.**   **At Residences.**  Egolf shall not meet one-on-one in any residence or place of accommodation with any undergraduate student enrolled at Georgetown, any Georgetown student in the Department of Physics, or any student with whom Egolf has a supervisory relationship.

    **iii.**   **Residing with a Student**. Egolf shall not reside with any Georgetown student to whom Egolf is not related absent written approval by the Provost, which shall take into consideration the age of the student whether Egolf has any supervisory relationship with the student, and evidence of voluntariness of the student's decision in this regard.

**b. Professional Relationship with Students.**  Egolf will maintain a professional faculty-student relationship with students and will not engage in a relationship with a student or supervisee that might affect Egolf's impartiality with that student.

**c. Questions Regarding Student Interaction.**  If Egolf has any questions as to whether a relationship with a student is appropriate, he shall immediately disclose the relationship to his chair or dean.  Egolf may be required to recuse himself from supervisory and/or academic responsibilities with respect to that student or supervisee.

**d. No Sexual Comments or Advances.**  Egolf will not make any sexual advances, comments or statements about genitalia, jokes of a sexual nature, or sex-related teasing to any Georgetown student.  Egolf shall not make any comment of a sexual nature that is of a lewd or lascivious nature when he knows or reasonable should know that any Georgetown student is close enough that he or she might reasonably be able to overhear such comment.  However, these restrictions will not apply as to Egolf's communications with the persons identified in Attachment A, with any person with whom Egolf has a romantic relationship if he has disclosed that relationship to the Provost, in the context of the provision of healthcare services, of when it is a *bona fide* requirement as to a work-related matter.

**e. Alcohol.**  Egolf shall comply with Georgetown's alcohol policies. Egolf will not provide alcohol to any student under the age of 21.

**f. Compliance with Policies.**  Egolf shall comply with all policies in the Faculty Handbook, including all policies that are under the purview of the Office of Institutional Diversity, Equity, and Affirmative Action.

## III.   SUMMARY OF ADMINISTRATIVE REVIEW

The Investigators interviewed Witness 1 on August 8, 2023. On August 9, 2023, IDEAA provided Respondent with a Letter Notice of the Administrative Review, which included Attachment A, a "Summary of the Allegations" ("Summary") under review.  Respondent was advised of his opportunity to respond in writing and to identify relevant witnesses.  Respondent provided a written response on September 15, 2023. After multiple emails with Respondent and his counsel,

and several delays, Respondent agreed to an interview, which was conducted on December 18, 2023. Following the interview, the Investigators provided Respondent a written summary of the interview, and Respondent provided his additions and corrections to that summary on January 17, 2024, and thereafter also provided supplemental productions of documents. The Investigators held a second interview with Witness 1 on March 15, 2024 and a second interview with Prof. Egolf on March 26, 2024.  Prof. Egolf was again provided a written summary of the interview, and Respondent provided certain additions and corrections to that summary on April 3, 2024. The Investigators reviewed the documents and information provided by Witness 1 and the Respondent.

In addition, the Investigators interviewed the following witnesses identified by the parties and/or IDEAA as having relevant information:[5]

- Witness 2 is a Faculty Member within the Physics Department
- Witness 3 is a Faculty Member within the Physics Department
- Witness 4 is an Assistant Teaching Professor within the Physics Department
- Witness 5 is a Vice Provost for Faculty and Prof. for Psychology
- Witness 6 is the Advising Dean in Arts and Sciences
- Witness 7 is a former Vice Provost/Research
- Witness 8 is a Cluster Research Administrative (CRA) and Grants Manager
- Witness 9 is a 2022 graduate of the University
- Witness 10 is a 2022 graduate of the University
- Witness 11 is a 2022 graduate of the University
- Witness 12 is a 2022 graduate of the University
- Witness 13 is a 2023 graduate of the University

## IV.    BACKGROUND – Parties and Witnesses

Witness 1 is a 2023 graduate of Georgetown University. He started at Georgetown in 2018 but withdrew from school during the 2020-2021 academic year during COVID-19, as he did not want to study remotely and had experienced certain other issues his sophomore year causing him to need the time off. He returned to Georgetown for the 2021-2022 academic year and graduated in May 2023 with a double major in Physics and English. While in school, Witness 1 took several classes taught by Prof. Egolf.  He also served as Prof. Egolf's Research Assistant during the summer following his junior year (2022).  Upon graduation, Witness 1 started a postbac program with Prof. Egolf, working through a grant awarded from the Research Corporation for Science Advancement ("RCSA").

Respondent has worked for the University since 2000 and is currently[6] an Associate Professor in the Physics Department, teaching a mix of classes in which mainly juniors and seniors enroll, including Physics electives. In addition to teaching, Prof. Egolf served as the Director of Undergraduate Studies ("Director") for the Physics Department during the 2022-23 academic year.

---

[5] The Investigators with the assistance of IDEAA attempted to contact another former student with a close relationship to Prof. Egolf who was identified by Witness 1 and Respondent during the review, but he was unresponsive to our requests.

[6] Respondent was placed on Administrative Leave during the pendency of this review.

In this role, Prof. Egolf served as the advisor to the first-year class of physics majors and also served as an advisor for a few upper-level students in each class year.

Witness 2 has worked for the University since 1996. He is a Professor in the Physics Department and recently began a term as Vice Provost of Research. As a Professor in the Physics Department, Witness 2 had Witness 1 in his Modern Physics and Experimental Methods course during Witness 1's sophomore year. Witness 2 has first-hand knowledge of Witness 1, and interacted with Respondent on various occasions, including conversations with Respondent surrounding the needs of Witness 1.

Witness 3 is a Professor in the Physics Department and was the Chair of the Department from 2020 through 2023. Witness 3 has first-hand knowledge of Witness 1, as he was a student in the Physics Department. Witness 3 also had discussions with Prof. Egolf about Witness 1's progress and grade for the work done on his thesis during the 2022-2023 academic year.

Witness 4 is an Assistant Teaching Professor in the Physics Department. Witness 4 has first-hand knowledge of Witness 1, as he was in her class and Witness 4 served as a Second Reader for Witness 1's Thesis.

Witness 5 has worked for the University since 2000 and currently serves as the Vice Provost for Faculty. Witness 5 has information about the postbac grant process.

Witness 6 has worked for the University since 2017 and currently serves as the Advising Dean in the Arts and Sciences Department. Witness 6 interacted with Witness 1 during his time at the University and assisted with navigating courses and Witness 1's request for a break from classes during his senior year at Georgetown. Witness 6 has also worked with Respondent on the Undergraduate Affairs committee and has spoken with him regarding Witness 1.

Witness 7 is the former Vice Provost for Research. His office coordinated grants for the University.

Witness 8 has worked for the University since 2022. Witness 8 is the Cluster Research Administrator and Grants Manager. Witness 8 has knowledge of the grant process for the University.

Witness 9 graduated from the University in December 2022 with a B.S. in Physics. Witness 9 took courses from Prof. Egolf and was in classes with Witness 1.

Witness 10 graduated from the University in May 2022 with a B.S. in Physics. Witness 10 took courses from Prof. Egolf and was in classes with Witness 1.

Witness 11 graduated from the University in May 2022 with a B.S. in Physics. Witness 11 took courses from Prof. Egolf and was in classes with Witness 1.

Witness 12 graduated from the University in 2022 with a B.S. in Physics. Witness 12 took courses from Prof. Egolf and was in classes with Witness 1.

Witness 13 graduated from the University in December 2023 with a Ph.D. in Physics. Prof. Egolf served on his dissertation committee for four years.

## V.    FACTUAL FINDINGS[7]

### A. Credibility Determinations

Some of the allegations at issue require credibility determinations. There are various instances where the allegations were substantiated based on written text messages and emails and/or statements by Prof. Egolf, either in his written responses or during the interviews with him, and interviews with other witnesses. Where the Investigators made credibility determinations based on differing versions of events, those are so noted. Overall, the Investigators found Witness 1 to be very credible based on the consistency of his responses over time, the text messaging corroborating his statements, and other evidence both from Prof. Egolf and others that were interviewed. While the Investigators also found Prof. Egolf to be forthcoming in many regards, some of his explanations for his behavior were not as credible as Witness 1 and/or did not align with the other evidence considered.

### B. Relationship between Prof. Egolf and Witness 1

At the end of his sophomore year (2019-2020), Witness 1 was assigned as one of Prof. Egolf's advisees. Witness 1 did not actually meet Prof. Egolf until he returned to school for the 2020-2021 academic year. Prof. Egolf explained the advisor/advisee process and stated that one of his responsibilities as Director is to assign first-year students their Physics advisors during the Spring semester each year. Prof. Egolf stated that the assignment of advisees is somewhat random and he generally keeps a few students each year as his advisees. If there is a student who is "off-track," then he may keep that student as his advisee. Or if a student specifically requests a particular faculty member, then Prof. Egolf will assign that student to the faculty member.

In this case, Prof. Egolf did not select Witness 1 as an advisee; instead he was assigned to Prof. Egolf during the 2019-2020 academic year. In reviewing the grades of his advisees at the end of the 2019-2020 academic year, Prof. Egolf noticed that Witness 1 was missing a grade in one of his courses. Respondent reached out to Witness 2, the professor of the course with the missing grade, to inquire about it. Respondent asked if, as his advisor, there was anything he could do to encourage Witness 1 to turn in his assignments. Witness 2 suggested that Prof. Egolf get to know Witness 1, as he appeared to be a bright student though he was dealing with certain challenges. Witness 1 ultimately withdrew from school for the 2020-2021 academic year due to the COVID-19 remote learning environment and other stressors from his sophomore year.

In the month preceding Witness 1's return to school, Witness 1 reached out to Prof. Egolf telling him that he would be taking Prof. Egolf's Quantum Mechanics class in the Fall but that he was

---

[7] The August 9, 2023 Notice letter included a Summary at Exhibit A with more detailed allegations. Those allegations will be addressed throughout the Report. To the extent that a specific concern is addressed, it will be referenced with a citation to the Summary, i.e., "Summary at ___."

concerned "with his rusty math skills." Witness 1 stated that at the time he reached out to Prof. Egolf, he really did not know him and had not previously had a class with him. Prof. Egolf exchanged several emails with Witness 1 over the summer about the math skills he should review.

During the Fall 2021 semester, Witness 1 enrolled in Prof. Egolf's Quantum Mechanics class and Prof. Egolf also served as his academic advisor. Prof. Egolf states that they began communicating via text, and as part of the advisor/advisee relationship, Prof. Egolf suggested that they meet to talk about Witness 1's goals and future plans. Witness 1 could not recall exactly when they began exchanging text messages but confirmed that it would have probably been towards the spring semester of his junior year. Witness 1 stated that he and Prof. Egolf often met over zoom during his junior year, and they would also meet in Prof. Egolf's office, or for lunch/dinner at a local pizza restaurant (Pizzeria Paradiso in Georgetown). During these discussions, Witness 1 shared with Prof. Egolf that he was seeing a therapist and had frequent blackouts. Prof. Egolf was also aware that Witness 1 has ADHD and Witness 1 later shared that he had generalized anxiety disorder, which, along with the blackouts, were serious impediments to his education. Witness 1 stated that initially, Prof. Egolf failed to appreciate his ADHD diagnosis, as Prof. Egolf, did not view ADHD as a serious condition and instead attributed his academic issues to laziness. Witness 1 further indicated that in time, Prof. Egolf believed Witness 1 and realized that he had a real condition and needed assistance. Prof. Egolf denied this characterization, stating that it was obvious to Prof. Egolf that Witness 1 thought differently than other students/people, but overall Witness 1 was a good student who wanted to do well.

Witness 1's blackout episodes got worse over the two years that Prof. Egolf worked with Witness 1. Prof. Egolf indicated that he was concerned for Witness 1's mental health, and he knew that Witness 1 was under the care of a therapist to help navigate and manage these issues. Occasionally, Prof. Egolf spoke to Witness 2 to get suggestions and/or feedback on ways to assist Witness 1 with his issues and to try to get Witness 1 to be more responsive and focused on schoolwork.

Witness 1 continued taking courses with Prof. Egolf through his senior year. He also conducted research with him over the summer between his junior and senior year and agreed to work for one year as a postbac fellow with Prof. Egolf, beginning the summer after his graduation. Further details of the relationship and interactions are summarized below.

### C. Prof. Egolf's Grading and Communication with Students

Witness 1 stated that it appeared that Prof. Egolf gave him preferential treatment in his academic studies, including issuing grades that may not have been wholly accurate.[8] Prof. Egolf denied this allegation. With respect to homework, Prof. Egolf states that he assigns rigorous homework and exams where there is no room for subjectivity in his grading. The homework usually consists of 10% of a student's grade and exams count for 90%.

According to Prof. Egolf, there are various ways in which students can receive assistance from him. Witness 1 and Witnesses 9-12 all spoke of Prof. Egolf's practice of staying after class to assist students with questions about homework. Additionally, students can schedule appointments or speak with Prof. Egolf during office hours. The documents reviewed reflect that Prof. Egolf is

---

[8] *See* Summary at 1 (N).

generally very responsive to requests from students.  The Investigators reviewed numerous emails with students where Prof. Egolf offered assistance, responded to questions on homework and exams, and scheduled meetings in-person or via zoom. Further, while text message correspondence shows that Prof. Egolf provided flexibility with Witness 1 in terms of turning in assignments and working with him to answer questions on tests, email correspondence corroborates that Prof. Egolf was flexible and worked with various students on how and when they turned in coursework and this treatment was not necessarily unique to Witness 1. Prof. Egolf responded to students almost any time of the day or night. To the extent that a student missed class or was going to miss class, Prof. Egolf reached out to check on those students and offered notes and/or suggestions of areas for review.  Prof. Egolf's outreach and responses to students appear to be consistent and without regard to sex/gender.  Both female and male Witnesses that were interviewed stated that they stayed after class to get assistance with homework and/or met with Prof. Egolf during office hours or via zoom. None of the witnesses complained of an inability to access Prof. Egolf or to get the assistance that they needed in his classes.

Prof. Egolf states that he adheres to the Georgetown principle of "cura personalis" which involves having concern and care for the personal development of the whole person. He takes this mantra seriously and according to him (and Witnesses 2, 3, and 12), he has always taken a personal interest in his students and has the ability to get to know them better because he often teaches smaller classes. Witness 2 stated that he and Prof. Egolf are on very opposite ends of the spectrum in terms of the relationships they have with students.  Witness 2 indicated that Prof. Egolf "gets closer to his students and becomes friends with them," whereas Witness 2 is more reserved.  Even so, Witness 2 relayed that there are "dozens of students who will testify to the personal relationship that they have formed with Prof. Egolf over the years and the importance [of that relationship] to their professional development over the years."  Likewise, Witness 3 stated that Prof. Egolf has developed friendlier interactions with students than other faculty do, but she has never heard of any complaints about him from students. In fact, she has heard that he is a "superb" teacher, and she knows that students are always excited to take his course.  Respondent also produced documentation from former students praising him as a professor and mentor.

Witness 1 claimed that Prof. Egolf was known to prefer male students over female students and that he regularly disparaged a group of women in his classes, claiming they were not good or serious students.  Prof. Egolf denied making disparaging remarks about these students to Witness 1 and noted that one of the students had earned an A in his class.  Prof. Egolf claimed that Witness 1 had told him that some students were unhappy with his grading methods and that perhaps one of the negative comments on his teaching evaluation had come from one particular group of women who were Witness 1's friends.  The Investigators were unable to corroborate Witness 1's claim that Prof. Egolf preferred male students and found Prof. Egolf's explanation including the strong grade earned by one of the women in Witness 1's class, coupled with testimony from other witnesses, credible when it came to this issue.

While most of Prof. Egolf's communication with students is in person or over email, he stated that he occasionally provides his cell phone number to students, but it usually occurs when he is planning to meet them for coffee or dinner.  Students might also obtain his cell phone number from other students.  Other than Witness 1, none of the student witnesses that the Investigators spoke with exchanged text messages with Prof. Egolf while they were students. Witness 11 was the only

witness (aside from Witness 1) to admit to having Prof. Egolf's cell phone number. However, Witness 11 stated that they only exchanged text messages post-graduation.

The lack of text message exchanges with current students stands in stark contrast to the voluminous text message history that Prof. Egolf had with Witness 1. *See* Summary at I (H).[9]  The Investigators reviewed text messages between Witness 1 and Prof. Egolf dating back to March 29, 2022[10] and continuing through July 2023. While Witness 1 was a student, he and Prof. Egolf, exchanged multiple text messages, often on a daily basis. For example, they would text to schedule times to meet and go over work/research and Prof. Egolf would text to "check-in" with Witness 1 ("How's it going?" "How were your classes today?" "What's your plan for the day?"). Witness 1 believed the messages had a "double meaning." He stated that often Prof. Egolf would send him a text at 5pm, ostensibly checking in on work, but also using it as an opportunity to talk to Witness 1 on a personal level and to try to get Witness 1 to open up to him. Prof. Egolf stated that while he did not plan on texting at a certain time of day, it was not without reason that he got in the habit of texting Witness 1 at the end of the day, and especially as Witness 1's issues increased, Prof. Egolf checked in with him and his research progress. Witness 1 stated that he often dreaded the text messages and having to answer them. The Investigators' review of the text messages reflects that most of the messages centered around school and/or research work and setting times to meet either via zoom or in person to go over homework or research. Some of the messages included actual pictures or computations that they were working on together. There were also discussions about sports, entertainment, and trips/vacations.[11]

Prof. Egolf and Witness 1 also exchanged several text messages after Prof. Egolf's father passed away. Prof. Egolf claims that Witness 1 happened to text him about 30 minutes after his father died, specifically asking about his father because he knew that Prof. Egolf's father was ill and that Prof. Egolf often spent weekends helping his parents. Despite the personal nature of the text messages related to the death of Prof. Egolf's father, Prof. Egolf denied looking to Witness 1 for support during this challenging time. He said that he was very clear with Witness 1 that Witness 1 was not his support system, that he did in fact have a large support system, and that it was Witness 1 who routinely expressed a desire for actual friendship with Prof. Egolf, which he was clear could not occur until after graduation.

---

[9] The Summary includes very specific text messages, all of which occurred after Witness 1's graduation.

[10] In Prof. Egolf's written response to the August 9, 2023 Notice letter, he provides a screenshot of a text message from February 27, 2022. Witness 1 only provided text messages from March 29, 2022 through July 26, 2023, and Prof. Egolf did not provide any text messages for review, aside from this screenshot.

[11] There is an allegation that Prof. Egolf asked Witness 1 about his relationship status and intimate relationships with other people. *See* Summary at 1 (A).  Witness 1 states that Prof. Egolf asked who he was dating multiple times and for details about his personal relationships.  Prof. Egolf admits in his written response to asking Witness 1 on at least one occasion whether he had a girlfriend. However, Prof. Egolf stated that it was Witness 1 who often spoke to him about his girlfriends and/or personal life and if Witness 1 made a comment about sex or leading in that direction, Prof. Egolf claimed he would stop the discussion and change the subject.

Overall, the text messages cover a broad spectrum of topics and appear to be initiated by both Prof. Egolf and Witness 1. The Investigators found Witness 1 to be credible when he stated that he had no desire to be friends with Prof. Egolf. Witness 1 claims that he felt obligated to engage with Prof. Egolf because he was a student, and his professor was messaging him and encouraging such communication. Witness 1 also referred to Prof. Egolf as his boss and thought that it was advantageous to engage in these discussions because it meant that Prof. Egolf would like and support him and assist him with educational and other opportunities. We found that Prof. Egolf's admitted and sincere desire to be "friends" with Witness 1 post-graduation, coupled with his failure to appreciate the possibility that Witness 1 might only have feigned interest to ingratiate himself with his professor and/or supervisor, may have led to some misunderstanding.

### D.  Witness 1's Work with Prof. Egolf Prior to Graduation

#### a.    NASA Research

Prof. Egolf stated that he encouraged his students and advisees to get involved in research early and often in their academic career. According to Prof. Egolf, Witness 1 became interested in Prof. Egolf's research and specifically enrolled in a computer science class in the spring of his junior year (2022) so that he could conduct research with Prof. Egolf that upcoming summer. During the summer following his junior year, Witness 1 conducted research for Prof. Egolf through a grant from NASA that the Physics department uses to support student research projects with professors. Witness 1 was Prof. Egolf's only research assistant that summer. While working together, they met either in-person or via zoom. Witness 1 took a trip to France, with a stop-over in Iceland during this summer. Even before leaving the country, while Witness 1 was at the airport, Prof. Egolf texted Witness 1 to see if he left, acknowledging that he searched for Witness 1's flight status (even though Witness 1 had not provided him that information):

| | |
|---|---|
| Prof. Egolf: | Left yet? |
| Witness 1: | Nope |
| | Waiting at the gate. |
| Prof. Egolf: | Ah. Delayed or just the usual? |
| Witness 1: | Whatever you call it when you're supposed to board but the plane has not arrived. |
| | Not an official delay but it's been a while |
| Prof. Egolf: | Ah |
| | I just looked it up. It says you're delayed. |
| | If you're flying Icelandair |
| Witness 1: | Impressive sleuthing |

GTOWN0113. While on this trip, Witness 1 and Prof. Egolf continued to exchange text messages. Most of the conversations were about the trip; areas Witness 1 visited and Witness 1 being locked out of a place where he was supposed to stay. Prof. Egolf claims that Witness 1 had told him that this was a "working vacation" and so he felt it was appropriate to contact him about their research. Witness 1 confirmed that he told Prof. Egolf that he would be working on the trip.[12] Overall, most of the exchanges during this trip did not involve work or research, however.

---

[12] Witness 1 noted that his research was going slowly because he was not a coder. He also stated that Prof. Egolf was not happy with him going away for the summer, since the research was proceeding slowly.

### b.  Witness 1's Thesis and Senior Year

During the spring of 2022, Witness 1 asked Prof. Egolf, via text, if he could sign up for Independent Research with him during his senior year. During this year-long course, students work alongside a professor to complete a thesis. At the end of the course, the student may be nominated by the professor to compete for a research award by presenting their thesis to the faculty.  Witness 1 questioned why Prof. Egolf would have been willing to work with him since he did not have the coding experience necessary for Prof. Egolf's research and really struggled during the summer they worked together his junior year. Prof. Egolf noted that it would be unusual for any undergraduate student to have the skills or background in the research a physics professor like him was conducting. Prof. Egolf felt that Witness 1's strengths include his ability to think differently than most people. This can be beneficial for physics, because Witness 1 will put things together in a unique way, and while it may not be right, it provides Prof. Egolf with the opportunity to think about things in an alternative way and a way that is different than Prof. Egolf normally thinks. According to Prof. Egolf, Witness 1 was a fantastic student and he did not agree to work with him on his thesis as "a charity case" or have particular concerns about his abilities given his prior academic and health challenges. Prof. Egolf stated that if Witness 1 is given the appropriate environment, he has the ability to succeed, but that given Witness 1's issues, he knew that he would have to stay on top of him to ensure the work got done.

The students have various projects that are due for the thesis throughout the year.  It appears from the text history that Witness 1 started drafting and/or outlining the introduction to his thesis in early September 2022. According to Prof. Egolf, by mid-November, Witness 1 had completed more writing than most other students and more than would be necessary even by the end of the spring semester.[13] For example, Witness 1 stated that he had written 60 pages, whereas his partner had only written 10 pages. While Witness 1 had written a lot, he did not include the right level of detail to explain certain topics. Text message conversations detail Prof. Egolf's apparent frustration with the pace with which Witness 1 was working on the thesis.

Witness 1 claims that Prof. Egolf drafted most of the thesis for him, particularly during the spring semester when Witness 1 was unwell and less focused on his writing.  (*See* Summary at I (O)). Prof. Egolf admitted that he reworked certain sections of Witness 1's thesis to demonstrate how it should be drafted. This was especially true of one of the mathematical portions that included a difficult derivation that he had worked on with Witness 1 over the summer.  Prof. Egolf explained that part of the research course involved teaching a student how to write like a scientist, and that is what he thought he was doing. Witness 3 confirmed that the level of involvement and writing from the professor varies.  Usually, she would expect to have the student do more of the drafting. However, Witness 3 did state that the "advisor can give extensive feedback and help re-write"

---

Witness 1 stated that he told Prof. Egolf he would be working on vacation to show Prof. Egolf that he cared about the work and was invested.

[13] Text messages between Witness 1 and Prof. Egolf show that Witness 1's peers were even impressed with the amount of work he completed. *See* GTOWN0207 ("Well Amy showed my [table of] contents to the class and someone turned around and said 'thanks for making us look bad'").

sections. Witness 2 taught the thesis course during the 2022-2023 academic year and stated that there are variations in students' work and assistance from the Professors. While Witness 2 stated that he would not add his own writing to a student's thesis, he did confirm that he would include comments and provide various examples from other thesis submissions. Witness 1 states that there were times when he would go into the thesis and see that Prof. Egolf had written whole sections for him. Overall, the other witnesses the Investigators spoke to indicated that it was not their method to provide the same level of extensive writing assistance claimed by Witness 1, but they acknowledged that the type and level of writing assistance may vary depending on the circumstances.

Witness 4 served as a second reader for Witness 1's thesis. The role of the second reader is to read the thesis in the fall and provide feedback to the student. The second reader is supposed to work with the student's Professor to discuss progress and decide on a grade for the student. Prof. Egolf spoke to Witness 4 about Witness 1's thesis, and she reported that it appeared he had done a lot of work and that she would provide more substantive comments in the spring. While Witness 4 reported that she does not usually write portions of the student's paper when serving as a research advisor for a thesis, she stated that to the extent that the thesis was for something more particular, such as a journal or research, then she may do a little more writing. Witness 4 thought that others in the department may employ the same methods.

Despite all of the work that Witness 1 completed on the thesis, he struggled towards the end of his senior year with health issues preventing him from finishing the thesis. As a result, Prof. Egolf did not nominate him for the research award. Prof. Egolf stated that he did not believe Witness 1 could give a 20-minute presentation of his thesis in front of other students and faculty. According to Prof. Egolf, the faculty were surprised that he had not nominated Witness 1 for the award because usually Prof. Egolf's students win the research award.

Witness 1's blackout episodes and stress increased significantly right before his finals during his senior year, and Prof. Egolf spoke to Witness 6 to set up a meeting with Witness 1 to discuss a two-week academic break (cognitive rest). Prof. Egolf also spoke with Witness 3 to help determine what would be the appropriate course of action for grading Witness 1's thesis work in the research course. Witness 3 stated that a student could still get an A in the class without submitting their final thesis. Witness 4 also stated that the thesis grade is not just based on the final product, but the overall work that the student did to get there. Prof. Egolf and Witness 3 thought it would be fair to grade Witness 1 based on the work that he had completed to date, even though the thesis was not technically complete. Witness 1 ultimately received an "A" in the research course, and according to Prof. Egolf, this is the most common grade for students in the course. Witnesses 3 and 4 confirmed that most students get an A in the course. Witness 1 stated that even if he completed half of his thesis, it was more than any of the other students had written and the grade was based on the work that he had done.

Following Prof. Egolf's outreach to Witness 6, Witness 1 reached out to Witness 6 via email in a "distressed state," concerned with not finishing his thesis and graduation. Witness 6 met with Witness 1 and they discussed what was needed in order for Witness 1 to graduate on time.[14]

_____

[14] Witness 6 stated that Witness 1 specifically asked to meet with Witness 6 without Prof. Egolf. Witness 6 thought the request was "odd" because it appeared from earlier interactions that they had a close

Following the conversation, Witness 6 granted Witness 1 a "cognitive rest" period of ten days. This type of break is not common. However, when a student has a diagnosed mental illness and has a recommendation from the counseling center or an outside therapist for a break, the University will grant it. Witness 1 had a note from his therapist. Witness 6 therefore informed Witness 1's professors about the need for him to have a break. Witness 1 raised no complaints about Prof. Egolf during his meetings with Witness 6. After the break, Witness 1 submitted his work to the various professors and ultimately graduated on time in May 2023.

### E. Dinners, Movies, and Events with Students

Witness 1 alleged that Respondent invited him to dinners and lunches often towards the end of his junior year and throughout his senior year. (*See* Summary at I (D)). According to Prof. Egolf, as a faculty advisor to Witness 1, he used these times to discuss and offer advice. The meals would either occur one-on-one or with other students and/or alumni. For example, some of the lunches/dinners included Witnesses 11 and 12. Witnesses 11 and 12 both stated that they went to dinner/lunch with Prof. Egolf with and without Witness 1. Witness 11 stated that often after class and discussion of homework, Prof. Egolf would offer to take any students that were left in the classroom out for pizza. Prof. Egolf always paid for the meals with students. According to Prof. Egolf he paid because his economic resources are greater than most students and he wanted to ensure that all students felt welcome to join. He also purchased alcohol during the meals for those students that were over 21 years old.

During some of the dinner or lunch outings, the conversation would turn to topics that Prof. Egolf stated were off limits to discuss with students. Prof. Egolf stated that he was very specific with Witness 1, and on "multiple occasions [he told Witness 1] that while [he] was a student they could be friendly but they could *not* be 'friends' and there would be very definite limits on their relationship.[15] [Prof. Egolf] specified that they could not come to each other's homes, that he would not discuss sex or nudity in any way, shape, or form, and that [Witness 1] would get no favors with regards to his academics." Prof. Egolf's Sept. 15, 2023 Response (emphasis in original). Witness 1 stated that he and Prof. Egolf would often have conversations that approached the line on these topics, and Prof. Egolf would stop the discussion and say that he could not wait until after he graduated to tell him these "off limits" stories. *See* GTOWN0372 ("I'm really looking forward to us finally being able to talk completely freely!"). For example, Witness 1 stated that Prof. Egolf often brought up how much he and another student nicknamed "Fish" drank during Fish's senior week, and that Prof. Egolf would tell him the details after graduation. Witness 1 knew the story would be "weird or inappropriate" because when Prof. Egolf alluded to such stories, he joked about the fact that it involved an "off limits" topic and stopped just short of mentioning something expressly sexual in nature. Another example Witness 1 described involved Prof. Egolf telling stories about a shot that was served at a local Georgetown bar known as a "b\*\*w job" shot. According to Witness 1, Prof. Egolf would not mention the name of the drink, but instead described its contents and the fact that the individual would have to take it without using their hands. Prof.

---

relationship. Witness 1 does not recall making this specific request, but stated that it makes sense because he wanted to meet with Witness 6 alone because he was his Dean.

[15] *See* Summary at 1 (B).

Egolf denies that these stories came up multiple times. Instead, he insists that they were only told at the graduation celebration. He further states that he did not call it a "b**w job" shot. Instead, he states that at the graduation celebration, Witness 1 named the shot after he described how it was taken when the event occurred 15-20 years ago.

According to Prof. Egolf, Witness 1 had asked more than once for Prof. Egolf to elaborate or share such stories. Witness 1 denied this allegation, stating that to the extent he indicated any interest in hearing such stories, it was out of obligation or because he felt like that was what Prof. Egolf, his professor and/or supervisor, wanted him to say, not because he had any genuine interest. According to Witness 1, Prof. Egolf repeatedly brought up stories during conversations by referring to how students of this generation are different from his generation and that while he would allude to the fact that the stories involved sexual innuendo or references, he would say in a "wink, wink" sort of way that because "we aren't friends," he could only tell Witness 1 the stories when Witness 1 was no longer a student. The Investigators found Witness 1 to be credible on the issue of these stories. His recollection was consistent and believable, and he did not embellish, repeatedly acknowledging that Prof. Egolf refrained from expressly making sexual comments during the time that he was a student, but instead alluded to the stories and the fact that they involved sexual innuendo or other "off limits" topics. If Prof. Egolf had not alluded to or referred to the "stories" and their "off limits" subject-matter, Witness 1 would have had no knowledge that they existed and no reason to raise or ask to hear them. Prof. Egolf had to have been the one to initiate such conversations (otherwise Witness 1 would have no knowledge of the stories to even ask about them) and he expressly stated in text that he would "finally tell you all of the crazy stories I've hinted at." *See* GTOWN0372-373. Further, Prof. Egolf admits that he repeatedly and expressly told Witness 1 that they were not friends and could not discuss sex or any sexual topics, which is also consistent with Witness 1's description of Prof. Egolf referring to the stories being "off limits" due to topics like this that he should not discuss with a student.

In addition to dinners, Prof. Egolf invited Witness 1 to attend shows at the Kennedy Center with him. While Prof. Egolf denied that he purchased his subscription to the Kenney Center for Witness 1, Prof. Egolf did invite Witness 1 to see three shows during the Spring semester of 2023, and one show after graduation (four of the five shows within his subscription). According to Prof. Egolf (and confirmed by text messages), Prof. Egolf asked Witness 1 about the best seats at the Kennedy Center. GTOWN0254 ("… [] have you been to the Kennedy Center Opera House? If so, are Orchestra seats (maybe 3/4 back) or 2nd tier balcony (back) better?"). Prof. Egolf claims that Witness 1 asked to go to the first show with him, and Prof. Egolf told Witness 1 that he could be a backup, but he had planned to ask someone else. Witness 1 stated that Prof. Egolf never intended to invite anyone else to the show and instead told him that they could make up this cover story that he was going to take someone else to the show, when he always intended to take Witness 1. Witness 1 does not deny that he wanted to attend the shows, because he loves musicals, but in suggesting that they should have a "cover story," Witness 1 believes that Prof. Egolf acknowledged an understanding that taking him to the Kennedy Center was wrong. Prof. Egolf denied telling Witness 1 anything about a cover story.

Prof. Egolf and Witness 1 took an Uber together to the first show. Thereafter, during the Spring semester and into the Summer, Prof. Egolf and Witness 1 saw three additional shows at the Kennedy Center in March, April, and June 2023 (Into the Woods, Les Miserable, and the Lion

King). Prof. Egolf paid for all of the tickets. During one of the performances, they shared a little bottle of champagne before the show when they had arrived early, which Prof. Egolf also purchased. (*See* Summary at I (G)).[16] Prior to the last show in June, Prof. Egolf received mailings asking him to subscribe for the next season at the Kennedy Center, which he discussed with Witness 1 while attending the June show. According to Prof. Egolf, Witness 1 was interested in some of the upcoming shows, and they were going to discuss whether Prof. Egolf would get another subscription. Ultimately, after Witness 1 stopped communicating with him, Prof. Egolf did not purchase another subscription and he took another professor to the last show of the season in July/August 2023, also paying for his ticket.

Witness 1 claimed that Prof. Egolf changed his clothes in his office in front of him. *See* Summary at II (B). Prof. Egolf stated that this occurred during the summer after graduation. The two were going to the Lion King at the Kennedy Center and Prof. Egolf wanted to put on a collared shirt before leaving. Prof. Egolf asked Witness 1 to shut the door. "[Witness 1] did not leave the room; he stayed inside and continued to talk with [Prof. Egolf] while [he] quickly changed, with his back toward [Witness 1]". *See* Prof. Egolf's written Response at pg. 18.

With respect to Witness 1's claims about the Kennedy Center, based on the totality of the evidence, the Investigators found Witness 1's version of events to be credible. Prof. Egolf admits to never having a subscription to the Kennedy Center previously and not purchasing one since. Prof. Egolf knew that Witness 1 liked musicals, which is what prompted the conversation about the Kennedy Center in the first place. While Prof. Egolf provided a reasonable explanation for why he did not invite anyone else to the first show at the Kennedy Center, there was no real explanation for why he only invited Witness 1 to the next 3 shows and only invited another person, Witness 2, to the final show after Witness 1 had stopped speaking to him. Regardless of why he purchased the subscription and/or whether he advised Witness 1 that they should have a cover story about their attendance at the shows together, it is undisputed that Prof. Egolf paid for Witness 1 to attend four shows at the Kennedy Center in an approximate six-month time-period.

In addition to the Kennedy Center, Prof. Egolf and Witness 1 also went to two movies together and Prof. Egolf invited him to the movies on at least one other occasion. *See* April 29, 2023 text exchange at GTOWN0363 (Egolf: "I was going to see if I should drive in and we could go to Air or Return [o]f the Jedi." Witness 1: "Oh that's a very nice offer thank you. I don't think today works very well however. The meds break is leaving me very very exhausted so I've just been sleeping on and off all day.").

Prof. Egolf acknowledged that other than Witness 1, he did not take any other students to shows at the Kennedy Center or to the movies in recent years. Prof. Egolf did note that he has gone to concerts, a golf tournament, and traveled to other countries with alumni and/or former students, including alumni taking him to Iceland to celebrate his 50th birthday.

---

[16] This was the only show in which Prof. Egolf purchased alcohol.

### F. Witness 1's Postbac Experience

Prof. Egolf is a Cottrell Scholar, having won an award from the RCSA. At various times, the agency allows its scholars to apply for research grants. Coming out of Covid, the agency started the Cottrell Postbaccalaureate ("postbac") Awards. Cottrell Scholars apply for funding to cover a year's stipend and funds for travel/equipment for a student to continue research with a Scholar post-graduation. According to the RCSA, "the expectation is that the [postbac] will be treated like a fellowship or training grant, rather than regular employment." Specifically, the RCSA notes, that "[s]ince this is a research training opportunity designed to support research activities, [RCSA] expects that this experience will not be diluted by other activities, such as being enrolled as a student or working as a teaching assistant or other role separate from the lab."

Prof. Egolf spoke to Witness 1 about the opportunity several times before they applied for this grant in January 2023. Witness 1 was still trying to determine what he wanted to do post-graduation, so Prof. Egolf thought that this postbac grant might be a good program for him and would allow Witness 1 to continue the research from his thesis. Prof. Egolf stated that the proposal specifically included plans to help Witness 1 figure out coping mechanisms for how to mitigate the effects of his ADHD (or to figure out where his neuroatypical thinking would be an advantage). Witness 1 was Prof. Egolf's first postbac student. Witness 1 also stated that he was unclear on what he wanted to do post-graduation, and his health issues were causing a lot of issues during his senior year. The grant seemed to be a good idea because it would give Witness 1 funds to live on and time to figure out what he would do next.

Witnesses 3, 5, 7, and 8 all confirmed that the Cottrell Scholar award was unique and that the University does not usually have these sort of grants. This type of grant was specific in that it was awarded to Prof. Egolf to do a particular type of research with Witness 1. The award was thus specific to Prof. Egolf and to Witness 1, and their identified research, and neither could simply be replaced or substituted.

The application for the postbac grant included a submission by Prof. Egolf and a letter that was to be submitted by Witness 1. Witness 1 states that Prof. Egolf drafted the entire application, including Witness 1's portion. (*See* Summary at I (P)). According to Prof. Egolf, Witness 1 had never submitted this type of application or been through a process like this before. He and Prof. Egolf had various meetings to discuss the application. Prof. Egolf recalled meeting with Witness 1 in his office for many hours as they tried to draft a good outline for the letter. Prof. Egolf noticed Witness 1 struggling with the letter, by going off task and trying to include things that belonged in Prof. Egolf's part of the proposal. Prof. Egolf decided to use the process as a learning opportunity, and he took the detailed outline of the draft that they had worked on during their meetings and "spewed out" how he would write the letter. According to Prof. Egolf, Witness 1 was supposed to take that draft and finalize it by incorporating parts of his own writing and include information about "the ways you get excited about science."[17] Prof. Egolf also sat on a zoom call with Witness

---

[17] *See* Jan. 14, 2023 text message at GTOWN0284 (Egolf: "I've already done your part now since there was no way it was going to get done in time starting from what you had given [and] the time you already put in and the time that's left. But I actually need you to go over it and submit it so that all of the time I've put in over the last several weeks when I should have been doing other things doesn't go to waste.").

1 for an entire afternoon so that he could answer questions while they each worked on their respective parts of the proposal. Prof. Egolf expressed frustration with Witness 1 during the application process, and specifically made reference to having "done [Witness 1's] part" and not wanting his own time and efforts to be wasted. *See* fn 17. Ultimately, Prof. Egolf submitted his own portion of the application but states that he never saw Witness 1's final submission. Accordingly, Prof. Egolf does not know what changes (if any) Witness 1 made to the draft Prof. Egolf had provided to him. Witness 1 recalled getting a full draft of the letter from Prof. Egolf that he simply submitted.

In the Spring of 2023, Prof. Egolf was awarded the grant, but before accepting the award, Prof. Egolf stated that he spoke with Witness 1 to ensure that he still wanted to participate and to make sure that he would be committed to the work for the year. Witness 1 agreed, and Prof. Egolf accepted the award. Georgetown received the grant money on June 1, 2023 and they were to begin working on June 15, 2023. The two spoke about the research on June 15, 2023, and on Monday, June 19, 2023, Prof. Egolf picked Witness 1 up in his car[18] and they went to Georgetown to work through the research on the whiteboard in Prof. Egolf's office.

Prof. Egolf noted that Witness 1 worked on research until June 22, 2023, when it appeared that he stopped all research efforts except for the submission of one graph. According to Prof. Egolf, he attempted to discuss the research with Witness 1 and help get him back on track. Over the next month, Prof. Egolf spoke with Witness 2 again, who advised him to try different ways to get Witness 1 to talk. There was a noticeable decline in the messages and conversation between Witness 1 and Prof. Egolf following the graduation celebration (described in the next section), despite Prof. Egolf continuously messaging Witness 1 about various issues. *See* July 5, 2023 text at GTOWN0402 ("Think about cool places you might want to take a trip although it's sounding like it won't be easy for you to escape to Georgetown for part of a day, much less somewhere fun for us to explore for a trip.") and GTOWN0403 ("I'm torn here between wanting to be supportive and not wanting to seem like I'm prying, so I'm not sure if I should ask more or not. It's hard to read much into texts. You know my number; feel free to use it any time, day or night. I can also drive out that way if you'd rather talk in person."). On or about July 13, 2023, Witness 1 informed Prof. Egolf that the research might not be the right job for him.

| | |
|---|---|
| Witness 1: | None of this is for lack of effort on your part. |
| Prof. Egolf: | I don't think you understood what I said if that's your response. |
| Witness 1: | I don't believe this job is for me and I think I need to quit. |
| | That was a preciser to that statement. |
| | *precurser |
| Prof. Egolf: | Okay. I don't know what's going on right now. Clearly this is not a conversation that should be happening over text messages. |
| | Can we have a conversation in person or on the phone? |
| Witness 1: | No I can't do that. |
| Prof. Egolf: | You can't do that now or you can't do that ever? |
| Witness 1: | This isn't about anything going on today. I've already half known this and I just don't have any more explanations or excuses to give so I think its just time. |
| | I cant do that now. |

---

[18] *See* Summary at I (L).

Prof. Egolf:    What time can we talk?
Witness 1:    I'm not ready to give [an] answer to that.
            I need to speak to some people first.

July 13, 2023 text messages at GTOWN0410. Despite Witness 1's messages telling Prof. Egolf that he needed time before they spoke, Prof. Egolf continued reaching out by email, text message, and phone calls. This further contact caused Witness 1 to become more distressed. Following consultation with his therapist and his parents, Witness 1 came to believe that Prof. Egolf's behavior towards him constituted "grooming" behavior.

Prof. Egolf states that he was shocked and worried about Witness 1. According to Prof. Egolf, Witness 1 had expressed reservations that he would not be able to get his research done since they were taking him off his meds. Additionally, he was working at home and his family situation was stressful, including driving his brothers to work, walking the dog, and watching over his brother who had dropped out of college and was having serious health issues. Prof. Egolf stated that for someone with ADHD like Witness 1, this was a disaster. Prof. Egolf was likewise concerned about himself because the grant was in his name and there was no research being done. After several attempts to spark conversation and only receiving brief responses (or none at all), Prof. Egolf has not been in contact with Witness 1 since the middle of the summer and no work has been done on the grant since their discussions in mid-June 2023.

### G. Witness 1's Graduation Celebration with Prof. Egolf

On or about May 15, 2023, Prof. Egolf invited Witness 1 over to his home for a "celebration" after graduation in June 2023. *See* GTOWN0370 ("By the way, are you coming over for champagne/dinner next week before you head to Europe?") and GTOWN0372 ("By the way, what's the next week looking like as far as a night to hang out and drink champagne?"). Prof. Egolf stated that he planned the celebration in part to let Witness 1 know that he was proud of him for all the work that he put into his research and it was also a time for Prof. Egolf to share the "stories" that he promised to tell Witness 1 upon graduation. Prof. Egolf indicated that he has had other celebrations with graduates in the past, but they have not been held at his house. However, he has had alumni over to his house, he has celebrated with individual graduates at a restaurant, and he has been to graduation parties for his students at restaurants with their families. But for this occasion, the celebration was at Prof. Egolf's house and no one else was present or invited besides Witness 1. Witness 1 states that leading up to graduation Prof. Egolf told Witness 1 about a student ("Fish")[19] who wanted to spend his senior week celebrating with Prof. Egolf instead of with his friends. Prof. Egolf told Witness 1 that he and Fish spent the week going to bars to celebrate Fish's graduation. Witness 1 believed that Prof. Egolf told this story as a way of convincing Witness 1 that he could choose the same path and celebrate with Prof. Egolf instead of his friends.

The day before the celebration, Prof. Egolf and Witness 1 planned to see the Lion King at the Kennedy Center. Prof. Egolf offered to have Witness 1 stay over that night as well so that he would not need to drive back and forth to Reston, VA from Maryland to pick up Witness 1 and he could

---

[19]Prof. Egolf claims that he told Witness 1 the full story about Fish for the first time during the celebration at Prof. Egolf's house.

stay and work at Prof. Egolf's home until their celebration. Witness 1 declined the invitation to stay over, but the two traveled together in Prof. Egolf's car to the show at the Kennedy Center and then Prof. Egolf returned Witness 1 to his parents' home in Reston, VA. *See* Summary at II (E).

On the day of the celebration (June 29, 2023), Prof. Egolf picked up Witness 1[20] from Witness 1's parents' home in Reston, Virginia and they went to Prof. Egolf's house in Maryland. Prof. Egolf had purchased a few bottles of champagne. (*See* Summary at II (F)). Prof. Egolf and Witness 1 drank wine or champagne before walking to a local pizza restaurant to pick up dinner. Most of the night consisted of them drinking champagne and watching movies.

During the celebration, Prof. Egolf stated that he told Witness 1 a story of how the last time he had champagne, his friends played a game called "Edward Champagne Hands," which involves taping a bottle of champagne to participants' hands. The participants are not able to remove the tape until they finish the bottle. (*See* Summary at II (G)(10)). After hearing the story, Prof. Egolf stated that Witness 1 insisted on playing the game. *Id.* Witness 1 stated that Prof. Egolf mentioned the game multiple times throughout the evening, until Witness 1 finally agreed to play. Prof. Egolf denied this and insists it was Witness 1 who wanted to play the game. Prof. Egolf states further that he did not play the game because he thought the game was "stupid" and, as he explained, when only two people are present, one needs to have their hands free to tape the bottles to the other person's hands. Witness 1 did not want to drink a lot and claims that he told Prof. Egolf this, and therefore made sure to have water in one of the bottles that was taped to his hand. Witness 1 further claims that Prof. Egolf was not happy that Witness 1 wanted to fill one bottle with water. But Witness 1 was able to push back and insist that one bottle be filled with water. According to Prof. Egolf, it was Prof. Egolf who "insisted that one of [] the bottles be filled with water because two bottles filled with champagne would be too much for him to safely drink." Witness 1 appears to be more credible on this point. Messages reflect that when discussing the celebration Prof. Egolf referred to it as Witness 1 coming over to drink champagne and he was repeatedly inviting Witness 1 to his home and trying to pin down a date for the celebration. Witness 1 does not appear to reciprocate the excitement about the event or drinking. It is undisputed that Prof. Egolf is the one who initially described the game while the two were talking about what to do that evening. Witness 1 credibly described being uncomfortable about the entire situation and not wanting to get too drunk.

Witness 1 eventually finished the bottle of champagne taped to his hand. During the time that Witness 1's hands were taped, Prof. Egolf continued drinking as well. According to Prof. Egolf, when Witness 1 needed to use the restroom, Witness 1 would remove the tape and when he returned, he asked Prof. Egolf to re-tape his hands. Witness 1 could not recall if he had his hands re-taped when he returned from the restroom. According to Prof. Egolf, while Witness 1 was in the bathroom, he heard him removing the tape and jokingly stated that he was "cheating." Witness 1 states that Prof. Egolf came to the door when he heard Witness 1 ripping off the tape and said "let me know if you need help." Witness 1 thought it was a weird/awkward comment, told Prof. Egolf "no" and made a conscious decision to make sure the door was locked. Witness 1 also alleged that Prof. Egolf offered to assist him with removing his pants to use the restroom and suggested that he did not need to be embarrassed because he's "seen everything" referring to naked men. Summary at II (G)(7) and (10)(c). Prof. Egolf denied this allegation. Witness 1 claims that when

---

[20] *See* Summary at I (L), II (C) and (D).

Witness 1 came out of the bathroom, Prof. Egolf was still standing there by the door. Witness 1 alleged that Prof. Egolf stood facing him and put both hands on his shoulder (Witness 1 described the conduct as "the way drunk people get more touchy"), and said "that's not fun" referring to Witness 1 removing the tape and claimed that Witness 1 was being "weird" about it. Witness 1 said "fine then I'm being weird about it" and the conversation ended. Prof. Egolf denied touching Witness 1's shoulders and having the conversation with Witness 1. Witness 1 appears to be more credible on this point.

Witness 1 alleged that Prof. Egolf left the door open when Prof. Egolf used the restroom and encouraged Witness 1 to do the same. *See* Summary II (G)(5) and (6). Prof. Egolf did not deny this allegation but could not specifically recall whether he had left the door open or not. Prof. Egolf stated that sometimes he does leave the door open and it depends on who is at his house, as he would sometimes leave the bathroom door slightly ajar so as to continue the conversation with his guest, especially younger guests who don't understand that older ears can't hear through doors.

There are several allegations of Prof. Egolf telling Witness 1 stories that referenced genitals, s*ee* Summary II (G), and it appears that many of these conversations occurred during this celebration. Prof. Egolf stated that he refrained from discussing certain matters until after Witness 1 was no longer a student and Prof. Egolf could speak more freely and share stories with him. While not all messages are captured in text, the following discussion came right before graduation.

Prof. Egolf:     Yeah, hopefully you'll have lots of new good stories.
                 I'm really looking forward to us finally being able to talk completely freely!
Witness 1:       Haha I'll have to start thinking.
Prof. Egolf:     I meant new stories after the trip. You seem to generate such things when you
                 travel.
Witness 1:       Oh I'm sure I'll have some.
                 Hopefully not so crazy.
Prof. Egolf:     Haha
                 Well, I can finally tell you all of the crazy stories I've hinted at.
Witness 1:       I definitely am excited for those.

May 18, 2023 text message exchanges at GTOWN0372-373. According to Witness 1, Prof. Egolf alluded to various stories prior to the graduation celebration.

According to Prof. Egolf, Witness 1 requested that he tell him the stories once they were at the graduation celebration. Witness 1 denies this allegation and instead insists that it was Prof. Egolf that initiated the discussion, which is consistent with the messages relayed via text. As mentioned above, Prof. Egolf told Witness 1 a story about a former student who studied at Georgetown over a decade ago named Fish. Prof. Egolf told Witness 1 that during Senior Week, between finals and graduation, Fish wanted to celebrate with Prof. Egolf because he stated that Prof. Egolf was the "person who had the most influence on him and his career." The student and Prof. Egolf went to a local bar in Georgetown (at the time Prof. Egolf lived in an apartment on campus). After hanging out and drinking, he came back to Prof. Egolf's apartment and fell asleep on a couch in the living room. Prof. Egolf recalled that the following morning when he walked out of his room, the student was laying naked on his couch, with an erection. Prof. Egolf states that he threw a blanket on him.

The next night, the same student wanted to hang out again and the same thing happened once again. Prof. Egolf stated that he played no part in the student getting undressed and he never explained why he was undressed, except to say that it had happened before when he was drunk on spring break. According to Prof. Egolf, the former student never raised any complaints against him.

During the celebration, while talking about the student being naked on the couch, Prof. Egolf and Witness 1 also had a conversation about how times have changed. Prof. Egolf stated that he mentioned that he played sports when growing up and everyone showered together and that a naked guy does not really register with him. This was followed by a discussion of how nowadays people will go all day after gym class without showering just to avoid the communal showers, which seemed weird to Prof. Egolf. Prof. Egolf also gave two examples of friends of his who are opposite extremes. He told Witness 1 of one of his best friends who probably had not been seen naked by any man other than medical personnel and he told Witness 1 of a varsity swimmer friend at Duke who would do things Prof. Egolf would never be comfortable with, such as urinating outside on the quad. Prof. Egolf then joked that maybe that guy didn't count because he had the largest genitals he had ever seen so maybe he was just showing off. Then Prof. Egolf corrected himself with "well, second largest… the largest on a white guy." *See* Summary at II (G)(1) and (2).

Prof. Egolf also indicated that Witness 1 asked him what it was like being a professor. Among other things, Prof. Egolf told him that he was freaked out when students had propositioned him for sex. Prof. Egolf stated to the Investigators that he has been propositioned multiple times, by students and alumni, and that it always surprised him. Prof. Egolf stated that he never reported any such events to the University. Witness 1 claimed that Prof. Egolf told him repeatedly about a woman propositioning him for sex in exchange for a better grade, including telling this story when Witness 1 was still a student, something Prof. Egolf denies. Prof. Egolf does admit to telling this story at the graduation celebration.

During the graduation celebration Witness 1 stated that Prof. Egolf also talked to him about how he had gotten in trouble at the university some years back after a student accused him of inappropriate behavior. According to Witness 1, Prof. Egolf got very emotional telling this story and was crying. Prof. Egolf admits that he told Witness 1 about the fact that it was easy for a student to accuse a professor of inappropriate behavior and that there were serious ramifications for a professor in these situations, such as being barred from campus for three years. Prof. Egolf stated that he thought it was probably clear to Witness 1 that Prof. Egolf was talking about himself, but he did not discuss specific accusations from other students or expressly indicate that this was something that had happened to him. Prof. Egolf denied that he was crying during this conversation but stated that he was serious.

In total, Prof. Egolf believed they drank approximately 3.5 bottles of champagne that day/night. Around 4 am, they went upstairs and Prof. Egolf showed Witness 1 to a guest room. Prof. Egolf went into the room with Witness 1 and pointed out a blanket in the closet in case he was cold. According to Prof. Egolf, Witness 1 began looking at the bookshelf and asked about the books. Prof. Egolf stated that Witness 1 was not on the bed but rather in front of the bookcase. Witness 1 stated that Prof. Egolf came in the room and sat on the bed. Prof. Egolf did not specifically recall

sitting on the bed, he said that he might have done so because it is the only piece of furniture in the room where he would be able to sit. Prof. Egolf claims he stayed for maybe 10 minutes before going to bed. In the morning Prof. Egolf woke first, showered, went downstairs, and got on his computer. Eventually, Witness 1 got up and went downstairs. Prof. Egolf asked if he wanted to go home, but Witness 1 said he was hungry, so they picked up and ate lunch from Chipotle before Prof. Egolf took him home.

## VI.    ANALYSIS

At the outset, we summarize some of the relevant facts described above:

- Beginning in Witness 1's junior year, Prof. Egolf and Witness 1 developed a close relationship. Prof. Egolf assisted Witness 1 both in his role as a professor and academic advisor and the two began routinely exchanging text messages, often meeting after class in person and/or on zoom, and had several meals together paid for by Prof. Egolf. Their conversations involved school and/or research topics, but also regularly delved into personal matters, including Witness 1's health and family challenges and travel plans, as well as their mutual interest in sports.

- Between his junior and senior year, Witness 1 performed research for Prof. Egolf and their personal relationship continued, extending further during Witness 1's senior year, when Witness 1 worked with Prof. Egolf on his thesis. Prof. Egolf and Witness 1 continued exchanging countless and often daily text messages and the two regularly had meals together outside of school paid for by Prof. Egolf. In addition, by his last semester of senior year, the two were socializing outside of school at least once a month when Prof. Egolf invited and paid for Witness 1 to attend four theater productions at the Kennedy Center and two movies. Prof. Egolf admits to changing his shirt in front of Witness 1 in his office before traveling to one of these shows.

- Prof. Egolf offered Witness 1 an opportunity to continue working with him through a postbac grant, which Witness 1 agreed to do in the middle of his senior year. While Witness 1 admittedly experienced numerous mental health and academic challenges during his final semester, impacting his ability to even complete his thesis, Prof. Egolf pushed forward with the postbac application process, completing both Witness 1's and his own portion of the application. Once the postbac award was granted by RCSA, Witness 1 received grant money to continue researching at Georgetown under the supervision and direction of Prof. Egolf.

- Prof. Egolf admits that while Witness 1 was a student he made comments to Witness 1 alluding to stories about sex and "off limits" topics that he could not wait to discuss with Witness 1 once Witness 1 graduated. As graduation approached, Prof. Egolf relayed excitement for being able to host Witness 1 at his home for a "celebration" where they would drink champagne and he could speak "freely" and share all of these stories.

- Almost immediately after Witness 1 graduated, and despite their ongoing supervisor/ mentee relationship, Prof. Egolf removed all prior boundaries, inviting Witness 1 to his

home to spend the night and driving him in his personal vehicle to and from school and/or Witness 1's parents' home to various social events.

- At the graduation celebration at Prof. Egolf's home, Prof. Egolf supplied at least four bottles of champagne, which the two consumed together, after he taped a champagne bottle to Witness 1's hand to play a drinking game. Witness 1 alleged that Prof. Egolf offered to assist him with removing his pants so that he could use the restroom since his hands were taped and chided him for insisting on closing the bathroom door when he used the restroom. Witness 1 further alleges that Prof. Egolf stood outside the bathroom door while he was using the restroom, and when Witness 1 exited the restroom, he put his hands on his shoulders and accused him of being "weird" and not "fun." Prof. Egolf confirmed that he joked that Witness 1 was "cheating" because he heard him remove tape from his hands in the bathroom. While Prof. Egolf denied offering to assist Witness 1 in using the restroom or putting his hands on Witness 1's shoulders and accusing him of being "weird" or not "fun," because the allegation is so specific, coupled with Prof. Egolf admitting to jokingly accusing Witness 1 of "cheating," those allegations appear credible.

- As promised, Prof. Egolf shared several of the stories with Witness 1 that he withheld while he was a student, including stories of genitalia, a student sleeping at his house naked and waking up with an erection and students that propositioned him for sex. He also utilized the bathroom with the door open and made comments about genitalia.

- After drinking champagne until approximately 4 a.m., instead of just showing Witness 1 to the guest room, Prof. Egolf entered the room with Witness 1, sat on the bed and had a discussion about the books on the bookshelf. While the bed may be the only piece of furniture in the room, Prof. Egolf could have just as easily remained standing while talking with Witness 1.

- Following Witness 1's graduation, Prof. Egolf repeatedly contacted Witness 1 by text even after Witness 1 stopped responding with the same frequency as he had responded previously. This texting included suggestions that the two should travel together or otherwise socialize beyond their working relationship. Around this time, Witness 1, in consultation with his therapist, believed that Prof. Egolf's behavior towards him constituted "grooming" behavior. Witness 1's increased discomfort in working for Prof. Egolf (among other issues) ultimately led him to stop the postbac work and, at the direction of his therapist, he ceased communication with Prof. Egolf. Prof. Egolf continued texting Witness 1 for some time even after Witness 1 informed Prof. Egolf that he would no longer be working on the postbac grant.

- Witness 1 was a vulnerable student and postbac with multiple mental health and learning issues, including but not limited to ADHD and anxiety, impacting his education and frequently necessitating accommodation. Prof. Egolf was aware of these issues and often provided Witness 1 with academic and professional assistance, both in Prof. Egolf's classes and in Witness 1's overall journey at the University. While Witness 1's mental health challenges did not affect his capacity to give consent in his interactions with Prof. Egolf,

26

we find that these challenges further contributed to the vast power differential between Witness 1 and Prof. Egolf.

With these facts in mind, we will now review the specific Issues to be analyzed below.

***Issue 1:*** Whether Prof. Egolf engaged in sex- or gender-based harassment in violation of the University's *Policy on Sexual Misconduct* and policies on *Equal Opportunity and Non-Discrimination in Education and Employment*.

The Investigators considered whether Prof. Egolf engaged in sex or gender-based harassment of Witness 1 by subjecting him to unwelcome conduct of a sexual or gender based-nature, with the purpose or effect of interfering with his work or academic performance. The *Policy on Sexual Misconduct* defines sexual harassment as "any unwelcome conduct of a sexual nature, including . . . verbal or physical conduct of a sexual or gender-based nature when . . . such conduct has the purpose or effect of interfering with an individual's work or academic performance, denying or limiting an individual's ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment." The Policy offers interpretive guidance, which states that a hostile environment exists when "conduct is severe or pervasive." Determining whether conduct is severe or pervasive includes a review of the "nature, scope, frequency, and duration of the conduct and the number of persons involved." The Policy further instructs that the conduct must be both "objectively intimidating, hostile or offensive and must interfere with a person's ability to participate in employment or educational programs or activities." In addition, the Policy states that "[s]exual harassment is especially serious when it occurs between teachers and students or supervisors and subordinates" because "sexual harassment unfairly exploits the power inherent in a faculty member's or supervisor's position." An individual's "perception of the offensiveness of the alleged conduct, standing alone, is not sufficient by itself to constitute sexual harassment."

First, because Witness 1 was never an employee of the University, and none of the allegations involve harassment of employees of the University, the Investigators found no evidence of a violation of the University *Policy on Equal Opportunity and Non-Discrimination in Employment*.

During the time that Witness 1 was a student and the brief time that he worked with Prof. Egolf on the postbac, the Investigators found that Witness 1 received an extraordinary amount of attention from Prof. Egolf in contrast to the level of attention Prof. Egolf provided to other students. Prof. Egolf served as his Professor, Physics advisor, Research Advisor for his thesis, Research Professor for his summer program (2022), and postbac supervisor. Beginning during Witness 1's junior year, the two met, spoke and texted regularly, including nights/weekends and on and off-campus. Prof. Egolf admits that he became well-acquainted with numerous aspects of Witness 1's life, including his family, his mental health, and certain other personal matters. In addition to multiple meals together, all paid for by Prof. Egolf, Prof. Egolf socialized with Witness 1 and paid for tickets at the Kennedy Center and the movies at least a half a dozen times over approximately a 6-month period. The documents reviewed reflect thousands of text messages exchanged between Prof. Egolf and Witness 1, often on a daily basis.

Prof. Egolf admitted that he did not have a similar relationship with any other students. While he provided examples of former students with whom he went to dinner or various events, he did not

identify, and we are not aware of any other student that received this same level of attention. Similarly, while Prof. Egolf routinely made himself available to his students for academic assistance, we found no evidence of him having provided the same level of access and support to any other students besides Witness 1. Particularly, the Investigators are not aware of him providing the same level of academic support and opportunities, including multiple research and employment opportunities, and drafting assistance, to other then-current students. Additionally, there is no student that Prof. Egolf invited to spend the night at his home with the express purpose of drinking alcohol and finally speaking "freely" and sharing stories of a sexual nature involving genitalia or sexual innuendos.

Prof. Egolf was clearly interested in a closer relationship, repeatedly extending invitations to attend out-of-school events, and while he waited until immediately following Witness 1's graduation to engage in some of the more concerning conduct, at that point he remained Witness 1's supervisor with control over Witness 1's postbac experience. The power dynamic and the role that Prof. Egolf played in Witness 1's education and professional advancement, was objectively intimidating and caused Witness 1 to reasonably feel as though he had to respond and/or indulge in conversation and engagement with Prof. Egolf. As time went on, the increasing and extensive outreach and personal invitations became unwelcome.

During the time that Witness 1 was an undergraduate student, there was an increasingly personal relationship (including text messaging, multiple dinners/lunches, plays at the Kennedy Center, movie outings, and discussions about family/personal situations), and multiple discussions where Prof. Egolf hinted at additional stories that would be told post-graduation. This relationship was unlike any other relationship that Prof. Egolf appeared to have had with students/mentees/advisees during the time they were in such roles. Furthermore, shortly after Witness 1's undergraduate graduation, and during the time when Witness 1 was being supervised by Prof. Egolf in his postbac program, the conduct by and from Prof. Egolf of a sexual nature became more overt. Prof. Egolf changed his shirt in front of Witness 1, drove him around in his personal vehicle, repeatedly invited him to spend the night at his house and did in fact host him overnight for a graduation celebration, where he provided him with excessive amounts of alcohol and played a drinking game with him, which encouraged him to get drunk, used the bathroom with the door open, and told him overtly sexual stories and/or stories involving genitalia. Witness 1 alleges that Prof. Egolf offered to assist him in the bathroom and accused him of being "weird" by not allowing Prof. Egolf in while he was using the restroom. Prof. Egolf admits that he jokingly told Witness 1 he was "cheating" by removing the alcohol bottle from his hands to use the bathroom. Witness 1 further alleges that when Witness 1 exited the restroom, Prof. Egolf put his hands on his shoulders and accused him of being "weird" and "unfun." While the Investigators found Witness 1 to be credible regarding what occurred in and after he used the restroom, even if the Investigators did not credit any portion of those events, Prof. Egolf's conduct and behavior during the graduation celebration was inappropriate, unwelcome and of a sexual nature.

Prof. Egolf fails entirely to appreciate the power differential between himself and Witness 1 and interprets Witness 1's engagement as genuine interest when in fact, as Witness 1 states, it was more of a feeling of obligation and/or an effort to ingratiate himself to obtain favorable grades or opportunities. As such, the two were never equals, and even to the extent that Witness 1 engaged in banter or correspondence with Prof. Egolf, and/or accepted his invitations, Witness 1 was unable

to freely give consent due to the unequal power dynamic. At all relevant times, Prof. Egolf controlled some facet of Witness 1's life, i.e., he was his Professor, his Research Advisor, his Thesis Advisor, and finally his supervisor over his grant for the postbac program. At every step of the way, Prof. Egolf controlled the outcome of Witness 1's grades, income, and/or professional advancement opportunities. While Witness 1 was initially excited that Prof. Egolf was investing in him, the attention and outreach got to be unwelcome and intimidating and Witness 1 began feeling uncomfortable and he often dreaded getting the "check-in" texts because he would have to respond. His interactions with Prof. Egolf and the stress he felt about them, especially following the graduation celebration, certainly interfered with his ultimate ability to participate in his postbac program, resulting in his withdrawal and discontinuance of participation in that program.

For example, as noted above, the following excerpts come from a text message exchange between Prof. Egolf and Witness 1 that occurred on July 13, 2023, whereby Witness 1 informed Prof. Egolf that he no longer wanted to work on the postbac:

| | |
|---|---|
| Witness 1: | Things have not been good for me and I know it has affected my behavior and my work. And I largely don't want to talk about it because I'm not comfortable with it. I really appreciate the concern and its not on you to fix it. |
| | I've been disappointed in the work too and I'll put some renewed effort into it. |
| Prof. Egolf: | It's fine if you don't want to talk about it. That's up to you. But, that's separate from what your behavior is saying. I don't know if your intention is to push me away as a friend or not, but that's what you're doing. If it's not, then chances are that it will eventually sort itself out. (If it is, then good job). But, I can't keep trying to arrange things only to get excuses that aren't really true or future actions that aren't followed through on. I'm here for you, but I need to stop messing with my own life since what I'm doing isn't even getting anywhere. |
| Witness 1: | None of this is for lack of effort on your part. |
| Prof. Egolf: | I don't think you understood what I said if that's your response. |
| Witness 1: | I don't believe this job is for me and I think I need to quit. |
| | That was a preciser to that statement. |
| | *precurser. |
| Prof. Egolf: | Okay. I don't know what's going on right now. Clearly this is not a conversation that should be happening over text messages. |
| | Can we have a conversation in person or on the phone? |
| Witness 1: | No I can't do that. |
| Prof. Egolf: | You can't do that now or you can't do that ever? |
| Witness 1: | This isn't about anything going on today. I've already half known this and I just don't have any more explanations or excuses to give so I think its just time. |
| | I can't do that now. |
| Prof. Egolf: | What time can we talk? |
| Witness 1: | I'm not ready to give an answer to that. |
| | I need to talk to people first. |
| Prof. Egolf: | Don't you think you should find out more about this experience that you're thinking about quitting? |
| Witness 1: | I know. I'd still like some time. |
| Prof. Egolf: | You don't need to give me a decision, but it makes sense to talk about your options. |

| Witness 1: | Not right now. |
| Prof. Egolf: | Can you at least tell me why you "don't believe this job is for" you? |
| Witness 1: | Not right now Not in the best state. |
| Prog. Egolf: | Is it anything personal between us? |
| Witness 1: | No it's not. But I also need you to respect that I'm saying I don't want to discuss this right now and you are not doing that. |
| Prof. Egolf: | Okay. Take what time you need but you do have to realize you just dropped a giant bomb. |
| Witness 1: | I understand. I'll get back to you when I'm ready. |

*See* GTOWN0409-11.

Based on a preponderance of the evidence standard, there is sufficient evidence to conclude that Prof. Egolf's conduct constitutes a violation of Georgetown's policy against sexual harassment. Prof. Egolf treated Witness 1 differently than other students and we found no other examples of any students receiving the same attention and access that Prof. Egolf provided to Witness 1. While some of the conduct may arguably have been welcome, ultimately and taken as a whole, Prof. Egolf's behavior was unwelcome and objectively intimidating, and regardless, Witness 1 was unable to freely give  consent given the unequal power dynamic. Prof. Egolf's conduct ultimately interfered with Witness 1's education and his ability to continue in the postbac program; such conduct included: the excessive attention and out-of-school social invitations, build-up of stories involving sexual innuendo, eventual telling of stories involving genitalia and/or sex, unprofessional removal of clothing and/or using the restroom without appropriate privacy, and "celebration" involving excessive alcohol, encouragement to get drunk and spend the night, lurking outside the bathroom door while Witness 1 used the restroom and making comments about him being "weird" or "unfun" for not allowing Prof. Egolf in to the bathroom while he was using it, discussions of a sexual nature, and sitting on the bed that Witness 1 was to sleep in at 4 am while continuing to engage him in conversation.

Looking at the totality of the circumstances, considering the credibility of both Witness 1 and Prof. Egolf, and the facts analyzed above, there is sufficient evidence to find a violation of the *Policy on Sexual Misconduct.* The graduation celebration was a culmination of more than a year of interactions and conduct whereby Prof. Egolf sought and encouraged an increasingly personal relationship with Witness 1.  The undisputed evidence reflects that Prof. Egolf hinted at and appeared excited about engaging in a night of drinking and sharing inappropriate stories of a sexual nature with his then supervisee.

Indeed, standing alone, and without making any credibility determinations, the totality of Prof. Egolf's admitted conduct involved sufficient evidence to find a violation of the policy. In addition, we found that Prof. Egolf's conduct at the graduation celebration, standing alone, was severe enough to violate University policy and certainly taken together with the prior conduct discussed above (such as the continuous outreach, multiple social invitations and interactions, and alluding to discussions about inappropriate topics) constituted pervasive behavior that was a violation of the policy. Such conduct ultimately contributed to Witness 1's decision to terminate his postbac research and thereby interfered with his educational opportunity.  Accordingly, the Investigators

conclude that Prof. Egolf has violated the University's *Policy on Sexual Misconduct* and policy on *Equal Opportunity and Non-Discrimination in Education.*

**Issue 2:**  Whether Prof. Egolf engaged in sex- or gender-based discrimination in violation of the University's policies on *Equal Opportunity and Non-Discrimination in Education and Employment*.

The Investigators considered whether Prof. Egolf engaged in discrimination based on sex/gender by demonstrating favoritism toward male students and/or employees in terms of the amount of attention, degree or personal interest, and interest in their academic development, which resulted in disparate educational and/or employment opportunities.  The University's non-discrimination policy prohibits discrimination against an individual based on their sex or gender. In evaluating a claim of sex- or gender-based discrimination, the first consideration is whether there is sufficient evidence of a prima facie case. Here, the Investigators must determine whether Prof. Egolf demonstrated favoritism towards male students on account of their gender, which thereby negatively impacted other unidentified female or non-male students (either through adverse action or lack of educational opportunities). The Investigators then consider whether Respondent has provided a legitimate, non-discriminatory reason for the adverse action or whether Respondent's reason is pretext (or an excuse) for discrimination.

First, the conduct being reviewed here involves students, and therefore there can be no violation of the University *Policy on Equal Opportunity and Non-Discrimination in Employment*. The issue here thus centers around whether male students experienced favoritism because of their gender, and whether this alleged favoritism of male students, negatively impacted female students.

The Summary raises an allegation that Prof. Egolf "engages more with men than women in his classes."  *See* Summary at III (A).  The Summary also raises the following allegations:

> Professor Egolf "plays favorites" and has exhibited a pattern of preferring to work with men over women outside of class; this includes developing mentor/mentee-like relationships with male students and continuing those relationships beyond their graduation. These relationships with male students/alumni include private or small group study sessions in advance of Professor Egolf's exams; going to dinner; taking them to shows at the Kennedy Center; having them over to his home; letting them sleep over at his home; and, at times, providing them with alcohol.

*See* Summary at III (B). While evidence shows Witness 1 (a male student) reaped the benefit of everything listed above, including ultimately securing a postbac fellowship, we are unable to substantiate a finding that male students generally experienced favoritism because of their gender. While Prof. Egolf did spend more time with Witness 1 than other students and provided him with extensive opportunities to socialize and correspond outside of class, we could not conclude that Prof. Egolf had engaged with any other students in this fashion – men or women.  Further, Witness 13 (a male alumni), stated that he did not receive any preferential treatment based on his sex/gender; and in fact asked to switch advisors while working on his dissertation because he could not get along with Prof. Egolf and was not progressing in his dissertation work.

31

The Investigators did confirm that Prof. Egolf has socialized with both with men and women, though most of his engagement and socializing occurs with advisees and Prof. Egolf has never had a female advisee. In light of the overall makeup of the Physics department, the Investigators were unable to conclude that this was due to favoritism or purposeful selection. The Physics Department is primarily comprised of male students. According to multiple witnesses, this is reflective of the fact that the field of physics is overwhelmingly made up of men. Prof. Egolf stated that while has not had any female advisees in the past, he did have two for the 2023-2024 academic year. Many of Prof. Egolf's classes were small, usually 15-20 students, the majority of which were male. Despite these statistics, all of the witnesses (except for Witness 1) stated that Prof. Egolf treated everyone the same and did not show a preference or favoritism for male students.

Additionally, there is insufficient evidence to support a finding that unidentified female students were negatively impacted and suffered adverse educational opportunities due to their gender. There were no witnesses that could not provide any specific examples of adverse actions taken against female students, and Witnesses 9 and 10, did not state that they were negatively impacted by Prof. Egolf's alleged favoritism of male students. Prof. Egolf also specifically noted that at least one of the women that Witness 1 had claimed was treated poorly by Prof. Egolf had earned and received an "A" in his class. Further, multiple student witnesses stated, and documents produced during the review reflect, that Prof. Egolf provided support for students without regard to sex or gender. Accordingly, on this issue the Investigators were unable to conclude that there was sex or gender-based discrimination in violation of the University *Equal Opportunity and Non-Discrimination in Education* policy.

**Issue 3:**  Whether Prof. Egolf engaged in professional misconduct that may be reviewed under the Faculty Handbook.

The conduct reported to IDEAA may also implicate Section III.C. 11 of the Faculty Handbook, regarding professional conduct of faculty members. The Provost requested that IDEAA gather information and make findings of fact related to the reported conduct. This section of the Faculty Handbook broadly covers various aspects of "Professional Conduct," which we address in further detail below:

(a) **Compliance** – Faculty members must comply with all applicable department, program, school, campus, and University policies, and with applicable law.

(b) **Fair Treatment** – Every member of the University has the right to be treated fairly, courteously, and professionally by students, colleagues, the Department Chair and by all members of the University administration, and to be protected from arbitrary or capricious action on the part of any such persons. Every member has a correlative responsibility to treat other members accordingly. Faculty members are to be free from arbitrary or capricious action on the part of the University Administration with respect to the determination of his or her own individual annual compensation, provided that an individual is not entitled to receive any information concerning the salaries or the factors material to the salaries of others, nor may the faculty member by this provision be entitled to receive any information received by the University in confidence relevant to initial appointment, the grant of tenure, promotion or

retention.  Faculty members must refrain from committing or inciting to acts of physical violence against individuals or property, or acts which interfere with the academic freedom of other persons within the University or interfere with the freedom of speech or movement of such persons.

\*        \*        \*

(e)(iii) **Academic Authority, Supervisory Responsibility, and Impartiality** – Faculty members, by virtue of their status in the University, wield significant power and authority over their students and supervisees.

*Personal Relationships in General* – If a faculty member has any relationship with a colleague, student, or supervisee outside of the professional relationship that might affect the faculty member's impartiality, the faculty member shall disclose the relationship to his or her own chair or dean, and may be required to recuse him or herself from certain supervisory and academic responsibilities with respect to that colleague, student, or supervisee. (*See also* the "Policy on Consensual Sexual or Romantic Relationships," Section IV.G).

The Investigators' factual findings are noted above, and the Investigators have additionally prepared the summary below to aid the Provost in the determination of appropriate next steps.

Witness 1 was a student through May 2023.  Upon graduation, there remained a supervisory/mentor relationship between Prof. Egolf and Witness 1.  The postbac research was a continuation of the thesis work that Witness 1 worked on under the supervision of Prof. Egolf as a student.  According to Prof. Egolf, the grant was specifically awarded for Prof. Egolf to work with Witness 1, and the relationship with Witness 1 involved collaboration and mentoring him on how to research the topics in the grant proposal.  In fact, according to the RCSA the grant/award was "designed to provide undergraduate seniors the opportunity to continue a research project for a year after graduation *under the supervision* of a Cottrell Scholar."  This continued relationship between Prof. Egolf and Witness 1, was not one of "friendship" but instead a continuation and/or progression of the pedagogical relationship between the two.  At the very least, Prof. Egolf was supervising and mentoring Witness 1 on this research assignment. Any actions taken by Prof. Egolf in his role as a faculty member and supervisor of this grant, which is paid to the University and subsequently to Witness 1, implicate University policies and procedures that govern the conduct of faculty with students and third-parties. Further, Prof. Egolf's actions in supervising Witness 1 during the postbac required University approval and went through the University process, and utilized the University's systems, offices and equipment.  Therefore, the Investigators believe that these policies would apply to the post-graduation relationship as well.

Beginning at the end of Witness 1's junior year and continuing through his senior year and into the postbac work he performed with Prof. Egolf, the amount of access, assistance, outside social events and overall communication he had with Prof. Egolf certainly gives rise to the appearance of a personal relationship extending beyond the normal faculty / student relationship.  Prof. Egolf identified no other students that he routinely and regularly texted, including nights and weekends, took to multiple meals, theater performances and movies, and invited to stay over in his home.

33

Certainly none of the other students in his courses with Witness 1 had the same relationship and benefits, nor did they have the same relationship or opportunities with other professors in the department.   Several of the faculty witnesses we spoke to confirmed that Prof. Egolf's style of getting to know his students differed from their personal practices.

Further, Prof. Egolf's inability to recognize the implications of the unequal power dynamic between himself and Witness 1 and how it may have impacted Witness 1's responses and interactions with Prof. Egolf is particularly troubling.  Coupled with the behavior at the graduation celebration, this raises concerns about Prof. Egolf's professionalism and judgment when interacting with his students and mentees.

**Issue 4:**    Whether Prof. Egolf engaged in conduct that violated an October 2015 confidential settlement agreement between Prof. Egolf and the Provost.

Many of the sections within 2(a)-(f) of the Confidential Settlement Agreement (the "Agreement") apply to and restrict Prof. Egolf's interactions with "students."  Detailed below are factual findings that may be used to determine whether there is a violation of the October 2015 Settlement Agreement:

- **2(a) – Meetings with Students**
  - **i. In Private Spaces** – Respondent met with Witness 1 in his office, as he did with other students. When meeting in his office, Respondent kept the door open, except for the instance in which he changed his shirt before heading to the Kennedy Center with Witness 1 post-graduation.  After graduation, while Witness 1 was working with Prof. Egolf as a postbac, Prof. Egolf drove Witness 1 in his personal vehicle where it was just the two of them on a few occasions and had Witness 1 over to his house for an overnight graduation celebration.
  - **ii. At Residences** – Respondent met with Witness 1 at Respondent's house post graduation, while Witness 1 was serving as a postbac.
  - **iii. Residing with a Student** – There are no allegations or evidence of Respondent residing with Witness 1 or any other students.

- **2(b) – Professional Relationship with Students** – As indicated above, Respondent had a more personal relationship with Witness 1 than he had with any other students. While Witness 1 was a student and supervisee, Prof. Egolf took him to multiple meals and social events and corresponded with him extensively by text. He hosted a personal, overnight graduation celebration, supplied excessive amounts of alcohol and encouraged Witness 1 to get drunk playing a drinking game.  He told stories involving sexual innuendo, sexual propositions, and genitalia.  He also provided Witness 1 with assistance with classwork and tests, offered him a position as a summer research assistant, agreed to work with him on his thesis, and offered him the opportunity to apply for the postbac grant.

- **2(c) – Questions Regarding Student Interactions** – While Prof. Egolf spoke to other faculty about certain concerns related to Witness 1's academic performance, he never disclosed or sought guidance about the personal relationship he developed with Witness 1.

- **2(d) – No Sexual Comments or Advances** –There is no evidence that Respondent propositioned Witness 1 or made overt sexual comments towards Witness 1 while he was a student. Instead, Prof. Egolf made innuendos and alluded to telling stories of a sexual nature after graduation, which he immediately did during the graduation celebration where he shared information of other students propositioning him, made comparison of genitalia, and recalled an incident of former student being drunk and waking up naked, with an erection on his couch.

- **2(e) – Alcohol** – There are no allegations or evidence of a violation of this section.

- **2(f) – Compliance with Policies** – *See* the Analysis of Issue 1 which found a violation of the Policy on Sexual Misconduct and the Equal Opportunity and Non-Discrimination in Education, as well as the analysis of issue 3 of this Report for a discussion of the factual findings with regard to conduct that may implicate the Faculty Handbook.

## VII.    CONCLUSION

Accordingly, as to Issue 1, the Investigators find that there is sufficient evidence under a preponderance of the evidence standard to substantiate a finding that Respondent engaged in sexual harassment as defined in the University's *Policy on Sexual Misconduct,* resulting in a violation of this Policy and the *Policy on Equal Opportunity and Non-Discrimination in Education*. As to Issue 2, the Investigators find that there is insufficient evidence under a preponderance of the evidence standard to substantiate a finding the Respondent engaged in sex- or gender-based discrimination in violation of the University's policy on *Equal Opportunity and Non-Discrimination in Education*. As provided above, the Investigators have also provided factual findings with respect to conduct that may implicate certain provisions of the Faculty Handbook and certain provisions of the October 2015 settlement agreement between Respondent and the Provost.

## VIII.   NOTICE OF RIGHT TO APPEAL

Pursuant to IDEAA's *Grievance Procedures to Investigate Allegations of Discrimination and Harassment,* Complainant or Respondent can file an appeal within 14 business days of IDEAA's notification of the results. To obtain an appeal, the appellant must demonstrate: (1) a material failure to follow IDEAA's *Grievance Procedures to Investigate Allegations of Discrimination and Harassment* during the investigation; and/or (2) significant evidence was not considered, which would have altered the outcome of the investigation.

## VI.    PROHIBITION AGAINST RETALIATION

This report serves as a reminder that the University's policies prohibit retaliation, harassment, or other adverse actions against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment or discrimination, or otherwise exercising rights protected by law.