# EXHIBIT E



*Office of the Provost*                                    *Georgetown University*

October 28, 2024

Dr. David Egolf
**Redacted**

via email

Re:   Notice of Breach of Settlement Agreement

Dear Dr. Egolf,

You are subject to a Confidential Settlement Agreement and Release dated October 17, 2015 ("Agreement"). Pursuant to paragraph 11, Georgetown University is hereby providing notice that you are in material breach of the Agreement, specifically the requirements in paragraph 2, as discussed below. The evidence of breach has been established through the admissions in your June 6, 2024 appeal ("Appeal") of the May 6, 2024 IDEAA investigative report ("Report") following the administrative review process. Following your appeal, which was denied, the administrative review process is complete. It is clear that you breached the Agreement.

The breaches relate to your interactions with **Roe** for whom you served as professor, physics advisor, thesis research advisor, summer program research professor, and post-baccalaureate scholar supervisor. (Report, p. 29; Appeal, p. 12). The facts establish that you engaged in an unprofessional, personal relationship with **Roe** which violated the Agreement. In addition, you (1) failed to use your best efforts to avoid meeting one-on-one with **Roe** in a private space with the door closed; (2) met one-on-one in your residence with **Roe** and (3) made comments or statements about genitalia, jokes of a sexual nature, or sex-related teasing to **Roe** Finally, you failed to comply with all policies in the Faculty Handbook, including all policies under the purview of IDEAA.

Unprofessional/Personal Relationship
Paragraph 2(b) of the Agreement states: "Egolf will maintain a professional faculty-student relationship with students and will not engage in a relationship with a student or supervisee that might affect Egolf's impartiality with that student." The evidence demonstrates that you failed to maintain a professional faculty-student relationship with **Roe** while he was an

1

undergraduate student and that you engaged in a personal and unprofessional relationship with **Roe** while he was under your supervision as a postbaccalaureate scholar.

As a Cottrell Scholar, you applied for and received a Cottrell Postbaccalaureate ("postbac") Award. It was specifically granted in order for you to do particular research with **Roe** and the award letter specified that it was "designed to provide undergraduate seniors the opportunity to continue a research project for a year after graduation *under the supervision* of a Cottrell Scholar." (emphasis added). You were responsible for all of the guidance on the work of the postbac, and it was a continuation/progression of your pedagogical relationship with **Roe** (See Report p. 33).

In the Appeal, you admitted to a number of statements in the Report with the assertion "This statement is true." You wrote:

- "Beginning during **Roe** junior year, the two met, spoke, and texted regularly, including on nights and weekends and on and off-campus. This statement is true" (Appeal, p. 16).
- "Dr. Egolf became well-acquainted with numerous aspects of **Roe** life, including his family, his mental health, and certain other personal matters. This statement is true." (Appeal, p. 17).
- "Dr. Egolf and **Roe** had multiple meals together. This statement is true." (Appeal, p. 18). You further wrote: "Beginning sometime in **Roe** junior year, they had meals together about once a month at a nearby restaurant in Georgetown. Most of the time they ate at Pizzeria Paradiso—a bright and open space popular among students and faculty. They discussed research, classes, and health issues, as well as books, movies, and sports. Initially, their meals often included other students or alumni, though as **Roe** senior year went on and his health issues intensified, the meals were more often one-on-one." (Appeal, p. 18).
- "Dr. Egolf paid for all meals he had with **Roe** This statement is true." (Appeal, p. 19).
- "Dr. Egolf paid for tickets at the Kennedy Center three times over approximately a six-month period. This statement is true." (Appeal, p. 20). You further wrote: "**Roe** had been experiencing more and more physical and mental difficulties as his senior year progressed, including hundreds of 'blackouts' a day, and he believed that his symptoms were exacerbated by stress. He loves musicals and he actively campaigned to be Dr. Egolf's guest, emphasizing that it would be beneficial to his stress levels." (Appeal, p. 20).
- "Dr. Egolf paid for tickets at the movies twice over approximately a 6-month period. This statement is true." (Appeal, p. 21).
- "Dr. Egolf and **Roe** exchanged thousands of text messages, often on a daily basis. This statement is true." (Appeal, p. 22).
- "Dr. Egolf repeatedly extended invitations to **Roe** to attend out-of-school events. This statement is true." (Appeal, p. 23).
- "Dr. Egolf changed his shirt in front of **Roe** This statement is true." (Appeal, p. 25).

- "Dr. Egolf drove **Roe** around in his personal vehicle. This statement is true." (Appeal, p. 25).
- Although you disagreed with the Report's characterization of the number of times you invited **Roe** to spend the night at your house, you admitted: "Dr. Egolf invited **Roe** to spend the night at his house after their celebration of **Roe** graduation, since they expected to drink and it would be late. . . . Dr. Egolf invited **Roe** to spend the night at his house after they went to see the Lion King so that he would not have to drive to **Roe** home in Reston and back the night immediately preceding when **Roe** was already slated to go to Dr. Egolf's home for their graduation celebration." (Appeal, p. 26).
- "Dr. Egolf hosted **Roe** overnight for a graduation celebration. This statement is true." (Appeal, p. 27).
- Although you disagreed with the characterization of the amount of alcohol you provided **Roe** you admitted: "It is undisputed that Dr. Egolf and **Roe** together consumed 3½ bottles of champagne at a fairly consistent rate over the course of about 11 hours." (Appeal, p. 28).
- In describing your use of the bathroom at the graduation party, you admitted: "It is correct to say that Dr. Egolf left the door slightly ajar when he went into the bathroom because **Roe** had continued talking." (Appeal, p. 30).
- In describing the types of stories you told **Roe** you wrote: "[Dr. Egolf] told **Roe** about his horror at being propositioned by a student and he told a story of a student whom he found naked on his couch. The latter led to Dr. Egolf and **Roe** having a discussion of how views of nakedness had changed through the years. Dr. Egolf told **Roe** that when he was growing up students routinely showered together, especially if they played sports, so nakedness was not really a big deal to him. And during that back-and-forth, Dr. Egolf made an off-hand joke about the size of a college friend's penis." (Appeal, p. 31).
- You also described the following related to a drinking game: " **Roe** used the restroom at some point during which a bottle was taped to his hand. He removed the bottle and Dr. Egolf teased him about cheating. . . . Dr. Egolf retaped the bottle to his hand." (Appeal, p. 32; see also p. 33).

This evidence clearly establishes a breach of paragraph 2(b) of the Agreement, which requires that you maintain a professional faculty-student relationship with students and prohibits you from engaging in a relationship with a student *or supervisee* that might affect your impartiality with that student.

Meeting in Private Spaces
Paragraph 2(a)(i) of the Agreement states: "Egolf shall use his best efforts to avoid meeting one-on-one with any Georgetown student in a private space (such as his office, a meeting room, or a laboratory) with the door closed."

While **Roe** was a Georgetown student, you attended dinners, shows at the Kennedy Center, and movies together. On May 15, 2023, before graduation, while **Roe** was still a student, you invited **Roe** to your house: "By the way, are you coming over for

3

champagne/dinner next week before you head to Europe." (Report, p. 21; Appeal, p. 27). The evidence also demonstrates that you changed your shirt in your office with **Roe** present with the door closed before heading to the Kennedy Center, and that you drove **Roe** around in your personal vehicle.

This evidence demonstrates that you failed to use your "best efforts" to avoid meeting one-on-one with **Roe** in violation of the Agreement. The obligation to use your "best efforts" means that you are required to do all that can possibly be done to comply with the requirement. It is a high bar. Not only did you fail to use "best efforts" when, as you admitted, you "repeatedly extended invitations to **Roe** to attend out-of-school events" (Appeal, p. 23), but also you invited **Roe** to a private party in your home while he was still a student.

One-on-One Meetings at Residences
Paragraph 2(a)(ii) of the Agreement requires: "Egolf shall not meet one-on-one in any residence or place of accommodations with any undergraduate student enrolled at Georgetown, any Georgetown student in the Department of Physics, or any student with whom Egolf has a supervisory relationship."

It is undisputed that you hosted **Roe** at your house for an overnight graduation celebration one-on-one with "champagne/dinner." (Report, pp. 21-25; Appeal, p. 27). This occurred while **Roe** was a postbaccalaureate scholar under your supervision. As discussed above, you initiated this encounter on May 15, 2023, when **Roe** was still a student.

The evidence demonstrates that you breached the Agreement by meeting one-on-one in your residence with **Roe** over whom you had a supervisory relationship at Georgetown, and you initiated that interaction while **Roe** was still an undergraduate student.

Sexual Comments and Advances
Paragraph 2(d) of the Agreement states: "Egolf will not make any sexual advances, comments or statements about genitalia, jokes of a sexual nature, or sex-related teasing to any Georgetown student. Egolf shall not make any comment of a sexual nature that is of a lewd or lascivious nature when he knows or reasonably should know that any Georgetown student is close enough that he or she might reasonably be able to overhear such comment."

It is undisputed that on May 18, 2023, which was graduation day, you texted **Roe** and said: *"Well, I can finally tell you all of the crazy stories I've hinted at."* (Report, pp. 17, 23; Appeal, p. 31). This statement indicates that you had, prior to May 18, 2023, hinted at "all of the crazy stories," which you then told **Roe** after graduation. You also admitted that you in fact told **Roe** stories about being propositioned by a student and finding a student naked on your couch. You admitted that you discussed views of nakedness, and you told **Roe** that when you were growing up students routinely showered together, so nakedness was not really a big deal to you. During this conversation, you also made a "joke" about the size of a college friend's penis. (Report, pp. 23-24; Appeal, p. 31).

4

Based on the evidence, it is my conclusion that you deliberately attempted to circumvent the requirement of paragraph 2(d) by waiting until **Roe** graduated before making explicit comments to him about genitalia, jokes of a sexual nature and sex-related teasing. You "hinted at" such stories while **Roe** was a student (Report, pp. 17, 23, 28, 30; Appeal, p. 31) and clearly understood that such behavior would violate the Agreement. Your conduct violates Paragraph 2(d) of the Agreement, because you made statements while **Roe** was an undergraduate student that alluded to the comments, stories, and jokes of a sexual nature that you then made while **Roe** was a postbaccalaureate scholar under your supervision.

<u>Compliance with Policies</u>
Paragraph 2(f) of the Agreement states: "Egolf shall comply with all policies in the Faculty Handbook, including all policies that are under the purview of the Office of Institutional Diversity, Equity, and Affirmative Action."

My determination that you breached the Agreement is independent of other proceedings related to your conduct. However, in addition to my findings, IDEAA found that you engaged in "sexual harassment as defined in the University's Policy on Sexual Misconduct, resulting in a violation of this Policy and the Policy on Equal Opportunity and Non-Discrimination in Education," (Report, p. 35), which implicates paragraph 2(f) of the Agreement. A formal charge has also been made with the FRC regarding your compliance with your professionalism and teaching responsibilities under Faculty Handbook. My determination of breach does not rely on the outcome of those proceedings, but they may be additional bases upon which you breached the Agreement.

<u>Determination</u>
You have breached the Agreement in several serious ways. Termination of employment is the appropriate penalty for such breaches. However, prior to imposing such a penalty, I will request input from the Faculty Responsibilities Committee on the appropriate corrective or disciplinary action, provided such input can be provided in a timely manner. While I would appreciate the Committee's input, I am not waiving my right to take action without the Committee's input.

The University does not waive any rights to assert breach of the Agreement on other bases or based on additional facts. The University does not waive any other rights under the Agreement or under law.

Sincerely,

*Robert M. Groves*

Robert Groves
Provost