**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID EGOLF

  Plaintiff,

                vs.

GEORGETOWN UNIVERSITY ET AL.

  Defendants.

Case No. 25-CV-3439.

◆————————◆

**PLAINTIFF'S FIRST AMENDED COMPLAINT
FOR RETALIATION IN VIOLATION OF TITLE IX,
RETALIATION IN VIOLATION OF THE DC HUMAN RIGHTS ACT,
BREACH OF CONTRACT, BREACH OF THE DUTY OF GOOD FAITH AND FAIR
DEALING, TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE,
INTERFERENCE WITH CONTRACTUAL RELATIONS,
NEGLIGENT SUPERVISION,
AND CIVIL CONSPIRACY**

◆————————◆

**Table of Contents**

I.      Preliminary Statement................................................................................................1

II.     Exhaustion Of Administrative Remedies ................................................................1

III.    Parties ..........................................................................................................................1

IV.     Jurisdiction and Venue..............................................................................................2

V.      Facts ..............................................................................................................................3

            Mr. Roe's 2023 Report to Georgetown.................................................................3

            Georgetown's Willful Disregard of Title IX .......................................................4

            Georgetown's Willful Violations of its Non-Disclosure and Non-Reliance
            Agreements With Professor Egolf .........................................................................6

            Georgetown Breached the Non-Disclosure Clause of the 2015 Agreement
            with Malicious Intent and Willful Disregard of Professor Egolf's Rights By
            Disclosing 2013 Protected Information to Employees and Investigators ..........8

            Georgetown Breached the Non-Disclosure Clause of the 2015 Agreement
            with Malicious Intent and Willful Disregard of Professor Egolf's Rights By
            Filing 2013 Protected Information in the Public Court Record...........................10

            Georgetown Breached the  Non-Reliance Clause of the 2015 Agreement
            with Malicious Intent and Willful Disregard of Professor Egolf's Rights
            When It Used 2013 Protected Information to Evaluate the Report...................11

            Georgetown Violated Professor Egolf's Right to Commence the Process
            at the "Step II" Phase ...........................................................................................12

            Georgetown Violated the Formal Complaint Requirement.................................13

            Georgetown Violated Professor Egolf's Right to See All of the Evidence
            Against Him...........................................................................................................15

            Georgetown Violated Professor Egolf's Right to a Fair Process
            by Employing Biased Investigators......................................................................17

            Georgetown Violated Professor Egolf's Right to a Fair Process by
            Employing Investigators With Whom the University Had an
            Attorney-Client Relationship................................................................................18

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda. Marvland 20814

Georgetown Violated Professor Egolf's Right to a Fair Process
by Assigning IDEAA to Investigate Matters Outside its Bailiwick........................ 18

Georgetown Violated Professor Egolf's Right to a Fair Process
by Engaging in a Fishing Expedition ................................................................. 19

Georgetown Violated Professor Egolf's Title IX Right to be Free of
Retaliation by Bringing Separate Charges Against Him Based on the
Same Facts ........................................................................................................ 20

Georgetown's Finding That Professor Egolf Engaged In Sexual Harassment
Is Fundamentally Unsound Because Georgetown Never Demonstrated
That Professor Egolf Engaged In Conduct of a Sexual Nature, Conduct
that Mr. Roe Found to Be Unwelcome, or Conduct that Was
Subjectively and Objectively Offensive ............................................................ 21

Georgetown's Finding that Professor Egolf Engaged in Sexual Harassment
Is Fundamentally Unsound Because Georgetown Did Not Evaluate the
Evidence Using the Preponderance of the Evidence Standard ........................... 26

Georgetown's Finding that Professor Egolf Created a Sexually Hostile
Environment Is Fundamentally Unsound Because Georgetown
Did Not Apply the "Severe or Pervasive" Standard ......................................... 27

Georgetown Failed to Reasonably Supervise Its Title IX Office .......................... 29

Georgetown Impermissibly Put Professor Egolf on Administrative Leave
and Failed to Remedy its Violation Even Though It Determined
that the Leave Violated the *Faculty Handbook* ............................................. 30

**Count One**, Retaliation in Violation of Title IX Against Defendant Georgetown
University ........................................................................................................ 31

**Count Two**, Breach of Contract Against Defendant Georgetown University ...................... 33

**Count Three**, Breach of The Covenant of Good Faith And Fair Dealing
Against Defendant Georgetown University ...................................................... 33

**Count Four**, Interference with Contractual Relations Against Defendants
Groves, Kilkenny, Okubadejo, And Berner ..................................................... 34

**Count Five**, Tortious Interference with Prospective Economic Advantage
Against Defendants Groves, Kilkenny, Okubadejo, and Berner ....................... 34

**Count Six**, Negligent Supervision Against Defendant Georgetown University .................. 35

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda. Maryland 20814

**Count Seven**, <u>Retaliation in Violation of the District of Columbia Human Rights Law</u>
Against All Defendants ................................................................................................ 36

**Count Eight**, <u>Civil Conspiracy</u> Against Defendants Groves, Kilkenny, Okubadejo,
Berner, Baron, and Hodge-Wren ............................................................................ 36

**Demand For Jury Trial** ........................................................................................................ 38

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## I. PRELIMINARY STATEMENT

1.      This is an action seeking compensatory and punitive damages from Defendant Georgetown University for Retaliation under Title IX and the District of Columbia Human Rights Act and for the common law violations of Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Negligent Supervision.

2.      This action also seeks compensatory and punitive damages from Defendants Robert Groves, Rosemary Kilkenny, Olabisi Ladeji Okubadejo, and Samantha Berner for their Tortious Interference with Prospective Economic Advantage, Tortious Interference with Contractual Relations, Retaliation under the District of Columbia Human Rights Act, and Civil Conspiracy as to their collaboration to violate Professor Egolf's Title IX, Human Rights Act, and contractual rights under the *Faculty Handbook* and the 2015 Agreement.

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.      None of Plaintiff's claims have any administrative exhaustion requirement.

## III. PARTIES

4.      Plaintiff is a citizen of the United States and a resident of the State of Maryland. He is a tenured Associate Professor of Physics at Georgetown University.

5.      Defendant Georgetown University is a non-profit corporation created by act of Congress and located in and authorized to do business in the District of Columbia.  It is a "program or activity" and a federal funds recipient, as described in 20 U.S.C. § 1687, and therefore subject to The Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq*.

6.      Robert M. Groves is an individual who is a citizen of the United States and a resident of the city of Washington, DC.  Groves was during the relevant time Georgetown's

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Marvland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Interim President.  He previously served as Georgetown's Executive Vice President and Provost.

7.      Olabisi Ladeji Okubadejo is an individual who is a citizen of the United States. Okubadejo was at the relevant times Georgetown's Associate Vice President of Equal Opportunity, Affirmative Action, and Compliance.

8.      Rosemary E. Kilkenny is an individual who is a citizen of the United States. Kilkenny was at the relevant times Georgetown's Vice President for Institutional Diversity, Equity & Inclusion and Chief Diversity Officer.

9.      Samantha Berner is an individual who is a citizen of the United States.  Berner was at the relevant times Georgetown's Title IX Coordinator and Director of Title IX Compliance.

10.      Defendants Groves, Okubadejo, Kilkenny, and Berner were during all material times employees of Georgetown University.

11.      Defendants Stephanie Baron and Sasha Hodge-Wren are individuals who are citizens of the United States.  They are attorneys in private practice hired by Georgetown to conduct an investigation.  They were not employees of Georgetown University.

### IV.  JURISDICTION & VENUE

12.      This Court has subject-matter jurisdiction over this Complaint pursuant to 42 U.S.C. § 2000d-7 and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

13.      Professor Egolf has an implied private right of action under Title IX.  <u>Cannon v. University of Chicago</u>, 441 U.S. 677 (1979).  Professor Egolf has an express private right of action under the DC Human Rights Act.  D.C. Code § 2-1403.16.

14.     This Court has jurisdiction over Plaintiff's pendent state law claims in that they arise out of a common nucleus of operative facts and are so related to the claim in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).

15.     Venue is proper because the actions complained of herein occurred within the District of Columbia.  28 U.S.C. § 1391.

### V.  FACTS

### *Mr. Roe's 2023 Report to Georgetown*

16.     Robert Roe[1] was an undergraduate student at Georgetown, studying physics, until his graduation in May 2023.

17.     Professor Egolf was Mr. Roe's major advisor.  Mr. Roe took four courses taught by Professor Egolf, frequently sought tutoring and mentoring from Professor Egolf, chose to be Professor Egolf's research assistant during the summer after his junior year, and elected to do a post-baccalaureate research fellowship with Professor Egolf's guidance.

18.     During Mr. Roe's fourth year at Georgetown, Professor Egolf and Mr. Roe applied for and won a highly-prestigious post-baccalaureate fellowship that would pay Mr. Roe to conduct research for the year following his graduation.  While the fellowship was to take place at Georgetown University, neither Georgetown nor Professor Egolf were Roe's employer or supervisor.

19.     Computer logs show that Mr. Roe worked only briefly on the fellowship.  He worked on the fellowship from about June 15 until June 22.  On June 22, Mr. Roe was issued

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

---

[1] "Robert Roe" is a pseudonym.

a paycheck for the work he did in June and the work he would do in July and August. Mr. Roe did virtually no work for the fellowship after that day.

20.    On or about July 19, 2023, about a month after ceasing work on his fellowship, Mr. Roe informed Georgetown's office of Institutional Diversity, Equity, and Affirmative Action ("IDEAA") that he had recently come to believe that Professor Egolf had been "grooming him" during the course of his mentoring.

21.    Mr. Roe informed IDEAA explicitly that Professor Egolf had never touched him in an inappropriate manner.

22.    Mr. Roe informed IDEAA explicitly that Professor Egolf never propositioned him for sexual or romantic activity.

23.    Mr. Roe made no allegation that Professor Egolf had engaged in any unwelcome conduct of a sexual nature.

24.    Mr. Roe did not allege that Professor Egolf had sexually harassed him.

25.    Mr. Roe's report to IDEAA included no allegations regarding Professor Egolf's conduct which would, if true, amount to sexual harassment.

26.    Mr. Roe refused Georgetown's urging that he file a Formal Complaint against Professor Egolf.

27.    IDEAA informed Georgetown's then-Provost Robert Groves of Mr. Roe's report.

28.    Groves directed IDEAA to conduct an investigation into Mr. Roe's allegations.

### *Georgetown's Willful Disregard of Title IX*

29.    Title IX prohibits sex-based discrimination and sexual harassment by any educational institution that receives federal funding.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

30.     The federal regulations promulgated pursuant to Title IX impose rules regarding how cases of alleged sexual harassment are to be processed.  These rules are intended to ensure a process which is fair for both the complainant and the accused.

31.     Because Georgetown University receives federal funding, it is required by law to abide by the strictures of Title IX.

32.     Because the District of Columbia generally follows analogous federal law, Georgetown is required by the District of Columbia Human Rights Act to abide by the strictures of Title IX.

33.     Georgetown's internal policies require that it abide by Title IX when responding to an allegation of sexual misconduct unless *none* of the allegations could, if proved, constitute Title IX misconduct.

34.     Georgetown's internal policies also require that Georgetown abide by Title IX even if it is merely *unclear* whether any of the allegations fall within the scope of Title IX protections.

35.     Georgetown has never claimed that none of the allegations could constitute Title IX misconduct.  To the contrary, Georgetown has alleged that Professor Egolf engaged in acts of sexual misconduct while on campus and while using University equipment. Georgetown's allegations, if true, would constitute misconduct in violation of Title IX.

36.     Instead, Georgetown contends that Title IX does not apply in this case because "most" of the allegations against Professor Egolf relate to events at Professor Egolf's house off campus.   This is a specious argument because Georgetown's policy requires the application of Title IX unless "none" of the allegations could amount to Title IX misconduct. Because "most" is not "none", Georgetown policy requires the application of Title IX.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

37.     Georgetown refused to abide by Title IX in its activities in response to Mr. Roe's report.

38.     Georgetown knew or should have known that Title IX applies to this case.

39.     Georgetown's willful refusal to abide by Title IX deprived Professor Egolf of the benefits of Title IX's fairness guarantees, such as the right to a fair and unbiased review of the allegations, it violated federal law, and it resulted in an invalid process and an invalid outcome.

### *Georgetown's Willful Violations of its Non-Disclosure and Non-Reliance Agreements With Professor Egolf*

40.     Ten years before the events that are the subject of this claim, a student accused Professor Egolf of sexual harassment (the "2013 Complaint").

41.     The 2013 Complaint included the conclusory assertion that Professor Egolf had engaged in sexual harassment.

42.     The 2013 Complaint did not allege any conduct that would, even if true, comprise sexual harassment.

43.     In response to the 2013 Complaint, Robert Groves demanded that Professor Egolf be stripped of tenure and fired.

44.     IDEAA conducted an investigation into Professor Egolf's student interactions.

45.     In 2015, Georgetown acknowledged that Professor Egolf had not engaged in sexual misconduct and entered into an agreement with Professor Egolf to resolve the 2013 Complaint without litigation (the "2015 Agreement").

46.     As part of the 2015 Agreement, Georgetown granted Professor Egolf a full and unconditional general release.  The release extended to any and all conduct that occurred prior to the execution of the Agreement.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

47.    The general release demonstrates Georgetown's recognition that Professor Egolf had not engaged in sexual misconduct.

48.    Georgetown would not have granted Professor Egolf an unconditional general release if it had identified any credible evidence that suggested that he had engaged in sexual misconduct or if it believed that any such evidence existed.

49.    The 2015 Agreement strictly barred the disclosure to any person of any materials which refer or relate to the 2013 Complaint (including the Agreement and information related to the investigation).

50.    The 2015 Agreement directed that all materials which refer or relate to the 2013 Complaint must be stored in a strictly confidential manner within the offices of University Counsel, IDEAA, or the Provost.

51.    The 2015 Agreement was accompanied by a letter written by Groves in which he expressed his opinions regarding the matter (the "Provost's Letter").

52.    The Provost's Letter sharply accused Professor Egolf of misconduct.

53.    The Provost's Letter demonstrates that Groves harbored anger and resentment over Professor Egolf's opposition to the 2013 Complaint and over Professor Egolf's avoidance of discipline.

54.    The Provost's Letter demonstrates that Groves continued to believe that Professor Egolf had been guilty of sexual misconduct.

55.    The 2015 Agreement directed that the Provost's Letter must "be maintained in a sealed envelope in the Office of the Provost"; that it could "be opened solely by and at the discretion of the Provost or Georgetown Counsel"; and that it must be "prominently marked as such on the exterior".

56.     For purposes of this Complaint, the requirements outlined in Paragraphs 49 through 55 comprise the "Non-Disclosure Clause". The 2013 Complaint, all materials related to the investigation that followed, the 2015 Agreement, and the Provost's Letter together comprise the "2013 Protected Information".

57.     The 2015 Agreement also provided that, except as described in Paragraph 58, Georgetown was strictly barred from using, relying on, or referring to the 2013 matter in making any employment decisions regarding Professor Egolf (the "Non-Reliance Clause").

58.     The sole exception to the Non-Reliance Clause is that the Provost's Letter could be used, relied upon, or referred to if and only if there were a future finding of a violation of the 2015 Agreement or of the *Faculty Handbook* which necessitated discipline.

### *Georgetown Breached the Non-Disclosure Clause of the 2015 Agreement with Malicious Intent and Willful Disregard of Professor Egolf's Rights By Disclosing 2013 Protected Information to Employees and Investigators*

59.     Georgetown stored information about the 2013 Complaint in its database of IDEAA proceedings. Gaining access to the records in the IDEAA database did not require special authorizations.

60.     Olabisi Ladeji Okubadejo, Georgetown's Associate Vice President of Equal Opportunity, Affirmative Action, and Compliance, accessed the 2013 Protected Information.

61.     Ms. Okubadejo disclosed the 2013 Protected Information to IDEAA employees Samantha Berner and Kay Bhagat-Smith.

62.     Groves, Okubadejo, Rosemary Kilkenny, and Samantha Berner each participated in and took steps to provide the Provost's Letter and portions of the 2015 Agreement to the investigators. They did so even though each of them knew that the terms of the 2015 Agreement strictly barred any disclosure to any person of any information

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

related to the 2013 Complaint. The investigators had no need to know anything about any of the 2013 Protected Information.

63.     Georgetown gave 2013 Protected Information to Professor Egolf's departmental chair, associate provost, dean, and others. None of the recipients of those materials had a need to know about any of the 2013 Protected Information.

64.     Storing and disclosing the 2013 Protected Information as described in Paragraphs 59 through 63 violated the Non-Disclosure Clause.

65.     Groves, Kilkenny, Okubadejo, and Berner each knew that Professor Egolf had not been found to be in violation of the 2015 Agreement or the *Faculty Handbook* when they participated in the decision to disclose information about the 2013 Protected Information to the investigators.

66.     Groves, Kilkenny, Okubadejo, and Berner each knew that disclosure of the 2013 Protected Information to the investigators would be highly prejudicial to Professor Egolf.

67.     Groves, Kilkenny, Okubadejo, and Berner each knew that knowing about the 2013 Protected Information was highly likely to cause the investigators to infer that Professor Egolf was guilty of the allegations made against him in 2023.

68.     Georgetown had no proper business purpose for disclosing the 2013 Protected Information to the investigators.

69.     Georgetown disclosed the 2013 Protected Information to the investigators with the intent of prejudicing the judgment of the investigators against Professor Egolf.

70.     Disclosure of the 2015 Agreement and the Provost's Letter to the investigators harmed Professor Egolf by negatively influencing the investigators' opinions and judgments

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

and was a factor in the investigators' conclusion that Professor Egolf had engaged in sexual misconduct.

71.    Georgetown willfully and maliciously violated the 2015 Agreement by disclosing the 2013 Protected Information to the investigators and others.

72.    Groves, Kilkenny, Okubadejo, and Berner conspired with one another in their disclosure of 2013 Protected Information in breach of the 2015 Agreement.

### *Georgetown Breached the Non-Disclosure Clause of the 2015 Agreement with Malicious Intent and Willful Disregard of Professor Egolf's Rights By Filing 2013 Protected Information in the Public Court Record*

73.    In response to Professor Egolf's suit, Georgetown filed a counterclaim alleging that Professor Egolf breached the 2015 Agreement by failing to maintain a professional faculty-student relationship with a student.

74.    Georgetown knew when it publicly filed the countercomplaint and the five documents attached to it (hereinafter collectively the "Countercomplaint") that each of those documents contains 2013 Protected Information.

75.    Georgetown knew when it publicly filed the Countercomplaint that it was required by the Non-Disclosure Clause to keep all 2013 Protected Information confidential and not to disclose any such information to any person.

76.    The claims that Georgetown made in its counterclaim did not necessitate the disclosure of the 2013 Protected Information.

77.    Georgetown did not follow the pre-disclosure requirements of the 2015 Agreement before filing its Countercomplaint.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

78.    Georgetown did not make reasonable efforts to obtain confidential treatment for the 2013 Protected Information, such as redacting confidential information or seeking leave to file the documents under seal.

79.    Georgetown did not make reasonable efforts to limit the scope of its public disclosure.

80.    Georgetown knew when it publicly filed the Countercomplaint that public disclosure of the 2013 Protected Information would be highly prejudicial to Professor Egolf's personal and professional reputation and standing.

81.    Georgetown's public filing of the Countercomplaint with knowledge that public filing violated the Non-Disclosure Clause was a willful breach of the 2015 Agreement.

82.    Georgetown's public filing of the Countercomplaint with intent to cause Professor Egolf reputational harm and not merely to advance Georgetown's litigation interests amounts to malice such that its public filing was a malicious breach of the 2015 Agreement.

83.    Georgetown's public filing of the Countercomplaint, its other public disclosures, and the exchange of information in various communications within the University also constitute breaches of the confidentiality provisions of the *Faculty Handbook*.

### *Georgetown Breached the Non-Reliance Clause of the 2015 Agreement with Malicious Intent and Willful Disregard of Professor Egolf's Rights When It Used 2013 Protected Information to Evaluate the Report*

84.    The individual defendants each relied on 2013 Protected Information in their evaluations of Roe's report.

85.    The individual defendants each knew of the existence and meaning of the Non-Reliance Clause.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

86.     The individual defendants violated the Non-Reliance Clause by relying on the 2013 Protected Information for their evaluations of Roe's report.

87.     The individual defendants each knew that the terms of the 2015 Agreement strictly barred the University from relying on the 2013 Protected Information unless Professor Egolf had been found to be in violation of the 2015 Agreement or the *Faculty Handbook*.

88.     Georgetown willfully and maliciously violated the 2015 Agreement by relying on the 2013 Protected Information to evaluate Mr. Roe's report.

89.     The individual defendants conspired with one another in their reliance on the 2013 Protected Information in breach of the 2015 Agreement.

### *Georgetown Violated Professor Egolf's Right To Commence the Process at the "Step II" Phase*

90.     Georgetown University has promulgated a *Faculty Handbook*.

91.     The *Faculty Handbook* is a binding contract between Georgetown and its faculty.

92.     Georgetown has promulgated various policies separate from the *Faculty Handbook*.

93.     The *Faculty Handbook* requires that Georgetown abide by all Georgetown policies when investigating allegations of misconduct.

94.     The *Faculty Handbook*, Title IX, and the DC Human Rights Act all require a prompt, fair, and impartial investigative process.

95.     The *Faculty Handbook* guarantees that every member of the faculty will be protected from arbitrary or capricious action by Georgetown.

96.     The *Faculty Handbook* lays out the process that must be followed when Georgetown investigates an allegation of sexual misconduct.

97.     The *Faculty Handbook* directs that if during an Administrative Review the identity of a person accused of wrongdoing (the "Respondent") is ascertained, the process must proceed immediately to the phase of the investigation referred to as "Step II".

98.     The Step II phase includes rules which provide various fairness protections to the Respondent.

99.     Mr. Roe identified Professor Egolf as the Respondent when he made his report to IDEAA.  IDEAA identified Professor Egolf as the Respondent in its August 9, 2023, letter to Egolf.

100.    Because IDEAA knew that Professor Egolf had been identified as the Respondent, the investigative process should have commenced at the Step II phase.

101.    The investigative process did not commence with the Step II phase.

102.    Georgetown's failure to commence the investigation at the Step II phase breached the *Faculty Handbook* and deprived Professor Egolf of the safeguards provided in the Step II phase.

### *Georgetown Violated the Formal Complaint Requirement*

103.    The *Faculty Handbook* requires that at the start of the Step II phase the complainant must provide IDEAA with a signed statement which identifies and describes the actions and conduct which the complainant alleges were acts of sexual misconduct.  This statement, along with supporting documentation, is referred to as the "Formal Complaint".

104.    The Formal Complaint must provide specific details about the allegations, such as the date, nature, and location of each of the alleged bad acts.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

105.    The Formal Complaint must also state the reasons for the complainant's belief that the complained-of actions were discriminatory, harassing, and/or retaliatory.

106.    The *Faculty Handbook* and Title IX both require that the University provide a copy of the Formal Complaint to the Respondent.  Providing the Formal Complaint to the Respondent is an essential requirement of the investigative process because it ensures that the Respondent has a fair opportunity to know and to respond to the specific allegations that are being made against him.

107.    To be accepted for investigation, Georgetown policy requires that the alleged conduct, if substantiated, would constitute a violation of an IDEAA policy.

108.    Georgetown policy and Title IX both limit the scope of the investigation to the allegations presented in the Formal Complaint.

109.    Mr. Roe refused to execute a Formal Complaint.

110.    When someone who reports sexual misconduct declines to make a Formal Complaint, certain university employees, including several IDEAA employees, are permitted by Title IX and the *Faculty Handbook* to sign and file a Formal Complaint.

111.    Georgetown did not obtain a Formal Complaint from any employee.  In fact, Georgetown did not even *seek* to obtain a Formal Complaint from any employee.

112.    Georgetown informed Professor Egolf of the allegations against him in a letter, dated August 9, 2023, in which it accused him of engaging in sexual misconduct (the "August 9 Letter").

113.    The August 9 Letter did not satisfy the requirements of Georgetown policy and Title IX as described in Paragraphs 103 through 107.

    a.    The August 9 Letter does not indicate which of the alleged actions constitute sexual misconduct, conduct of a sexual nature, unwelcome conduct,

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

sexual harassment, or hostile environment, or interfered with Mr. Roe's educational opportunity.

b.     The August 9 Letter does not explain the basis or reasons for Georgetown's claim that the alleged actions constitute sexual misconduct, sexual harassment, or a hostile work environment.

114.    The August 9 Letter was written by Georgetown personnel with highly specialized knowledge, training, and experience in the field of sexual harassment.  Those employees knew or should have known that the *Faculty Handbook*, other University policies, and Title IX impose fair notice requirements.

115.    The August 9 Letter contains a narrative description of the complaint against Professor Egolf but it does not provide a specific articulation of the acts he is alleged to have done which constitute sexual misconduct and the basis for Georgetown's conclusion that such acts constitute misconduct.  As such, the August 9 Letter did not provide fair notice to Professor Egolf of the allegations against him.

116.    Professor Egolf repeatedly asked Georgetown to provide a list of his purported bad acts and the reason for Georgetown's conclusion that each such act constituted sexual misconduct.  Georgetown consistently and repeatedly refused Professor Egolf's requests.

117.    Georgetown's report contained allegations against Professor Egolf about which Georgetown had never given him notice.

118.    Georgetown violated the requirements of the *Faculty Handbook* and of Title IX by failing to provide Professor Egolf with a copy of a Formal Complaint.

### *Georgetown Violated Professor Egolf's Right to See All of the Evidence Against Him*

119.    The *Faculty Handbook* and Title IX both require that at the commencement of the Step II phase of the investigation, Georgetown must provide respondents with copies of all documentation detailing or supporting the allegations of misconduct.

120.    IDEAA employees Samantha Berner and Kay Bhagat-Smith took notes during several interviews that they conducted with Mr. Roe.  They conveyed those notes to Vice President Okubadejo.  Ms. Okubadejo relied on some or all of those notes when she discussed Mr. Roe's report with Provost Groves.

121.    Georgetown did not provide a copy of those notes (nor any other notes made during the investigation) to Professor Egolf.  In fact, Georgetown never even disclosed to Professor Egolf that those notes existed.

122.    When the existence of the notes came to light during a grievance hearing, IDEAA personnel refused to produce copies of those notes to the Plaintiff.

123.    The Faculty Grievance Committee directed IDEAA to produce some of those notes to the hearing panel for *in camera* review.

124.    After completing its *in camera* review, the Faculty Grievance Committee reported to Professor Egolf that the notes included Mr. Roe's statement, ***"To be clear, there has never been any physical contact of a sexual nature".***  The Faculty Grievance Committee also reported to Professor Egolf that the notes stated that Mr. Roe stated that Professor Egolf had never touched him inappropriately and had never propositioned him for sexual or romantic contact.  IDEAA had not disclosed this potentially exculpatory information to Professor Egolf and did not include this information in its Report.

125.    The faculty grievance panel also disclosed to Professor Egolf that one of IDEAA's allegations against Professor Egolf related to an interaction that had occurred two decades earlier.  The fact that that incident occurred so long ago sharply diminished its probative value to this case.  In addition, the University was barred from considering that incident in this case pursuant to the terms of the 2015 Agreement.  IDEAA had not disclosed that potentially exculpatory fact to Professor Egolf.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

126.    IDEAA's withholding of evidence, especially of exculpatory evidence, violated the *Faculty Handbook*, Title IX, and the DC Human Rights Act.

### *Georgetown Violated Professor Egolf's Right to a Fair Process by Employing Biased Investigators*

127.    The *Faculty Handbook* and Title IX both require that investigations of alleged sexual misconduct be conducted by people who are unbiased and who have no conflict of interest.

128.    Title IX defines a conflict of interest to include any "bias for or against complainants or respondents generally".

129.    Georgetown hired attorneys Stephanie K. Baron and Sasha E. Hodge-Wren to conduct the investigation.   Baron exclusively represents management in employment law matters.   She specializes in representing universities in disputes with their faculty and students.   Hodge-Wren exclusively defends employers and businesses in matters involving discrimination and harassment and other matters.

130.    Because Baron and Hodge-Wren work exclusively on behalf of management in employment matters, and because Baron specializes in representing universities in disputes with their faculty, they are not impartial.

131.    Georgetown violated the *Faculty Handbook*, Title IX, and the DC Human Rights Act by employing investigators who were not impartial and unbiased.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

***Georgetown Violated Professor Egolf's Right to a Fair
Process by Employing Investigators With Whom the
University Had an Attorney-Client  Relationship***

132.    The *Faculty Handbook* and Title IX both require that investigations of alleged sexual misconduct be conducted by people who are unbiased and who have no conflict of interest.

133.    Defendants Stephanie K. Baron and Sasha E. Hodge-Wren had an attorney-client relationship with Georgetown University.

134.    Because of their attorney-client relationship, Baron and Hodge-Wren were not unbiased.

135.    Because of their attorney-client relationship, Baron and Hodge-Wren had a conflict of interest.

136.    Because they were highly likely to be called as witnesses in the pending litigation, Baron and Hodge-Wren had a conflict of interest.

137.    Baron and Hodge-Wren refused to provide certain information to Professor Egolf because of their attorney-client relationship with Georgetown, prejudicing Professor Egolf's development of evidence and violating their duties under the *Faculty Handbook* and Title IX to act without bias.

138.    Baron and Hodge-Wren hid their attorney-client relationship with Georgetown from Professor Egolf by, *inter alia*, explicitly informing him at the start of their interviews with him that their "role [was] as neutral investigators" and that "there is no attorney-client privilege that attaches to our communications".

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda. Marvland 20814

***Georgetown Violated Professor Egolf's Right to a Fair
Process by Assigning IDEAA to Investigate
Matters Outside its Bailiwick***

139.    Provost Robert Groves directed IDEAA to investigate whether Professor Egolf had engaged in conduct that violated (i) any provision of Section III.C.11 of the *Faculty Handbook*, (ii) any university policy, (iii) any law, and/or (iv) Sections 2.a through 2.f of the 2015 Agreement.

140.    The *Faculty Handbook* allocates investigatory duties among various Georgetown departments and entities.

141.    Groves' instruction to IDEAA to investigate whether Professor Egolf had violated any provision of Section III.C.11 of the *Faculty Handbook* was *ultra vires* because the *Faculty Handbook* allocates authority for investigating those claims to the Faculty Responsibilities Committee, not IDEAA.

142.    Groves' instruction to IDEAA to investigate whether Professor Egolf had violated any provision of the 2015 Agreement was *ultra vires* because IDEAA has no authority to conduct such inquiries.

143.    Groves' instruction to IDEAA to investigate whether Professor Egolf had violated any university policy or any law was *ultra vires* (except as to laws and University policy related to discrimination or sexual misconduct) because the *Faculty Handbook* restricts IDEAA's investigative authority to matters within its jurisdiction.

144.    By its foregoing actions, Georgetown violated the provisions of the *Faculty Handbook* regarding allocation of investigatory authority.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

### *Georgetown Violated Professor Egolf's Right to a Fair Process by Engaging in a Fishing Expedition*

145.    Georgetown policy and Title IX both restrict the scope of the investigation to the allegations that appear in the Formal Complaint.

146.    The *Faculty Handbook* and Title IX both restrict investigations to cases in which there is a reasonable basis in fact for believing that wrongdoing has occurred.

147.    The August 9 Letter alleged that Professor Egolf had engaged in sex- or gender-based harassment and that he demonstrated favoritism toward male students.

148.    Neither Mr. Roe nor any other source provided information which could provide a reasonable basis for believing that Professor Egolf had engaged in sex- or gender-based harassment.

149.    Neither Mr. Roe nor any other source provided information which could provide a reasonable basis for believing that Professor Egolf demonstrated favoritism toward male students.

150.    Groves' instruction to IDEAA to investigate whether Professor Egolf had engaged in sex- or gender-based harassment or demonstrated favoritism toward male students amounts to a fishing expedition; an investigation hoping to catch a violation despite a lack of information supporting the propriety of the search.

151.    Georgetown violated the  fairness guarantees of the *Faculty Handbook* and Title IX by investigating allegations for which there was no reasonable factual predicate.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

*Georgetown Violated Professor Egolf's Title IX Right to be Free of Retaliation*
*by Bringing Separate Charges Against Him Based on the Same Facts*

152.    In addition to the charges that Georgetown brought against Professor Egolf in the IDEAA proceedings, Georgetown also brought charges against Professor Egolf in a Faculty Responsibilities Committee proceeding.

153.    Georgetown alleged in the Faculty Responsibilities Committee proceeding that Professor Egolf had violated the University's professionalism standards.

154.    The facts and circumstances that formed the basis of Georgetown's professionalism charge were the same facts and circumstances which Mr. Roe had alleged in his report to IDEAA and for which Georgetown had sought to fire Professor Egolf in the IDEAA proceedings.

155.    It is unlawful retaliation under Title IX for an educational institution to bring charges against an individual for code of conduct violations for the purpose of interfering with or evading any rights protected by Title IX if the charges arise out of the same facts or circumstances as are made in a report of sexual misconduct, even when the alleged code of conduct misconduct does not involve sexual misconduct.

156.    Georgetown's charge against Professor Egolf for alleged unprofessionalism was unlawful retaliation under Title IX and the DC Human Rights Act.

*Georgetown's Finding That Professor Egolf Engaged In Sexual Harassment Is*
*Fundamentally Unsound Because Georgetown Never Demonstrated*
*That Professor Egolf Engaged In Conduct of a Sexual Nature,*
*Conduct that Mr. Roe Found to Be Unwelcome,*
*or Conduct that Was Subjectively*
*and Objectively Offensive*

157.    Georgetown claims that its conclusion that Professor Egolf sexually harassed Mr. Roe is based on the following facts:  Professor Egolf spent a large amount of time with

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda. Marvland 20814

Mr. Roe; Professor Egolf tutored Mr. Roe; Mr. Roe was a passenger in Professor Egolf's car; Professor Egolf exchanged a large number of text messages with Mr. Roe; that they exchanged some of those text messages in the late evening hours; Professor Egolf and Mr. Roe engaged in social activities together several times; Professor Egolf and Mr. Roe ate meals together; Professor Egolf had conversations with Mr. Roe regarding non-academic matters and matters related to Mr. Roe's personal life; and Professor Egolf invited Mr. Roe to his home to celebrate Mr. Roe's graduation with pizza, champagne, and movies.

158.    Pursuant to both Georgetown policy and Title IX, conduct is sexual harassment only if it is (i) conduct of a sexual nature; (ii) unwelcome conduct; (iii) offensive to its subject; and (iv) objectively offensive.

### *Professor Egolf Engaged in No Conduct of a Sexual Nature*

159.    None of the activities described in Paragraph 157 is *ipso facto* conduct of a sexual nature.

160.    For example, there is nothing inherently sexual about spending a large amount of time with another person.  In fact, in this case Professor Egolf spent a large amount of time with Mr. Roe because (i) he was Mr. Roe's academic advisor, (ii) Mr. Roe took four courses with Professor Egolf over the course of two years, (iii) Mr. Roe chose to do research with Professor Egolf, (iv) Mr. Roe sought extensive tutoring from Professor Egolf; and (v) Mr. Roe sought out Professor Egolf's guidance and support.

161.    Nor did Professor Egolf engage in any conduct of a sexual nature during any of the activities described in Paragraph 157.

162.    For example, Professor Egolf made no statements of a sexual nature in the text messages that he sent to Mr. Roe.  In fact, virtually all of the communications between

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Professor Egolf and Mr. Roe, including in-person conversations, email, and text messages, addressed school-related matters.

### *Professor Egolf Engaged in No Conduct That Mr. Roe Did Not Welcome*

163.    Professor Egolf engaged in no conduct which Mr. Roe found to be unwelcome during the activities described in Paragraph 157.

164.    The evidence (including Mr. Roe's own statements) proves that Mr. Roe welcomed his friendly relationship with Professor Egolf and voluntarily engaged in the activities described in Paragraph 157.  For example, Mr. Roe actively sought tutoring from Professor Egolf throughout the two years during which he took classes in Professor Egolf's department, and he repeatedly expressed excitement about celebrating his graduation with Professor Egolf.

165.    IDEAA alleged that Professor Egolf's late evening text exchanges were proof of sexual misconduct.  The evidence contradicts that allegation.  As IDEAA acknowledged in its investigative report, Professor Egolf "responded to students almost any time of the day or night".

166.    The evidence shows that Mr. Roe commenced two-and-a-half times as many late-evening text exchanges as did Professor Egolf.

167.    Mr. Roe ate meals with Professor Egolf because their tutoring sessions were frequently during, immediately preceding, or immediately after tutoring sessions and because Professor Egolf frequently offered to take any students who remained in the classroom after a class out for pizza.  The meals that Mr. Roe and Professor Egolf ate together were always at bright, popular locations on or near the Georgetown campus.  Eating meals together, with or without other students at the table, is not a sexual act.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

168.    Professor Egolf and Mr. Roe saw "Top Gun" together because Mr. Roe invited Professor Egolf to go with him.  Professor Egolf and Mr. Roe saw "Close" together when Mr. Roe invited himself to join Professor Egolf, sending a text message to Professor Egolf saying, "And I'd love to tag long to the movie if possible!"  IDEAA did not acknowledge this fact in its Report or incorporate it into its analysis.

169.    Professor Egolf and Mr. Roe saw three musicals at the Kennedy Center.  They did so because Mr. Roe lobbied to be Professor Egolf's guest, stating that he "definitely want[ed] to go" and explaining that he thought it would be good for him because it would reduce his stress.  IDEAA did not acknowledge this fact in its Report or incorporate it into its analysis.

170.    Professor Egolf engaged in discussion regarding personal matters only as Mr. Roe invited and only as to personal matters which Mr. Roe had voluntarily shared with Professor Egolf.

171.    Mr. Roe initiated text exchanges on nonacademic matters on nearly one hundred occasions.

172.    Mr. Roe never stated that Professor Egolf engaged in unwelcome conduct.

173.    Georgetown's investigation uncovered no facts that demonstrate that Professor Egolf engaged in unwelcome conduct.

174.    Professor Egolf engaged in no conduct which Mr. Roe found to be offensive during the activities described in Paragraph 157.

175.    Professor Egolf engaged in no conduct which a reasonable person would find to be offensive during the activities described in Paragraph 157.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

*Georgetown's Contention that Mr. Roe Could Not Consent to His Relationship with Professor Egolf Because of a Power Differential is Specious*

176.    IDEAA disregarded the voluminous evidence demonstrating that Mr. Roe welcomed and actively sought out his non-academic interactions with Professor Egolf on the ground that Mr. Roe "was unable to freely give consent due to the "unequal power dynamic" between the two parties.

177.    Georgetown *asserted* that Mr. Roe could not freely give consent because of a power differential but it never actually *evaluated* whether a power differential between the Parties negatively impacted Mr. Roe's ability to freely give or withhold consent.

178.    Georgetown *asserted* that Mr. Roe could not freely give consent because of a power differential but it never actually *evaluated* whether a power differential between the Parties facilitated any acts of sexual harassment or other exploitation of Mr. Roe.

179.    There is no evidence supporting Georgetown's assertion that Mr. Roe was unable to freely give consent to non-academic interactions or that his granting or withholding of consent were impacted in any way by a power differential between them.

180.    The evidence contradicts Georgetown's assertion that a power differential caused Mr. Roe from being able to withhold consent to non-academic interactions. For example, Mr. Roe never alleged that he felt unable to freely give or withhold consent or that that his granting or withholding of consent was impacted in any way by a power differential between them.

181.    Mr. Roe never alleged that he had ever suffered, or that he believed that he might suffer, any negative repercussions as a result of declining any invitation from Professor Egolf.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

182.    There is no evidence that Mr. Roe actually suffered any threatened or actual negative repercussions as a result of declining any invitation from Professor Egolf.

183.    The *Faculty Handbook* recognizes that genuinely consensual romantic and sexual relationships can exist between individuals in unequal positions of power or authority and that such relationships do not constitute sexual harassment.

184.    *A fortiori*, Mr. Roe's non-romantic and non-sexual relationship with Professor Egolf, accompanied by extensive and repeated expressions of genuine consent, cannot be assumed to be nonconsensual.

185.    Georgetown has not articulated the basis of its contention that each of the activities described in Paragraph 157 is conduct of a sexual nature, unwelcome conduct, conduct which was offensive to Mr. Roe, or conduct which was objectively offensive.

186.    Georgetown's contention that Professor Egolf engaged in sexual harassment of Mr. Roe through the activities described in Paragraph 157 lacks evidentiary support, is illogical, and is arbitrary.

187.    Thus, because Professor Egolf's conduct described in Paragraph 157 was not conduct of a sexual nature, not unwelcome conduct, and not offensive conduct, it was not sexual harassment.

### Georgetown's Finding that Professor Egolf Engaged in Sexual Harassment Is Fundamentally Unsound Because Georgetown Did Not Evaluate the Evidence Using the Preponderance of the Evidence Standard

188.    University rules and Title IX both require that IDEAA use the preponderance of the evidence standard to determine whether the evidence shows that an accused person engaged in sexual harassment.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda. Maryland 20814

189.   IDEAA recognized that its determination was to be based on a preponderance of the evidence standard and claimed to have used that standard, but the evidence proves that IDEAA did not do so.

190.   There is extensive evidence demonstrating that Professor Egolf's relationship with Mr. Roe was one of voluntary mentorship of an entirely platonic nature, that the non-academic interactions that Professor Egolf and Mr. Roe had were in service to Professor Egolf's position as Mr. Roe's mentor, that the social activities in which Mr. Roe and Professor Egolf engaged were largely ancillary to their academic relationship, and that to the extent that they engaged in social activities that were not ancillary to their academic work, Mr. Roe always demonstrated through his words and actions that he was doing so voluntarily.

191.   On the other hand, there is no evidence that Professor Egolf touched Mr. Roe inappropriately, that he made sexual or romantic propositions to Mr. Roe, that he made sexually suggestive comments or actions, or that he otherwise engaged in conduct that might reasonably be denominated as sexual harassment or creating a hostile environment.

192.   IDEAA's investigative report contains no weighing of the evidence supporting the allegation that Professor Egolf had engaged in sexual harassment against the evidence opposing that conclusion.  By failing to apply the preponderance of the evidence standard, Georgetown violated University rules, breached Professor Egolf's rights under the *Faculty Handbook* to be free from arbitrary conduct, and violated Title IX.

### Georgetown's Finding that Professor Egolf Created a Sexually Hostile Environment Is Fundamentally Unsound Because Georgetown Did Not Apply the "Severe or Pervasive" Standard

193.   Georgetown policy and Title IX both recognize that in an academic setting conduct creates a sexually hostile environment only if the wrongdoer engaged in offensive

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

conduct of a sexual nature which was so severe or pervasive that it interfered with the subject's academic performance or his ability to participate in or benefit from Georgetown's education programs.

194. Mr. Roe never alleged that Professor Egolf engaged in any unwelcome conduct of a sexual nature which directly or indirectly interfered with his educational experiences and opportunities.

195. IDEAA did not assess the purported severity or pervasiveness of Professor Egolf's allegedly improper conduct.

196. The sole basis of IDEAA's contention that Professor Egolf's conduct restricted Mr. Roe's academic performance or his ability to participate in or benefit from Georgetown's education programs was its conclusion that Mr. Roe's "interactions with Professor Egolf and the stress he felt about them, especially following the graduation celebration" interfered with his ability to participate in a post-baccalaureate research fellowship and ultimately caused him to terminate the fellowship.

197. Mr. Roe stated in writing that his decision not to continue working on the fellowship had nothing to do with anything personal between himself and Professor Egolf.

198. IDEAA presented no evidence demonstrating that Professor Egolf engaged in any conduct that interfered with Mr. Roe's ability to participate in, or caused him to terminate, the fellowship.

199. Mr. Roe's fellowship was comprised of participating in Professor Egolf's computational research.

200. Mr. Roe and Professor Egolf performed that research using Georgetown's shared high-performance computing resources.

201.    Computer records demonstrate conclusively that Mr. Roe ceased participation in the research a week before the graduation dinner that IDEAA claims to have been the cause of Mr. Roe's cessation of work.

202.    Georgetown's conclusion that Professor Egolf engaged in a sexually-hostile environment is directly contradicted by the evidence, is illogical, is arbitrary, and breaches Professor Egolf's rights under the *Faculty Handbook* to be free of arbitrary conduct.

203.    Georgetown willfully and maliciously violated its own policy and Title IX by ignoring incontrovertible evidence that its conclusion that Professor Egolf created a sexually-hostile environment was false.

204.    By concluding that Professor Egolf had engaged in sexual harassment without determining that Professor Egolf engaged in conduct that was so severe or pervasive that it limited Mr. Roe's ability to participate in or benefit from Georgetown's education program or activity, Georgetown violated University rules and procedure, breached Professor Egolf's rights under the *Faculty Handbook* to be free of arbitrary conduct, and violated Title IX.

### *Georgetown Failed to Reasonably Supervise Its Title IX Office*

205.    Georgetown has a duty to use reasonable care to supervise its employees to, *inter alia*, ensure that its personnel abide by governing law and binding contracts.

206.    Georgetown had numerous opportunities to take steps to ensure that IDEAA's actions would be consistent with the procedural and substantive requirements of Title IX and the *Faculty Handbook*.

207.    Georgetown failed to take steps to ensure that IDEAA conducted the investigation in a manner consistent with Title IX and the *Faculty Handbook*.

208.    Georgetown disregarded Professor Egolf's warnings that IDEAA was conducting the investigation in a manner grossly inconsistent with Title IX and the *Faculty Handbook*.

209.    Georgetown contends that it lacks authority to review substantive findings reached by IDEAA.  There is no basis in law or fact for this contention.  In fact, neither Title IX nor the *Faculty Handbook* restrict Georgetown's authority to review substantive findings reached by IDEAA.  Georgetown never articulated the basis for its conclusory contention that it lacked authority to review the substantive findings reached by IDEAA.

210.    Georgetown knew or should have known that neither Title IX nor the *Faculty Handbook* nor any other Georgetown policy restrict Georgetown's authority to review substantive findings reached by IDEAA.

211.    IDEAA engaged in procedural and substantive misconduct in the conduct of its investigation and Professor Egolf's appeal.

212.    IDEAA acted with willful disregard of Professor Egolf's rights to a prompt and fair investigation.

213.    Georgetown's willful failure to supervise IDEAA was the proximate cause of the harm that resulted from IDEAA's actions.

### *Georgetown Impermissibly Put Professor Egolf on Administrative Leave and Failed to Remedy Its Violation Even After It Had Determined that the Leave Violated the Faculty Handbook*

214.    Robert Groves placed Professor Egolf on administrative leave in July 2023.

215.    The duly-appointed Faculty Grievance Committee found that Groves' action violated the *Faculty Handbook*.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

216. The Faculty Grievance Committee also found that Professor Egolf was harmed by Groves' improper action.

217. Among other harms, Professor Egolf lost a valuable external grant because of Groves's improper action.

218. Despite the decision finding that Groves had violated the *Faculty Handbook* by putting Professor Egolf on leave, Georgetown has refused to restore Professor Egolf to his position.

219. Georgetown's refusal to reinstate Professor Egolf amounts to the imposition of a sanction without authorization via faculty committee review, contravening the *Faculty Handbook's* guarantee that faculty have the right to a timely faculty committee review before any discipline or sanctions are imposed when the discipline or sanctions harm the faculty member in his or her professional capacity.

**COUNT ONE**
**RETALIATION IN VIOLATION OF TITLE IX**
**Against Defendant Georgetown University**

220. Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

221. Title IX makes it illegal to retaliate against any person for participating "in any manner in an investigation, proceeding, or hearing" under the statute. Applicable regulations include accused persons within the class of persons protected by Title IX, so it is illegal to retaliate against accused perpetrators for their participation in Title IX proceedings.

222. A complaint of sexual misconduct was filed against Professor Egolf in 2013. That complaint was not supported by evidence of sexual misconduct, but extensive evidence demonstrated that the complainant was a voluntary participation in an entirely platonic and

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

academic relationship.  Based on that complaint, Georgetown investigated Professor Egolf for sexual harassment.

223.    Professor Egolf opposed the 2013 complaint and opposed the use of Title IX in a case lacking evidence of sexual misconduct.  He was ultimately found not to have engaged in misconduct and he suffered no discipline at the conclusion of the matter.

224.    Despite the facts and the ultimate findings, Robert Groves continued to believe that Professor Egolf was guilty of sexual misconduct and harbored anger and resentment over Professor Egolf's opposition to the proceedings and his avoidance of discipline for the alleged harassment.

225.    The 2023 investigation was retaliatory conduct because Groves was motivated in full or in part by his anger and resentment over Professor Egolf's participation in the 2013 investigation and Professor Egolf's avoidance of discipline for the alleged harassment.

226.    Groves testified during an administrative proceeding that he was motivated in his instruction to IDEAA to conduct an investigation by his knowledge of the 2013 investigation.

227.    Each of the individual defendants participated in the retaliatory investigation.

228.    Each of the Defendants engaged in additional retaliatory conduct.

229.    The Defendants' additional retaliatory conduct includes making disclosures of highly prejudicial information that it had agreed to keep confidential within the university, to Defendants Baron and Hodge-Wren, and in public court records for retaliatory purposes.

230.    The Defendants' additional retaliatory conduct includes bringing charges against Professor Egolf in a Faculty Responsibilities Committee proceeding for alleged code of conduct violations constituted unlawful retaliation because they were brought for the purpose of interfering with and evading Professor Egolf's rights to a fair and impartial

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

proceeding guaranteed to him by Title IX and the DC Human Rights Act and therefore were unlawful retaliation under those laws.

## COUNT TWO
### BREACH OF CONTRACT
### Against Defendant Georgetown University

231.    Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

232.    Defendant Georgetown University's *Faculty Handbook* constitutes a contract with Plaintiff.

233.    Defendant Georgetown University entered into an additional contract with Professor Egolf in the form of the 2015 Agreement.

234.    The allegations detailed herein demonstrate that Georgetown violated material terms of both of those contracts with Professor Egolf.

## COUNT THREE
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### Against Defendant Georgetown University

235.    Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

236.    All contracts contain an implied duty of good faith and fair dealing.

237.    Through its conduct as detailed herein, Georgetown has acted in bad faith, arbitrarily, with malice, and in willful disregard for Professor Egolf's rights.

238.    Through its conduct as detailed herein, Georgetown has evaded the spirit of the *Faculty Handbook* and of the 2015 Agreement.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## COUNT FOUR
## INTERFERENCE WITH CONTRACTUAL RELATIONS
### Against Defendants Groves, Kilkenny, Okubadejo, and Berner

239.    Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

240.    Through their conduct as detailed herein, each of the Defendants engaged in improper actions with the purpose and effect of interfering with Professor Egolf's rights under the *Faculty Handbook* and under the 2015 Agreement.

241.    The Defendants engaged in such conduct with malice and improper motive.

242.    Through its conduct as detailed herein, the Defendants unlawfully interfered with Professor Egolf's contractual relations.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE
### Against Defendants Groves, Kilkenny, Okubadejo, and Berner

243.    Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

244.    Through their conduct as detailed herein, each of the Defendants engaged in improper actions with the purpose and effect of interfering with Professor Egolf's prospective economic advantage, including his ongoing employment as a tenured associate professor, his likely advancement to full professor, his ability to access other employment opportunities, and his generation of economic benefits through the conduct of research.

245.    The Defendants engaged in such conduct with malice and improper motive.

246.    Through their conduct as detailed herein, the Defendants interfered through their intentional conduct with Professor Egolf's prospective economic advantage.

## COUNT SIX
## NEGLIGENT SUPERVISION
### Against Defendant Georgetown University

247.    Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

248.    Professor Egolf informed Georgetown through communications with its provost and its general counsel, that its personnel, including each of the individual Defendants, were during the course of their conduct of the investigation into Professor Egolf acting in a manner inconsistent with statutory law and contractual duties.

249.    Georgetown knew or should have known, including through communications with its provost and its general counsel, that its personnel, including each of the individual Defendants, were during the course of their conduct of the investigation into Professor Egolf taking actions which were inconsistent with statutory law and contractual duties.

250.    Georgetown was negligent in failing to make proper regulations ensuring compliance with Title IX and compliance with the contractual rights of faculty derived from the *Faculty Handbook*.

251.    Georgetown was negligent or reckless in its supervision of the individual Defendants and in giving improper instructions to IDEAA staff, including but not limited to the instructions to investigate matters outside the ambit of IDEAA's authority and to conduct the investigation without complying with Title IX.

252.    The actions of Georgetown's employees were dangerous and incompetent.

253.    Notwithstanding its knowledge of the dangerous and incompetent actions of its employees, Georgetown failed to adequately supervise those employees.

254.    Georgetown was negligent or reckless in permitting, or failing to prevent, negligent and other tortious conduct by its employees.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## COUNT SEVEN
### RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### Against All Defendants

255. Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

256. The District of Columbia Human Rights Act makes it unlawful for an employer to take adverse action against an employee for participating in an investigation regarding conduct made unlawful by the Act.

257. The District of Columbia Human Rights Act makes it unlawful for an employer or an educational institution to discriminate based on sex.

258. Sexual harassment is a form of discrimination based on sex.

259. The District of Columbia Human Rights Act makes it illegal to retaliate against any person for participating "in any manner in an investigation, proceeding, or hearing" under the Human Rights Act.

260. It is unlawful to retaliate against accused perpetrators for their participation in Human Rights Act proceedings.

261. The Defendants' conduct as alleged herein, and as summarized in Count One constitutes retaliation in violation of the District of Columbia Human Rights Act.

## COUNT EIGHT
### CIVIL CONSPIRACY
### Against Defendants Groves, Kilkenny, Okubadejo, Berner, Baron, and Hodge-Wren

262. Plaintiff incorporates each of the other Paragraphs of this Complaint as if fully alleged herein.

263. Defendants Robert M. Groves, Rosemary E. Kilkenny, Olabisi Ladeji Okubadejo, Samantha Berner (the "Georgetown Conspiring Defendants") and Stephanie Baron and Sasha

Hodge-Wren (the "Outside Conspiring Defendants" or, together with the Georgetown Conspiring Defendants the "Conspiring Defendants") combined, confederated, agreed, and/or acted in concert with one another.

264. Outside Conspiring Defendants Baron and Hodge-Wren are legally distinct from Georgetown.

265. Outside Conspiring Defendants held themselves out as independent investigators and therefore they must be regarded as such for purposes of this claim.

266. The Conspiring Defendants' agreement and concerted action had as its purpose one or more unlawful objectives, including:

a. interfering with and inducing breaches of Plaintiff's contractual rights under the *Faculty Handbook*; and/or

b. interfering with and inducing breaches of the 2015 Agreement's non-disclosure and non-reliance clauses; and/or

c. committing tortious acts against Plaintiff, including interference with contractual relations and tortious interference with prospective economic advantage, as alleged in this First Amended Complaint.

267. In furtherance of the conspiracy, and consistent with their common design, the Conspiring Defendants committed overt acts, including but not limited to:

a. Accessing, maintaining, and/or exploiting Georgetown's IDEAA database in a manner that allowed 2013 Protected Information to be retrieved without special authorization and then accessed by Defendant Okubadejo.

b. Disclosing and disseminating 2013 Protected Information to and among Georgetown Conspiring Defendants, Outside Conspiring Defendants, and various other Georgetown employees.

c. Conducting a biased and non-impartial investigation while purporting to conduct an independent investigation consistent with the requirements of Georgetown policy and Title IX.

d. Causing or facilitating Georgetown's public filing in this litigation of materials containing 2013 Protected Information without making reasonable

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

efforts to obtain confidential treatment of that material, thereby amplifying dissemination and Professor Egolf's reputational harm.

268.    The Conspiring Defendants acted intentionally, willfully, and with malice and improper motive, and without lawful justification, with the purpose and effect of harming Plaintiff and depriving him of the benefit of his contractual and statutory protections.

269.    Plaintiff is entitled to all relief available for the underlying unlawful acts committed in furtherance of the conspiracy, including compensatory damages and such other relief as the Court deems just and proper.

270.    As a direct and proximate result of the wrongs detailed in each of the foregoing Counts and the preceding facts, Plaintiff has suffered and continues to suffer damages, including economic losses, harm to professional standing and reputation, and other injuries.

> WHEREFORE, as a result of Defendant's breach of the contract, directly causing Plaintiff financial and other damages, Plaintiff demands judgment joint and severally against the Defendants in the sum of Ten Million Dollars ($10,000,000.00) as compensatory damages.  Plaintiff also demands the reasonable costs, including attorney's fees, incurred in bringing this action, and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff David Egolf, by and through his under-signed counsel, herewith demands a trial by jury on all issues.

Respectfully Submitted,

Dated: June 11, 2026

LIPPMAN, SEMSKER & SALB, LLC
Micah Salb, Esq.  (Bar #453197)
msalb@lsslawyers.com
7979 Old Georgetown Road Suite 1100
Bethesda, MD 20814
(301) 656-6905