**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAVID EGOLF<br><br>  Plaintiff,<br><br>                    vs.<br><br>GEORGETOWN UNIVERSITY, ET AL.<br><br>  Defendants. | Case No.  25-CV-3439. |
| GEORGETOWN UNIVERSITY,<br><br>  Counterclaim Plaintiff,<br><br>                    vs.<br><br>DAVID EGOLF.<br><br>  Counterclaim Defendant. | |

◆————————◆

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

◆————————◆

Professor Egolf filed a motion for leave to amend his complaint (i) to make editorial changes; (ii) to add a claim under the District of Columbia Human Rights Act, and (iii) to add a claim for civil conspiracy.  The Defendants oppose, arguing that the Human Rights Act claim is untimely and that the District recognizes no cause of action for civil conspiracy.[1]  The Defendants err.

---

[1] The Defendants raise several other criticisms of Professor Egolf's proposed Amended Complaint. *See*, *e.g.*, Def's. Opp., p. 2 (last paragraph), p. 5 (last paragraph).  But they make no argument to support those conclusory assertions. In addition, the structure and language of their brief make clear that their

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## A

### PROFESSOR EGOLF'S HUMAN RIGHTS ACT CLAIM IS NOT UNTIMELY

The Defendants first argue that Professor Egolf's proposed addition of claim under the DC Human Rights Act would be futile because it is time-barred.  They note that the DCHRA had a one-year statute of limitations at the relevant time and that the retaliatory conduct occurred more than a year before Professor Egolf filed his Complaint.  Based on this, they argue that the DCHRA claims fall outside the limitations period.  Defs'. Opp. to Mot. for Leave to Am. (hereinafter the "Opp."), p. 7.  But as the following discussion demonstrates, Professor Egolf's Human Rights Act claims are timely.

## 1

### PROFESSOR EGOLF'S RETALIATION CLAIM FOR BEING PUT ON ADMINISTRATIVE LEAVE AND BARRED FROM CAMPUS IS TIMELY

Professor Egolf alleges that the Provost's action of putting him on administrative leave and barring him from campus was retaliatory in violation of the Human Rights Act. *See* Am. Compl., ¶¶ 214-19.  As recounted in the complaint, a University committee with authority over the issue found that barring Professor Egolf from campus was a violation of Professor Egolf's rights under the *Faculty Handbook* (*see* id., ¶ 219) but the University refused to vacate that improper order (*see* id., ¶ 218).  Since that retaliatory act continues to this day, it plainly falls within the actionable period.

---

opposition is based only on their contention that the DC Human Rights Act claim is untimely and that there is no cause of action for civil conspiracy cause of action.  Professor Egolf has therefore limited his response to those issues.

**2**

### THE INITIATION AND CONDUCT OF THE FACULTY RESPONSIBILITIES COMMITTEE PROCEEDINGS IS TIMELY

Second, Professor Egolf alleges that the initiation and conduct of the Faculty Responsibilities Committee proceedings were retaliatory.[2]  The initiation of the proceedings and the conduct of the proceedings are not separate events for limitations purposes.  (For the same *Morgan/Ladner* reason as is discussed in the following Part 3.)  Since those proceedings have not yet been completed,[3] they are obviously within the limitations period.

**3**

### THE IDEAA INVESTIGATION IS NOT TIME-BARRED BECAUSE THE STATUTE OF LIMITATIONS DID NOT COMMENCE UNTIL THE CONCLUSION OF THE POST-INVESTIGATION PROCEEDINGS

Third, the Defendants err in their claim that Professor Egolf's retaliation claim related to the IDEAA investigation is untimely.  They contend that the limitations period began to run on the day the investigation was completed; starting from that date, the one-year limitations period expired before Professor Egolf filed suit.  Opp., p. 6.  But the Defendants miss an important part of the analysis:  Their analysis is based on the "discrete acts" doctrine of National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), but that doctrine applies only when the investigation is a stand-alone event.  In cases like this one, where the

---

[2] The Defendants acknowledge Professor Egolf's contention that the initiation of the proceeding was retaliatory but make no mention of the conduct of that proceeding.

[3] The executive vice president has not yet made her decision.  *See* Georgetown Faculty Responsibilities Code (Part III(G) of the *Faculty Handbook*), attached hereto as Exhibit 1, at Paragraph 11(b).

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

investigation is only a part of a broader disciplinary process which culminates in a final decision, the statute of limitations does not begin to run until the final decision is issued.

In <u>Harris v. Ladner</u>, Howard University informed an assistant professor that her application for tenure was denied.  The district court held that this communication triggered the limitations period.  The D.C. Circuit reversed, holding that the limitations period did not begin with that initial denial of tenure but instead with the university's final decision.  This was true because Howard's <u>Guidelines for Appointments, Promotions, and Tenure Committees</u> entitled Dr. Harris to reconsideration of the tenure committee's negative recommendation <u>*before* a final decision would be issued</u>.  *Ladner*, 127 F.3d 1121, 1124 (D.C. Cir. 1997).  Reconsideration was not a collateral attack on a final decision; it "was the next step in the tenure application process" before a final decision would be issued.  <u>Id.</u>; *see also* <u>Moini v. LeBlanc</u>, 456 F.Supp.3d 34, 43 (D.C. 2020).

Thus, *Harris* drew an important distinction between the "ongoing process" scenario present in that case and cases that are governed by *Morgan's* "discrete acts" rule.  *Morgan* sets the basic rule that each action is subject to its own limitations period.  *Harris*, 127 F.3d at 1125.  *Harris* holds that stages of a proceeding are not discrete acts when they are part of a process leading to a final decision.  <u>Id.</u> at 1124-25.  In Dr. Harris' case, her request for reconsideration was one step in the ongoing tenure application process laid out in the university's Guidelines, all of which preceded the issuance of a final decision.  Thus, the reconsideration stage was considered part and parcel of the preliminary tenure decision such that the issuance of the preliminary decision did not mark the start of the limitations period.  *Harris*, 127 F.3d at 1124.  The limitations period would commence only when the entire process was completed.  <u>Id.</u>

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Thus, under *Harris*, an investigation and the events that flow from it leading, ultimately, to a final decision also amount to a single retaliatory act for statute of limitations purposes.

Here, Georgetown's IDEAA investigation has been completed.  But the completion of that investigation was not an end point.  It was simply a milestone along the highway down which the University was required to travel in its process of firing Professor Egolf.

"Georgetown has established Grievance Procedures for the prompt, fair, and impartial resolution of all Complaints of Sexual Misconduct".  Georgetown Policy on Sexual Misconduct (Part IV(J) of the *Faculty Handbook*), attached hereto as Exhibit 2; *see* Grievance Procedures to Investigate Allegations of Discrimination and Harassment (hereinafter the "Grievance Procedures") (Part IV(A) of the *Faculty Handbook*), attached hereto as Exhibit 3.  Those Grievance Procedures lay out a multi-step process, summarized in the Policy on Sexual Misconduct as follows:

> Unless resolved through Informal Resolution, the University will investigate the allegations in any Complaint in a prompt, fair, and impartial manner, with one or more internal or external investigators.  Following the investigation, a determination regarding responsibility will be made in accordance with the applicable Grievance Procedures.  If there is a determination of responsibility, the University will determine sanctions and remedies as appropriate.

Exh. 2, *Policy on Sexual Misconduct*, p. 10.

Thus, Georgetown's policy is precisely the sort described in *Harris*.  The post-investigation steps occur before a final decision is rendered.  As such, the investigation and the post-investigation steps (at least such of them as precede the issuance of a final decision) are treated as a single process such that the statute of limitations commences only after the entire process is completed by the issuance of a final decision.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Because the Defendants ignore *Harris*, they erred in their contention that the limitations period commenced when the investigation was completed; the limitations period will not commence until the University renders a final decision.

**C**

**PLAINTIFF NEED NOT PARTICIPATE IN A PROCEEDING
UNDER THE DCHRA TO GAIN ITS PROTECTION**

The Defendants argue that Professor Egolf's Human Rights Act claim is not viable because he has not alleged that he ever actually engaged in an "investigation, proceeding, or hearing" under the D.C. Human Rights Act. Opp., p. 5. But there is no such requirement. The DCHRA makes it illegal to retaliate against "any person . . . on account of having exercised . . . any right granted or protected under this chapter". D.C. Code Ann. § 2-1402.61(a). It is a broad and expansive statute.[4] This right to be free of retaliation for participating in a proceeding (the "participation clause"[5]) extends to people accused of harassment just as it does to anyone else.[6]

---

[4] In D.C. v. Bryant, 307 A.3d 443 (D.C. 2024), the Court of Appeals reaffirmed that participation in a sexual harassment lawsuit constitutes protected activity under the DCHRA's participation clause. While *Bryant* involved a witness to a harassment lawsuit rather than an accused harasser, the court's broad reading of the participation clause is consistent with the federal precedent supporting protection for accused employees who participate in formal proceedings.

[5] Ruppe v. Blinken, 743 F.Supp.3d 1 (D.D.C. 2024).

[6] Many federal courts have concluded that Title VII's anti-retaliation provision does not protect against retaliation for participating in internal proceedings as distinct from EEOC or other governmental proceedings. *See*, *e.g.*, Savignac v. Day, 754 F. Supp. 3d 135, 209 (D.D.C. 2024), adhered to as amended, 763 F. Supp. 3d 17 (D.D.C. 2025). That conclusion is borne of the language of Title VII, which states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter". Courts read the language, "participated . . . in an investigation, proceeding, or hearing under this subchapter" to mean that it must be a governmental proceeding. But this issue does not apply in this case because the DCHRA uses much

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**B**

### CIVIL CONSPIRACY IS A VIABLE CAUSE OF ACTION UNDER DC LAW

The Defendants raise several arguments opposing the addition of Professor Egolf's claim for civil conspiracy. Their first two arguments are quickly dispensed with.

First, they argue (just as Professor Egolf had noted in his motion) that civil conspiracy is not actually an independent cause of action. It is, instead, a means for establishing vicarious liability for an underlying tort. (In this case, the underlying torts implicated by the Defendants' conspiring were tortious interference with contractual relations and tortious interference with prospective economic advantage.) But that it is not an independent cause of action does not mean that it is not properly presented as a basis for liability, and so the fact that it is not an independent cause of action is no basis on which to reject it as a source of remedy.

Second, they argue that the proposed Amended Complaint would be futile because Professor Egolf makes no allegations against the third-party investigators, Stephanie Baron and Sasha Hodge-Wren, with respect to these claims and he does not seek to add them to the tort counts in his proposed Amended Complaint.[7] They also point out that Professor Egolf has not added Georgetown as a Defendant in the proposed Amended Complaint.

broader language disallowing retaliation: "It shall be an unlawful discriminatory practice to . . . retaliate against . . . any person . . . on account of having exercised . . . any right granted or protected under this chapter". This language does not restrict action to cases in which the plaintiff participates in a proceeding under the chapter.

[7] The Defendants also state that those two torts have already been levied against Groves, Kilkenny, Okubadejo, and Berner (hereinafter the "Georgetown Individuals"). They do not explain, however, what relevance that fact has on their argument, on the counts at issue, or on the case as a whole. That those two torts have already been levied against the Georgetown Individuals appears to have no bearing on those torts serving as the underlying torts supporting a civil conspiracy claim.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

The Defendants make a good point.  Professor Egolf should have included Georgetown as a defendant in the proposed Civil Conspiracy count and he intended to name Baron and Hodge-Wren as defendants in the two tort claims (consistent with his included them as defendants in the civil conspiracy count).  As such, Professor Egolf respectfully requests that the Court accept the attached revised first amended complaint (which corrects those two omissions), attached hereto as Exhibit 4, in lieu of the previously-filed first amended complaint.

## 1

### BARON AND HODGE-WREN PARTICIPATED IN THE CONDUCT WHICH GAVE RISE TO PROFESSOR EGOLF'S TORT CLAIMS FOR INTERFERENCE WITH CONTRACTUAL RELATIONS AND WITH PROSPECTIVE ECONOMIC ADVANTAGE

The Defendants argue that the proposed Amended Complaint would be futile because Professor Egolf makes no allegations against Ms. Baron and Ms. Hodge-Wren with respect to his claims for interference with contractual relations and with prospective economic advantage.  But they err.  This case is chock full of such conduct.

Several important violative events related to Baron and Hodge-Wren's attorney-client relationship with Georgetown.  *See* Am. Compl., p. 18.  At the outset of this case, Ms. Baron and Ms. Hodge-Wren both told Professor Egolf that no attorney-client privilege attached to their work.  And at the start of her investigative interview of Professor Egolf, Ms. Baron told him that that she was conducting a "neutral investigation":

> At the start of the interview, Prof. Egolf was advised of our role as neutral investigators.  He was informed that there is no attorney-client privilege that attaches to our communications. We requested that he maintain confidentiality during the pendency of the review.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Baron, <u>Summary of Interview with Prof. David Egolf (excerpt)</u>, attached hereto as Exhibit 5, p. 1.

Similarly, Ms. Hodge-Wren wrote in an email to Professor Egolf's attorney:

> As we previously indicated, while we are attorneys, we are not acting as counsel to the University for purposes of this review and instead are acting as neutral fact-finders.

<u>Hodge-Wren email to Salb</u>, dated September 14, 2023, attached hereto as Exhibit 6.

But those reassurances were, apparently, false.  During a hearing that was part of the internal proceedings that occurred prior to this litigation, Ms. Baron refused to answer questions about her communications with University personnel on the grounds that to do so would invade the attorney-client privilege.  *See* <u>Faculty Responsibilities Committee Informal Transcript</u>, pp. 50-53, 59, attached hereto as Exhibit 7.[8]  The University, too, asserted privilege.  <u>Id.</u>

The significance of this cannot be overstated.  It speaks directly to the investigators' honesty in their communications with Professor Egolf and, in turn, in their conduct of the investigation.  It also speaks to the investigators' violation of important rules of attorney ethics by claiming to be performing a neutral investigation when they could not do so because of their attorney-client relationship with Georgetown.  (Please see the discussion in Part 3 below.)  By conducting the investigation despite having a conflict of interest, Baron

---

[8] In this regard, the Defendants clearly err in their contention that "[Professor Egolf's] conspiracy theory rests entirely on his speculation that the two independent investigators Georgetown hired to conduct the investigation had attorney-client relationships with Georgetown, which they "hid" from Plaintiff".  His contention is not speculation; it is based on the explicit assertion of privilege by both the attorney and the University during the internal proceedings.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

deprived Professor Egolf of his statutory and contractual right to a neutral investigation, leading ultimately to the tort claims that Professor Egolf has asserted.

The investigators participated in the tortious conduct in a host of several other ways. First, they received and relied on excerpts from the 2015 Agreement. Am. Compl., p. 32. By doing so, they violated the University's confidentiality agreement with Professor Egolf, again leading to the harm that the tort claims seek to remedy. And they did so without even inquiring into whether those documents were protected by any restrictive covenants.[9]

Second, the investigators found that Professor Egolf sexually harassed Mr. Roe. But that finding is fundamentally meritless because Professor Egolf engaged in no conduct of a sexual nature and Mr. Roe was a fully voluntary participant in his platonic relationship with Professor Egolf. Those two facts make the investigators' conclusion utterly meritless, giving rise to their tort liability.

Third, the investigators sidestepped the inconvenient fact of Mr. Roe's voluntary participation in his platonic relationship with Professor Egolf by stating conclusorily that the existence of a power dynamic between a professor and a student makes it impossible for any student to consent to such a relationship. That conclusion is contradicted not only by common sense but also by the law, which does not support a rule of such simplicity and one dimensionality.

---

[9] They might contend that they were unaware that the excerpts were protected by a confidentiality agreement and a non-reliance agreement, but that contention would have to be tested in discovery. More importantly, application of an appropriate standard of care would require that they inquire with Georgetown as to whether the excerpts that they were given were subject to any restrictive covenants. This is particularly true because they were given excerpts, which should have immediately alerted them to the possibility of restrictive covenants appearing in the pages not provided to them.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

These allegations, and a host of others, support Professor Egolf's contention that Baron and Hodge-Wren participated in the conduct which gave rise to the tort claims, so this Court must reject the Defendants' claim that Professor Egolf makes no allegations against them as to those tort claims.

2

**PROFESSOR EGOLF HAS ALLEGED A CONSPIRATORIAL AGREEMENT**

Next, the Defendants argue that Professor Egolf has not plausibly alleged any agreement between the Defendants to accomplish a common unlawful purpose. Opp., pp. 9 *et seq.* But Professor Egolf's complaint handily satisfies his burden—especially at the pleading stage. *See* Thompson v. Trump, 590 F.Supp.3d 46, 97 (D.D.C. 2022) (summarizing requirements of a civil conspiracy claim).

As a liminal matter, during the internal proceedings that preceded this litigation, Baron refused to answer questions about her communications with University personnel on the grounds that to do so would invade the attorney-client privilege. *See* Exh. 7, FRC Informal Transcript, pp. 50-53, 59. The Defendants' use of privilege to shield communications creates a significant barrier to Professor Egolf's ability to collect information probative of whether there was an agreement. As such, the University's assertion of privilege makes it fundamentally unfair for them to be heard to complain that Professor Egolf lacks information about their communications.

Beyond that liminal matter, while the Defendants are correct in pointing out that Professor Egolf's complaint does not assert that they had an explicit agreement or that they explicitly communicated to coordinate their actions, it need not do so. Professor Egolf's burden at the pleading stage is only to allege circumstantial evidence from which a common

intent can be gleaned.  Halberstam v. Welch, 705 F.2d 472, 480 (D.C. Cir. 1983) (in most civil conspiracy cases, courts must infer an agreement from indirect evidence); Weishapl v. Sowers, 771 A.2d 1014, 1024 (D.C. 2001); Doe v. Roman Cath. Diocese of Greensburg, 581 F.Supp.3d 176, 212 (D.D.C. 2022); *see also* Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983) (proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement).

The plaintiff must "convey some sense that co-conspirators had a mutual understanding to try to accomplish a common and unlawful plan, thereby sharing in the general conspiratorial objective" Johnson v. Georgetown Univ., --- F.Supp.3d ----, 2026 WL 879522 at *21 (D.D.C. 2026).  Courts require "enough factual matter, taken as true, to suggest that an agreement was made".  *Thompson*, 590 F.Supp.3d at 97.  The pleading standard demands only "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement".  Id.

Each of the allegations listed in Part 1 above demonstrates coordinated conduct adequate to satisfy Professor Egolf's duty to allege facts from which an agreement to accomplish a common unlawful objective can be inferred.  For example, Georgetown and Ms. Baron asserted the existence of an attorney-client privilege more than two years into the process and solely to avoid sharing details of the communications between them.  That assertion of privilege contradicted the statements that Baron and Hodge-Wren had previously made that there was no attorney-client privilege.

Likewise, the investigators ignored Mr. Roe's voluntary relationship with Professor Egolf by stating conclusorily that the existence of a power dynamic between a professor and a student makes it impossible for any student to consent to a platonic friendship with a

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

professor.  Not coincidentally, University personnel *also* argued that the existence of a power differential would make it impossible for a student to consent.  That the investigators and the University made the same contention suggests coordinated conduct, satisfying Professor Egolf's duty to allege an agreement to accomplish a common unlawful objective.

Similarly, Mr. Roe reported to Georgetown's the Title IX Coordinator, Samantha Berner, that Professor Egolf had never touched him inappropriately or propositioned him.  Berner never disclosed that key fact to Professor Egolf.  Mr. Roe made the same report to Ms. Baron—and she, too, withheld that fact from Professor Egolf.  Again, this commonality of action suggests a common objective.

Finally, the Provost's goal of firing Professor Egolf would not be achievable without the buy-in from his co-conspirators.  The Provost's ability to strip Professor Egolf of tenure and fire him depended squarely on the investigators' agreement to find sexual harassment.  But a finding of sexual harassment is flatly incompatible with the most fundamental requirements of a sexual harassment allegation; if the investigators had not been acting in concert with the University, therefore, they never would have concluded that platonic conduct which Mr. Roe explicitly welcomed amounted to sexual harassment.  *See* <u>McMullen v. Synchrony Bank</u>, 164 F.Supp.3d 77, 97-98 (D.D.C. 2016) (noting that the fraudulent scheme described could not have operated without an agreement between the parties).

Professor Egolf has, therefore, presented circumstantial evidence of coordinated conduct which satisfies his duty to allege an agreement to accomplish a common unlawful objective.  *See* <u>Halberstam v. Welch</u>, *supra*.  By recounting that the Defendants engaged in undisclosed communications with one another, worked supposedly separately toward the same goal of finding the existence of sexual misconduct, and ignored facts and law which are

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

anathema to the sought-after conclusion, Professor Egolf has alleged circumstantial evidence of a conspiracy agreement adequate to defeat the Defendants' opposition.

**3**

**BARON'S PREEXISTING ATTORNEY-CLIENT RELATIONSHIP
WITH GEORGETOWN CREATES A FUNDAMENTAL
CONFLICT OF INTEREST IN HER CONDUCT
OF THE INVESTIGATION**

The Defendants challenge "Plaintiff's argument that there is an inherent conflict of interest prohibiting attorneys from conducting investigations concerning an employee's compliance with laws and regulations on behalf of organizations". Opp., p. 13.  This reflects a fundamental misunderstanding of the law of attorney ethics.

It also demonstrates a misunderstanding of Professor Egolf's argument.  Professor Egolf does not contend that there is some inherent conflict of interest that prohibits attorneys from conducting investigations, as the Defendants contend.  (Indeed, Professor Egolf's attorney has conducted internal investigations, taught on the topic, and believes that attorneys are uniquely qualified to do investigations.)  The problem arises when the results of an investigation might harm the attorney's client's interests or when the attorney fails to advise all participants of the existence of the attorney-client relationship.

In that regard, the cases on which the Defendants rely are entirely inapposite.  They quote the reference in In re Kellogg Brown & Root, Inc., 756 F.3d 754, 759 (D.C. Cir. 2014), to a "novel approach to the attorney-client privilege".  That reference relates to a test for determining whether attorney-client privilege applies when corporate counsel is providing both business and legal advice—a scenario that has nothing to do with this case.  More importantly, that case—as well as In re Sealed Case, 676 F.2d 793, 800-02 (D.C. Cir. 1982),

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

on which the Defendants also rely—dealt with counsel serving their clients in compliance roles as internal watchdogs. That is very different from conducting an investigation involving parties with opposing interests.

The problem about which Professor Egolf complains is Georgetown's use of attorneys with whom it had a preexisting attorney-client relationship to conduct an ostensibly independent and neutral investigation in a dispute between the University and one of its faculty members. Georgetown's actions, and the actions of the investigators, plainly violate the District of Columbia Rules of Professional Conduct.

Rule 2.4 governs lawyers serving as third-party neutrals. It defines the role of a "neutral" in terms that are fundamentally incompatible with a pre-existing attorney-client relationship with one of the parties. A lawyer serves as a third-party neutral when she assists two or more persons who are not clients resolve a dispute. The plain language of Rule 2.4 thus establishes that the neutral role presupposes that neither party is the attorney's client. When a university retains its own attorney to conduct an investigation into a dispute with a faculty member, the attorney is not assisting persons who are not clients—the university is already a client. This structural incompatibility is not merely a technical defect; it goes to the heart of what neutrality means.

Further, Rule 1.7 contains an absolute and non-waivable prohibition against a lawyer advancing two or more adverse positions in the same matter. Conducting a purportedly neutral investigation while simultaneously representing one of the parties is a paradigmatic example of advancing adverse positions in the same matter.

Rule 1.7(b) provides additional grounds for the conflict. It prohibits a lawyer from representing a client with respect to a matter if the lawyer's professional judgment on behalf

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests. An attorney who has an ongoing attorney-client relationship with a university—and who depends on that relationship for fees and future business[10]—has a financial and professional interest in maintaining the university's goodwill. This interest may, consciously or unconsciously, affect the attorney's judgment in conducting an investigation that could result in findings adverse to the university.

There is an important and useful exception to this rule. Rule 1.7(c) permits representation in circumstances described in paragraph (b) if each potentially affected person provides informed consent after full disclosure, and if the lawyer reasonably believes that he or she will be able to provide competent and diligent representation to each affected person. But Comment [30] to Rule 1.7 states that it is generally doubtful that a lawyer could hold such a belief where the representation of one client is likely to have a substantial and material adverse effect upon the interests of another client. In the context of an investigation into a dispute between the university and a faculty member, the interests of the university and the faculty member are directly adverse, making it difficult to conclude that the attorney can provide truly neutral and competent service to both.[11] *See, e.g.*, In re Robbins, 192 A.3d

---

[10] Ms. Baron testified at the internal proceeding that she has represented Georgetown both prior to and subsequent to her engagement in this case.

[11] Further complicating the matter, the D.C. Rules require that each potentially affected client provide informed consent after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation, but in cases like this one the faculty member is not the attorney's client, which raises the question of whether the faculty member can meaningfully consent to the attorney's dual role.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

558, 565 (D.C. 2018) (attorney violated Rule 1.7(b)(2) by representing one party when that representation was adversely affected by the attorney's representation of another and violated Rule 1.7(b)(4) because his professional judgment was adversely affected by his own financial interest in an escrow company involved in the matter and those violations were not cured by Rule 1.7(c) because the attorney did not obtain informed consent); Griva v. Davison, 637 A.2d 830, 838 (D.C. 1994).

It is for all of these reasons that this Court held in Kumar v. George Wash. Univ. that a professor stated a plausible breach of contract claim against the university for failing to empanel an investigation committee free from real or apparent conflicts of interest and bias. *Kumar*, 174 F.Supp.3d 172, 186 (D.D.C. 2016). The court found that a professional relationship between a committee chair and a party with an interest in the investigation's outcome was sufficient to raise a question about the committee's impartiality. An attorney who represents the university has a professional and financial relationship with the university—a relationship that is at least as significant as the professional relationship that the *Kumar* court found sufficient to raise a question of bias. If a university's own attorney conducts an investigation in a dispute with a faculty member which university policy requires be independent, the faculty member reasonably raises a breach of contract claim. When an attorney conducts an internal investigation for a university, the investigation is typically understood as serving the university's legal interests—which is precisely the opposite of the neutrality required in a dispute between the university and a faculty member. U.S. Equal Empl. Opp. Comm'n v. Geo. Wash. Univ., 342 F.R.D. 161 (D.D.C. 2022).

In the university-faculty dispute context, these concerns are particularly acute. The faculty member who is the subject of or a party to the investigation has a strong interest in

ensuring that the investigator is genuinely neutral. If the investigator is the university's own attorney, the faculty member—and any reviewing court or administrative body—may reasonably question whether the investigation's conclusions reflect an objective assessment of the facts or a predisposition in favor of the university.

Indeed, Ms. Baron's work reflected several major defects that suggest that she was not acting independent of the University's interests. See supra Part B(1).

Thus, the Defendants' challenge to Professor Egolf's contention that the investigators had a major conflict of interest is unsound.

## C

### THE 2015 AGREEMENT DID NOT AUTHORIZE GEORGETOWN'S USE OF NON-RELEVANT INFORMATION IN LITIGATION

Georgetown filed a counterclaim alleging that Professor Egolf breached five provisions of Paragraph 2 of the 2015 Agreement. It made extensive disclosures in the counterclaim of information which the 2015 Agreement had denominated as "strictly confidential" and which the *Faculty Handbook* required be kept confidential. And much of the confidential information that Georgetown disclosed is unrelated to the matters that Georgetown put in issue in its counterclaim. For example, Paragraphs 14 through 24 of the counterclaim provide background information about the case that preceded the Agreement. That information is irrelevant to whether Professor Egolf breached the agreement (i.e., the only question presented by the counterclaim).

Paragraph 27 of the counterclaim states that the 2015 Agreement required Egolf to undergo training sessions to review Georgetown's policies and procedures related to student-faculty relations, professionalism, and harassment. Paragraph 28 of the

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

counterclaim states that the 2015 Agreement required that, before returning to campus, Egolf had to be evaluated by an independent forensic psychologist, who had to "confirm to Georgetown in writing that he believes to a reasonable degree of certainty that it is safe to have Egolf return to Georgetown, that Egolf poses no danger to students, and that Egolf has the ability to respect and conform to professional boundaries". Those allegations are unrelated to the issue presented by the counterclaim.

Similarly, Paragraph 34 of the counterclaim recounted that the 2015 Agreement required Egolf to comply with Georgetown's alcohol policies and to not provide alcohol to any student under the age of 21. This, too, has absolutely nothing to do with any issue in the counterclaim (or in the case generally).

Thus, because Georgetown's disclosures went far beyond that required by the litigation, Professor Egolf seeks to amend his complaint to add these disclosures as additional bad acts in breach of contract as to the 2015 agreement, in breach of contract as to the *Faculty Handbook* (which requires confidentiality of certain university proceedings), and in retaliation.

Georgetown makes two arguments opposing this amendment.

1

**THE COURT'S REASONS FOR PERMITTING DISCLOSURE OF CONFIDENTIAL INFORMATION ON THE COURT DOCKET IS IRRELEVANT TO WHETHER DISCLOSURE VIOLATED THE CONTRACTS OR CONSTITUTED RETALIATORY CONDUCT**

The Defendants argue that Professor Egolf's proposed amendment would be futile for the same reasons set forth in the Court's previous decisions on this issue. As the Defendants point out, this Court has declined to limit the scope of the allegations publicly disclosed in

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

the Defendants' counterclaim and has allowed one of the Defendants' attachments to be on the public docket. But that ruling, and the principles underlying it, have no relevance to the issue in dispute here. The principles of public judicial proceedings that governed that ruling are irrelevant to whether the Defendants' actions constitute retaliation or breach of contract.

## 2

### THE LEGAL PROCEEDINGS EXCEPTION TO THE CONFIDENTIALITY AGREEMENT DOES NOT OPEN THE DOOR TO WHOLESALE DISCLOSURE

The Defendants also argue that their disclosures of confidential information did not breach the 2015 Agreement because Section 9(b)(i) of the 2015 Agreement (hereinafter the "Section 9 exception") expressly permits such disclosures. That section states, "Both Parties may disclose Confidential Information where required by law or pursuant to any grievance or legal proceedings which relate to this Agreement".

The Defendants are correct in their statement that Section 9 creates an exception to the confidentiality provision in the 2015 Agreement because the Agreement relates to Georgetown's counterclaim. See Azima v. RAK Investment Authority, 926 F.3d 870, 878 (D.C. Cir. 2019) (The clause "relates to" is quite broad and requires only that "has some logical or causal connection to it"). But while the Section 9 exception authorizes some use of confidential information, it does not authorize the Defendants to use the information as Georgetown has done.

The Section 9 exception permits confidential information to be disclosed only *when and as may be necessary* to address any legal proceedings that might arise about the Agreement. It operates as a targeted, conditional carve-out—not a blanket license to disclose all confidential information once any dispute arises. Only confidential information that is

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

relevant and necessary to the proceeding may be disclosed.  U.S. v. Williams Companies, Inc., 562 F.3d 387, 397 (D.C. Cir. 2009) (a general conclusion that a party is entitled to disclosure of documents does not open the doors altogether, but instead permits disclosure only of those documents which an individualized review shows to be material to a disputed issue).

This principle is reinforced by the Whole-Text Canon of contract interpretation.  *See* Scalia & Garner, Reading Law:  The Interpretation of Legal Texts (Thomson/West 2012), pp. 167-68.  Under this canon, the exception must be read in harmony with the broader confidentiality obligation it modifies.  Mercer Management Consulting, Inc. v. Wilde, 920 F.Supp. 219, 235-36 (D.D.C. 1996).  To interpret the 2015 Agreement as permitting disclosure of *all* confidential information—regardless of its relevance to the proceeding— would effectively nullify the confidentiality obligation whenever any dispute arose, rendering the confidentiality clause meaningless and offending the rule that a contract cannot be interpreted in a way that renders another provision meaningless.  Abdelrhman v. Ackerman, 76 A.3d 883, 891 (D.C. 2013).  The exception must therefore be read as permitting disclosure of confidential information to the extent, and only to the extent, that it is relevant and necessary to the qualifying grievance or legal proceeding.

This reading is consistent with the rule recognized in Shvartser v. Lekser that confidentiality agreements do not create a barrier to litigation discovery.  Confidential information must be produced in discovery even if there is an otherwise-applicable confidentiality agreement.  But a confidentiality agreement that shelters some information does not shelter all other documents in the case.  *Shvartser*, 270 F.Supp.3d 96, 98 (D.D.C. 2017).  The implication of that holding is that the exception enables disclosure only of

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

relevant confidential information in the proceedings and does not transform all confidential information into freely-disclosable material.  Id.

Furthermore, the phrase "pursuant to" has been consistently interpreted by courts to mean "in accordance with" or "in carrying out", supporting the argument that disclosure must occur within the framework of the proceeding itself.  Getz v. Peace, 934 N.W.2d 347 (Minn. 2019) (relying on Black's Law Dictionary to define "pursuant to" as "in compliance with", "in accordance with", "as authorized by", and "under", and A Dictionary of Modern Legal Usage, which defines "pursuant to" as "in accordance with; under; as authorized by; or in carrying out"); *see also* In re J. Ray McDermott & Co., Inc., 622 F.2d 166 (5th Cir. 1980).

Thus, the Defendants' contention that the Section 9 exception expressly permits its disclosures fails because the exception only permits disclosures necessary to the counterclaim.  Because the Defendants' disclosures exceeded that which was necessary, they constitute a breach of contract and the Section 9 exception does not save them.

### D

### THE DEFENDANTS STATE NO UNDUE DELAY OR OTHER CAUSE TO DENY PROFESSOR EGOLF'S MOTION FOR LEAVE TO AMEND

The Defendants end their opposition to amendment by urging this Court to deny the motion because he unduly delayed the filing of his motion and because "Courts in this District routinely deny leave to amend where a party seeks to add claims based on information that was known or available well before the motion was filed".  Opp., p. 16.

The Defendants' position does not fairly reflect the law of amendment for at least two reasons.

First, delay alone does not justify denial of leave to amend. In <u>Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.</u>, the D.C. Circuit held that "the length of a litigation is relevant only insofar as it suggests either bad faith on the part of the moving party or potential prejudice to the non-moving party should an amendment be allowed". *Caribbean Broadcasting*, 148 F.3d 1080, 1084 (D.C. Cir. 1998), *citing* 6 Wright, Miller & Kane, § 1487 (1990 & Supp.1997). Because the district court had denied leave to amend without "intimating a concern either with bad faith or with prejudice", the denial was reversed. Mere delay without more is not a permissible basis to deny leave to amend.

Second, even when a motion for leave to amend is properly denied because of undue delay, the sort of delay that can lead to that outcome is a matter of years and of extensive completed litigation, not the very brief time that this case has been pending. In <u>Elkins v. D.C.</u>, 690 F.3d 554, 565 (D.C. Cir. 2012), for example, the D.C. Circuit affirmed the denial of leave to amend where the plaintiff sought to add a new theory of municipal liability nearly five years after filing her initial complaint and after discovery had closed. The distinction with our case—pending five months and with discovery not yet begun—is stark. *See also* <u>Anderson v. USAir, Inc.</u>, 818 F.2d 49, 57 (D.C. Cir. 1987) (affirming denial of leave to amend where the plaintiff sought to add five new counts on the same day the parties filed cross-motions for summary judgment and after discovery had been completed); <u>Doe v. McMillan</u>, 566 F.2d 713, 720 (D.C. Cir. 1977) (upholding denial of leave to amend where the plaintiffs' complaint had been before the District Court, the Circuit Court, and the Supreme Court for more than three years before the plaintiffs first moved to amend); <u>Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.</u>, 810 F.2d 243, 247 (D.C. Cir. 1987) (same).

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

The Defendants do not suggest that they would be prejudiced by the amendment or that Professor Egolf's motion to amend is motivated by bad faith.  Because the D.C. Circuit has held that "the district court may not deny" a motion for leave to amend "based solely on timeliness unless the defendants can show undue prejudice", the Defendants' lack of prejudice forecloses their opposition.  Atchinson v. D.C., 73 F.3d 418, 426 (D.C. Cir. 1996); In re APA Assessment Fee Lit., 766 F.3d 39, 56-57 (D.C. Cir. 2014).  "[T]here must be some additional harm, such as prejudice or bad faith, for a delay to be considered 'undue.'"  Mwani v. Al Qaeda, 600 F.Supp.3d 36, 50-51 (D.D.C. 2022).

The Defendants put much force behind their contention that Professor Egolf's motion should be denied because the proposed amendment is based on a new legal theory rather than newly discovered facts.  Accepting, *arguendo*, that Professor Egolf's motion is not based at all on any new facts (even though that is incorrect), that factor is simply irrelevant.  The D.C. Circuit distinguishes between amendments that add new factual allegations and those that merely clarify legal theories or make technical corrections.  But directly contrary to the Defendants' position, the D.C. Circuit has held that where an amendment would do no more than clarify legal theories or make technical corrections, "we have consistently held that delay, without a showing of prejudice, is not a sufficient ground for denying the motion".  Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999).

The sole factual basis for the Defendants' argument vis-à-vis delay in moving to amend is that they have already answered the operative Complaint.  That is simply not a cognizable basis on which to deny leave to amend.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff leave to file the proposed First Amended Complaint and for such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: July 8, 2026

LIPPMAN, SEMSKER & SALB, LLC
Micah Salb, Esq. (Bar #453197)
msalb@lsslawyers.com
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
(301) 656-6905

## CERTIFICATE OF SERVICE

I certify that on this the 8th day of July in the year 2026, a copy of the foregoing motion was served on counsel for the Defendant by the Court's electronic case filing system

Micah Salb, Esq.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814



**EXHIBITS**

1.  Georgetown Faculty Responsibilities Code (Part III(G) of the Faculty Handbook)

2.  Georgetown Policy on Sexual Misconduct (Part IV(J) of the Faculty Handbook)

3.  Grievance Procedures to Investigate Allegations of Discrimination and Harassment (Part IV(A) of the Faculty Handbook)

4.  Revised First Amended Complaint

5.  Baron, Summaries (2) of Interviews with Prof. David Egolf (excerpts)

6.  Hodge-Wren email to Salb, dated September 14, 2023

7.  Faculty Responsibilities Committee Informal Transcript, pp. 50-53, 59

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814