*Transcript*
*January 9, 2026*


***Opening Statement by Dean Edelstein***

**Dean Edelstein**

REDACTED

**Ms. Baron**

I think Samantha may have described what witness-- well, once conflicts cleared and I was certain that I didn't have a conflict, then I believe Samantha may have.  We had a telephone call where she shared what Witness 1 had talked about in her interview.

**Professor Egolf**

Did you receive any further materials from Georgetown during the course of your investigation?

**Ms. Baron**

I may have.  I just-- sitting here today, two years later, I don't recall.  So whatever materials I had that we-- we considered as part of our investigation are referenced in the report.

**Professor Egolf**

Did you ever have any conversations with anyone on Georgetown's legal staff?

**Ms. Baron**

Yes.

**Professor Egolf**

Can you describe to us those conversations?

**Ms. Baron**

I believe those conversations would be protected by the attorney-client privilege.

**Dean Edelstein**

It's a privilege.  She's not going to talk about this here.

**Mr. Salb**

Whoa, whoa, whoa.

**Professor Egolf**

You were not employed as an attorney, were you?

**Ms. Baron**

I was employed as a fact finder, but the attorneys for Georgetown are attorneys.

**Professor Egolf**

Yeah, who are-- were they your attorneys?

**Chair Shelanski**

Well, excuse me, excuse me. What's the relevance of this? I want to know where this is going because it's taking a lot of time. I'm going to exclude from our consideration because we-- the panel are not interested in Ms. Baron's discussions with Georgetown lawyers. I think it's fair game to ask about what she discussed with IDEAA, but give me some reason for going through this line of questioning. I don't understand that.

**Mr. Salb**

This is a legal issue. Will you hear from me?

**Chair Shelanski**

No, I will not hear from you.

What is-- this is-- this is not a legal proceeding. This is not a legal proceeding. This is an administrative proceeding. It's designed to get at some facts that are contained in a report. If you can give me a reason that this-- our particular focus in this proceeding, if this is-- if this has to do with some kind of collateral proceeding that you're involved in, that is not an appropriate use of this proceeding. For-- I'll be very clear about that.

**Professor Egolf**

For example, if they discussed what outcome might be--

**Chair Shelanski**

Then ask the question or ask the-- ask-- you can ask-- I think you can ask the question if she ever had any discussion with anyone about Georgetown-- about what the University would prefer as an outcome. I'll allow that question. If that's your question, that's fine, but I'm not going to allow fishing into her discussions with University counsel, because they're not relevant to anything that the three of us have to decide.

**Mr. Salb**

How can you contend that it's not relevant when she claims to be an independent investigator, but she also has an attorney-client relationship with the University?

**Chair Shelanski**

Well, when you're hired by the University, there are certain confidentiality-- there are certain parameters and certain discussions she's having. If you can tell me-- if you want to ask a specific question about bias, about outcome determinative things, but you know, tell me

what the relevance is.  You haven't given me that.  I'm going to allow you to speak, just to tell me what the relevance is of this.

**Mr. Salb**

All of the-- all of the feedback, all of the information that the investigator relied on, is supposed to be reflected in her report.  She's claimed that that's the case.  To the extent that she had communications with University counsel, that obviously changed it.  We don't know what those are, so we can't ask specific questions.

**Chair Shelanski**

But you can ask a much more specific question, which is, did you receive information related to the investigation from the University counsel related to the facts and circumstances of the investigation?  You can ask that question.

OK, you know, other than that, about University policies, about, you know, University exposure to liability, about things like that, that may have been part of that, I-- I don't think are relevant to us, but, well--

**Mr. Salb**

They're relevant in the sense that it is-- it is black letter law that an investigator cannot be the attorney for a party.

**Chair Shelanski**

Right.  So she is-- so she is not the attorney for a party, but--

**Mr. Salb**

If she-- she-- in that case, there's no attorney-client privilege.

**Chair Shelanski**

No, but there is a-- well, I'm not sure that that's true, OK.  I'm not sure that that's true.  The privilege can-- can sweep more broadly.  And the second thing I would say is I'm concerned about relevance here more than-- more than privilege.  And so I'm really-- I-- I'm-- I want to be very clear.  To the extent that you can articulate a relevance to our view of the credibility of the IDEAA report, I'm willing to hear it.  To the extent that we're fishing more broadly for communications that might not have to do with the reliability of the report, I don't want to have that be part of this proceeding.

**Mr. Salb**

Well, that's precisely why he's asking the question.

**Chair Shelanski**

Right.  So what I'm-- OK, but the question-- OK, so ask the question more specifically-- I think if you have 15 minutes of questions about what conversations you may or may not have had with the University counsel, I don't think are going to be very helpful.  I think if you have some more specific questions about whether University counsel articulated the desired outcome, provided information that's not contained in the report, I think those are fair game.

**Mr. Salb**

Can he begin with a broad question regarding the subject matters of the conversation?

**Chair Shelanski**

Yes.

**Professor Egolf**

OK.  What were the subject matters of your conversation with Georgetown's legal staff?

**Dean Edelstein**

I think there's-- I mean, now the privilege issue comes in, right?

**Chair Shelanski**

I-- I-- I think what you can-- I would-- I would prefer that you ask-- I thought you meant by a broad question of-- did you speak with Georgetown legal staff about the outcome of the investigation?  Did they provide you materials that are not reflected in your report?

**Dean Edelstein**

That's still privileged.

**Chair Shelanski**

I'm not sure.

**Mr. Salb**

You know, if, if the University wants to take the position that it's privileged, we'll stop and we'll move on.

**Chair Shelanski**

We can come back to this, but I-- I do think it is fair game for you to ask whether there were, whether there were materials on which you relied that are not reflected in your report.

That's a question I have as well.

REDACTED

**Professor Egolf**

Did Georgetown legal counsel speak to you before your report was finalized?

**Ms. Baron**

Did I have any conversations with them before the report was filed?  Yes.

**Professor Egolf**

Did they in any way try to indicate liability issues in finding one way or the other.

**Dean Edelstein**

It's the privilege issue again.

**Chair Shelanski**

I'm going to ask-- I'm not going to bar this question.  I'm going to ask you to [unintelligible] to-- to hold it for now.  OK.  Because as an-- as an investigator hired by the University, she can be enlisted by University counsel.  This is the legal principle.  To help her or them, whoever the University council was, provide legal advice to their counsel, the University.

So to the extent that the University counsel would speak with the investigator as a way of advising on the IDEAA investigation on legal issues to the University, I don't know that the content of those conversations are privileged, but they could be.  That's the concern I have.