IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID EGOLF<br><br>Plaintiff and Counterclaim Defendant<br><br>vs.<br><br>GEORGETOWN UNIVERSITY, ET AL.<br><br>Defendants and Counterclaim Plaintiffs | Case No. 25-CV-3439. |

## PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR LEAVE TO AMEND

COMES NOW Plaintiff David Egolf, by and through his undersigned counsel, and hereby respectfully replies in further support of his Motion for Leave to File a Second Amended Complaint.

Professor Egolf's motion is governed by the "freely give leave when justice so requires" standard of Rule 15(a)(2). The Defendants' oppositions[1] largely ask the Court to decide merits questions on an undeveloped record, to treat routine case development as undue prejudice, and to impose a heightened standard inconsistent with Rule 15.

The Court should grant Professor Egolf's motion for leave to amend.

[1] Professor Egolf has filed two motions seeking amendment. The first adds clarifying edits and additional claims and parties based on information that emerged after the operative pleading was filed—most notably, information about the investigators' relationship to Georgetown. The second reflects a new, central event that occurred after the first amendment briefing—Georgetown's termination of Professor Egolf—which bears directly on Plaintiff's damages and retaliation theories and should be reflected in the operative complaint. All of the proposed changes arise from the same core nucleus of facts already at issue. The Court denied the first motion as moot when Professor Egolf filed his second motion to amend, such that this briefing addresses all amendments.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## A

## RULE 15'S LIBERAL LEAVE STANDARD CONTROLS

Federal Rule of Civil Procedure 15(a)(2) provides that the Court "should freely give leave [to amend] when justice so requires". The Supreme Court has identified only limited grounds on which leave can permissibly be denied—undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or futility. Foman v. Davis, 371 U.S. 178, 182 (1962); Firestone v. Firestone, 76 F.3d 1205, 1208–10 (D.C. Cir. 1996); Atchinson v. District of Columbia, 73 F.3d 418, 425–26 (D.C. Cir. 1996). Under the Rule 15(a)(2) standards, the Defendants bear the burden to show a recognized basis for denial.[2] *See*, *e.g.*, Smith v. Café Asia, 598 F.Supp.2d 45, 48 (D.D.C. 2009); Dove v. WMATA, 221 F.R.D. 246, 247–49 (D.D.C. 2004). The Defendants do not meet their burden.

### 1

### There is No Hint of Bad Faith

There is no basis to claim that Professor Egolf has not acted in good faith. He aims to amend to reflect developments in the underlying disciplinary processes (including revelations during the Faculty Responsibilities Committee proceeding) and, later, to include a major new fact—his termination—that occurred after the first motion was fully briefed. Having a current, accurate complaint serves Rule 1's directive of the just, speedy, and inexpensive determination of the action and is not bad faith.

---

[2] Defendants write at great length about their view that Professor Egolf's proposed second amended complaint was not narrowly limited to the new fact of Georgetown's termination of Professor Egolf's employment, as Professor Egolf had described it in his motion for leave to amend, but that it also expands the allegations, fixes deficiencies, and made substantive, not "modest editorial", changes. *But none of those matter* because they are not recognized bases on which a court can base a Rule 15 motion.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## 2

## This Is Not A Case of Repeated Efforts Fruitlessly Trying To Remedy A Defective Complaint

The Defendants argue that Rule 15's liberal amendment policy does not entitle a plaintiff to repeated opportunities to revise a proposed pleading after the opposing party identifies its deficiencies. But that is plainly incorrect: *Rule 15's liberal amendment policy exists for precisely that reason*. *See*, *e.g.*, Harrison v. Rubin, 174 F.3d 249, 252–53, 255–56 (D.C. Cir. 1999) (holding that the court's denial of leave to amend to correct a complaint was an abuse of discretion); Belizan v. Hershon, 434 F.3d 579, 583–84 (D.C. Cir. 2006) (plaintiffs ordinarily should have an opportunity to amend where more particularized allegations could cure a pleading deficiency); Rollins v. Wackenhut Svcs., Inc., 703 F.3d 122, 130–31 (D.C. Cir. 2012) (denying leave to amend was an abuse of discretion where the amendment addressed deficiencies identified in the defendant's motion to dismiss).

The Defendants' reliance on *Foman* is unavailing. The Supreme Court recognized in that case that it is reasonable for a court to deny leave to amend following "repeated failure to cure deficiencies". The Court did not hold that a motion for leave to amend can be denied when the purpose of the motion is to cure deficiencies.

## 3

## Professor Egolf Did Not Unduly Delay Seeking Leave to Amend

This case remains at an early stage. Discovery has not yet begun and will not commence until after the Rule 16 conference. Therefore, the proposed amendments do not derail a discovery schedule, require redoing discovery, or cause the type of concrete prejudice that justifies denying leave to amend.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

The Defendants assert that Professor Egolf unduly delayed filing his first amended complaint because he supposedly knew the relevant "facts" earlier and merely changed his "legal theory". But Professor Egolf's first motion sought to add claims and parties tied to information he learned only after the operative pleadings had been filed—specifically, information disclosed during the January–February 2026 Faculty Responsibilities Committee proceeding about the investigators' relationship to Georgetown. That is precisely the kind of post-pleading development that warrants amendment under Rule 15. *See, e.g.*, Mattiaccio v. DHA Grp., Inc., 293 F.R.D. 229, 233-34 (D.D.C. 2013) (permitting amendment based on new information learned during a deposition); 2910 Georgia Ave. LLC v. D.C., 312 F.R.D. 205, 212 *et seq.* (D.D.C. 2015); *see also* Rosden v. Leuthold, 274 F.2d 747 (D.C. Cir. 1960) (permitting retrospective amendment of pleadings to conform to evidence adduced at trial).

The Defendants' contention that Professor Egolf had "already challenged the investigators' impartiality" in the operative complaint misses the point. Discovering that the investigators were not simply "biased" but in fact maintained an undisclosed attorney–client relationship with the University while presenting themselves as neutral factfinders is materially different information that reasonably supports additional claims and parties.

Finally, the Defendants argue Plaintiff should have "waited" to bring a single amendment because he should have known that his termination was going to happen. But Rule 15 does not require a plaintiff to delay amending to add viable claims until some later, uncertain event occurs. When Georgetown terminated Professor Egolf on July 15, 2026, Plaintiff promptly moved to update the pleading so that the operative complaint reflects the true posture of the dispute and the full extent of injury. That is diligence, not delay.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## 4

## Amendment Would Cause the The Defendants No Cognizable Prejudice

The Defendants argue that they would suffer undue prejudice—and therefore this Court should deny Professor Egolf's motion—because permitting the amendment would cause them to have to brief new or revised issues (in addition to the briefing that they have already done).

The Defendants' argument is entirely meritless. Prejudice to the opposing party when deciding whether to grant leave to amend a complaint requires far more. The opposing party must demonstrate that it was "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely". Butler v. White, 67 F.Supp.3d 59 (D.D.C. 2014); Uzoukwu v. Metro. Wash. Council of Gov'ts, 983 F.Supp.2d 67 (D.D.C. 2013). The Defendants have never stated, and cannot say, that they have been deprived of the opportunity to present facts or evidence which they would have offered had Professor Egolf filed his motions for leave to amend earlier.

Nor are the ordinary burdens of litigation (including briefing a Rule 15 motion) the kind of burden that warrants denial of leave to amend, particularly at the outset of the case and where the amendments relate to the same facts and the same alleged pattern of retaliation and contractual breaches as were already reflected in the complaint. Courts recognize specific circumstances that constitute prejudice, such as when an amendment would substantially change the theory on which a case has been proceeding and is proposed late enough that the opponent would be required to engage in significant new preparation. Bronner v. Duggan, 324 F.R.D. 285, 291 (D.D.C. 2018); Klayman v. Jud. Watch, Inc., 288 F.Supp.3d 314 (D.D.C. 2018). But none of those circumstances that create recognized undue prejudice can be found in this case.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

### 5

### The Defendants' Requested "Narrow Leave" Remedy Is Unwarranted

The Defendants ask the Court, alternatively, to limit amendment to termination-related facts and to bar Plaintiff from adding or maintaining claims such as civil conspiracy and the Human Rights Act retaliation claim. That request would improperly convert Rule 15 into a vehicle for piecemeal merits adjudication and would force Plaintiff to litigate on an artificially truncated set of allegations, despite the fact that the proposed amended pleadings arise from the same core events and are intended to be tried together.

## B

## THE DEFENDANTS' FUTILITY ARGUMENTS DO NOT SUPPORT DENIAL OF PROFESSOR EGOLF'S MOTION FOR DENYING LEAVE TO AMEND

Most of the Defendants' opposition hinges on "futility". But futility is a narrow basis for denial. It is assessed under the same standard as a motion to dismiss, and leave can be denied as futile only where the proposed pleading would not survive a Rule 12(b)(6) challenge. In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218–19 (D.C. Cir. 2010); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996); Landrith v. Roberts, 999 F.Supp.2d 8, 20-21 (D.D.C. 2013) (denying leave to amend when the amendment merely restates the same allegations in different terms so failed to correct the defect of the dismissed complaint). If the proposed claim is plausibly pleaded, amendment is not futile.

At this stage, leave to amend is warranted unless the proposed complaint could not survive a motion to dismiss. The proposed amended complaint easily meets that bar, so amendment is not futile.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

### 1

### The Proposed Amendment to Add a D.C. Human Rights Act Retaliation Claim is Not Futile

The Defendants contend that this Court should deny Professor Egolf's amendment to add a Human Rights Act claim because adding the claim would be futile. They base that contention on two grounds. First, they argue that the proposed claim is time-barred. Second, they argue that Professor Egolf cannot bring a Human Rights Act retaliation claim because he did not engage in protected activity—i.e., he did not participate in a DCHRA "investigation, proceeding, or hearing". Because neither of these are valid grounds on which to base a finding of futility, this Court should reject the Defendants' arguments.

#### *a*

#### *The Defendants Err in Their Contention that Professor Egolf's Human Rights Act Claim Is Untimely, Making Amendment Futile*

The Defendants contend that amendment to add a Human Rights Act claim would be futile because the claim is time-barred. They treat Plaintiff's alleged harms as a series of isolated, stale "discrete acts" and argue that everything before the one-year period preceding the filing of the Complaint is barred under the Human Rights Act's one-year limitations period. But Plaintiff's proposed DCHRA retaliation claim addresses ongoing retaliatory conduct tied to continuing proceedings and continuing restrictions. Plaintiff has alleged, among other things, that retaliatory actions remained in effect and that certain processes had not yet concluded even as recently as of the date of filing. On those allegations, the Defendants cannot establish that the claim is time-barred as a matter of law.

First, as the Defendants acknowledge, the University's termination of Professor Egolf's employment this year plainly occurred within the limitations period.[3]

Second, Professor Egolf claims that the Provost retaliated against him in violation of the Human Rights Act when he put Professor Egolf on administrative leave and barred him from campus. The University committee with authority over that issue found that the Provost's decision barring Professor Egolf from campus violated Professor Egolf's rights under the *Faculty Handbook*. Despite that decision, the University refused to vacate the Provost's improper order. Professor Egolf remains barred from campus—that is, he remained subject to that retaliatory decision. Thus, that conduct occurred during the limitations period and Professor Egolf's Human Rights Act claim as to that action is timely.

Finally, Professor Egolf's Human Rights Act claims based on the University proceedings against him were also timely filed. Relying on the "discrete acts" doctrine of Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Defendants argue that the limitations period for the IDEAA investigation expired one year after the investigation was completed. But that doctrine applies only when the investigation is a stand-alone event. In cases like this one, where the investigation is only one part of a broader disciplinary process which culminates in a final decision, the statute of limitations does not begin to run until the final decision is issued.

In Harris v. Ladner, Howard University informed an assistant professor that her application for tenure was denied. The district court held that that notification triggered the

[3] The Defendants argue that "[r]elocating the DCHRA count to Count Two and anchoring it to the termination . . . does not answer the substantive deficiencies the Defendants identified", but they are striking down a straw man; Professor Egolf relocated the Human Rights Act claim because it made more sense for it to be earlier and to be placed closer to the Title IX claim.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

start of the limitations period. The D.C. Circuit reversed, holding that the limitations period did not begin with that initial denial of tenure; instead, it began when the university made its final decision. *Ladner*, 127 F.3d 1121, 1124 (D.C. Cir. 1997). The basis of the D.C. Circuit's decision was that Howard's *Guidelines for Appointments, Promotions, and Tenure Committees* entitled Dr. Harris to reconsideration of the tenure committee's negative recommendation *before* a final decision would be issued. Id. Reconsideration was not a collateral attack on a final decision; it "was the next step in the tenure application process" before a final decision would be issued. Id.; *see also* Moini v. LeBlanc, 456 F.Supp.3d 34, 43 (D.C. 2020).

Thus, *Harris* drew an important distinction between the "ongoing process" scenario present in that case and cases that are governed by *Morgan's* "discrete acts" rule. *Morgan* sets the basic rule that each action is subject to its own limitations period. *Harris*, 127 F.3d at 1125. *Harris* holds that stages of a proceeding are not discrete acts when they are part of a broader process that ends with a final decision. Id. at 1124-25. An investigation and the events that flow from it leading, ultimately, to a final decision are a single retaliatory act for statute of limitations purposes. Thus, the issuance of the preliminary decision in Dr. Harris' case did not trigger the start of the limitations period. Id. at 1124.

In this case, the IDEAA investigation was completed, but completing the investigation was not an end point. Georgetown has established a multi-step grievance process for the resolution of complaints of sexual misconduct. The investigation was simply a one step in the process that Georgetown created.

The steps in Georgetown's multi-step grievance process for the resolution of complaints of sexual misconduct are summarized in the *University's Policy on Sexual Misconduct* as follows:

> Unless resolved through Informal Resolution, the University will investigate the allegations in any Complaint in a prompt,

> fair, and impartial manner, with one or more internal or external investigators. Following the investigation, a determination regarding responsibility will be made in accordance with the applicable Grievance Procedures. If there is a determination of responsibility, the University will determine sanctions and remedies as appropriate.

Thus, Georgetown's policy is precisely the sort of policy as was found in *Harris*, with the post-investigation steps occurring before the final decision is rendered. As such, the investigation and other steps preceding the issuance of a final decision are a single process and the statute of limitations commences only when the entire process is completed by the issuance of a final decision. Because the Defendants ignore *Harris*, they erred in their contention that the limitations period commenced when the investigation was completed.

In sum, Professor Egolf's retaliation claim under the District of Columbia Human Rights Act is timely because the University continued its unlawful ban against Professor Egolf coming to campus into the limitations period, it continued its improper internal processes into the limitations period, and it fired Professor Egolf within the limitations period.

### *b*

### *The Defendants Err in Claiming that Amendment to Add the Human Rights Act Claim Would Be Futile Base on Professor Egolf's Purported Lack of Protected Activity*

The Defendants argue that amending the Complaint to add a Human Rights Act claim would be futile because Professor Egolf did not engage in protected activity—i.e., he did not participate in a DCHRA "investigation, proceeding, or hearing". But that argument reads the Human Rights Act retaliation provision far too narrowly and, at best, raises merits questions not appropriately resolved against Plaintiff on a Rule 15 motion.

The Defendants argue that "defending oneself" is not protected activity and that a federal regulation cannot expand a private right of action. But notwithstanding the

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Defendants' characterization, Plaintiff alleges more than mere self-defense: He alleges a pattern of retaliatory actions tied to his assertion of rights protected by the Human Rights Act under governing policies and law, contractual protections, and objections to procedural violations in an institutional disciplinary process. These are fact-bound and legal questions not appropriately resolved against Plaintiff on a motion for leave to amend.

The Defendants contend that Professor Egolf did not engage in protected activity because Human Rights Act retaliation claims are limited to people who have "complained of sex discrimination"; they contend that defending oneself against an accusation—as in Professor Egolf's case—does not fit within that rubric. Opp., p. 5. But there is no such restriction in the Human Rights Act.

The Human Rights Act makes it illegal to retaliate against "any person . . . on account of having exercised . . . any right granted or protected under this chapter". D.C. Code Ann. § 2-1402.61(a). It is a broad and expansive statute. Its protection is not limited to people who participate in Human Rights Act proceedings but in fact extends to anyone who exercises any right granted or protected under the Act.[4] In Bryant v. District of Columbia, 102 A.3d 264, 269 (D.C. 2014), and District of Columbia v. Bryant, 307 A.3d 443, 457-58 (D.C.

---

[4] Many federal courts have concluded that Title VII's anti-retaliation provision does not protect against retaliation for participating in internal proceedings as distinct from EEOC or other governmental proceedings. *See*, *e.g.*, Savignac v. Day, 754 F.Supp.3d 135, 209 (D.D.C. 2024), adhered to as amended, 763 F.Supp.3d 17 (D.D.C. 2025). That conclusion is borne of the language of Title VII, which states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter". Courts read the language, "participated . . . in an investigation, proceeding, or hearing under this subchapter" to mean that it must be a governmental proceeding. But this issue does not apply in this case because the DCHRA uses much broader language disallowing retaliation: "It shall be an unlawful discriminatory practice to . . . retaliate against . . . any person . . . on account of having exercised . . . any right granted or protected under this chapter". This language does not restrict action to cases in which the plaintiff participates in a proceeding under the chapter.

2024), the Court of Appeals reaffirmed that participation in a sexual harassment lawsuit constitutes protected activity under the DCHRA's participation clause. While *Bryant* involved a witness to a harassment lawsuit rather than an alleged harasser, the court's broad reading of the participation clause is consistent with the federal precedent supporting protection for accused employees who participate in formal proceedings. *See also* Vogel v. District of Columbia, 944 A.2d 456, 464 (D.C. 2008) ("the complaint must allege an employment practice that is prohibited by the DCHRA").[5]

The Defendants argue that allowing a respondent in a contested sexual harassment proceeding to bring a Participation Clause claim would have "absurd" results:

> If accepted, every such person who was found to have committed sexual harassment and therefore terminated would have been discharged because of their "participation" in a contested Title IX, or DCHRA, or Title VII proceeding.

They rely in that contention on Doe v. Belmont University, in which the court wrote, "[i]f this were the law, every respondent in a Title IX investigation would have a baked-in retaliation claim simply because they resisted an allegation of sexual misconduct". 367 F.Supp.3d 732, 757 (M.D.Tenn. 2019), *case dismissed*, No. 19-5369, 2019 WL 5079251 (6th Cir. Sept. 18, 2019). But, of course, that is sophistry; merely resisting an allegation of sexual misconduct

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

[5] The Defendants attack Professor Egolf's Title IX claim on the argument that defending oneself against an accusation is not a complaint of sex discrimination. Opp. to 2d Mot., p. 7. But a Rule 15 pleading is not the right place to attack allegations already in the complaint. Equally important, the Defendants are wrong. *See, e.g.*, Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 866 (9th Cir. 2014) (holding on the theory of Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011), that an injured party can sue if he "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint"; Doe v. Marshall Univ. Bd. of Governors, 683 F.Supp.3d 522 (S.D.W. Va. 2023) (holding that successfully defending against prior Title IX complaints constituted protected activity and the university's alleged solicitation of a new complaint in response was actionable retaliation).

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

would not afford a retaliation claim to respondents in Title IX investigations because *they would also have to show that they suffered retaliation because of it*.

## 2

## The Proposed Amendment to Add a Conspiracy Claim is Not Futile

The Defendants ask this Court to reject Professor Egolf's proposed amendment to add a conspiracy claim, contending that the amendment would be futile for two reasons. First, they argue that Professor Egolf has not alleged an agreement between the Defendants to accomplish a common unlawful purpose. Second, they argue that the claim is doomed by the intracorporate conspiracy doctrine.[6] But neither of these are valid grounds on which to base a finding of futility, so this Court should deny the Defendants' request.

### *a*

### *The Defendants Err in Their Claim that Amendment to Add the Conspiracy Count Would Be Futile Because Professor Egolf Has Not Alleged Coordinated Action*

The Defendants argue that Professor Egolf has not plausibly alleged an agreement between the Defendants to accomplish a common unlawful purpose. Opp., pp. 9 *et seq.* But Professor Egolf's complaint handily satisfies his burden—especially at the pleading stage. *See* Thompson v. Trump, 590 F.Supp.3d 46, 97 (D.D.C. 2022) (summarizing requirements of a civil conspiracy claim). The Defendants' demand for granular "who/what/when" detail

---

[6] The Defendants also argue that civil conspiracy is not an "independent cause of action" under District law and therefore cannot be pled. But that is not a basis to deny leave to amend where a plaintiff pleads conspiracy as a theory for concerted liability tied to underlying tortious conduct, as here, where Professor Egolf alleges tortious interference with contractual relations and tortious interference with prospective economic advantage.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

exceeds what Rule 8 requires at this stage. The Defendants argue Plaintiff must plead a particular conversation or express agreement. That is not the pleading standard, and it is not a basis to deny amendment as futile—especially where, as alleged, key information about relationships and communications is in the Defendants' possession.

Further, as a liminal matter, during the internal proceedings that preceded this amendment, Stephanie Baron refused to answer questions about her communications with University personnel on the grounds that to do so would invade the attorney-client privilege. The Defendants' use of privilege to shield communications creates a significant barrier to Professor Egolf's ability to collect information probative of whether there was an agreement. As such, the University's assertion of privilege makes it fundamentally unfair for them to be heard to complain that Professor Egolf lacks information about their communications.

While the Defendants are correct in pointing out that Professor Egolf's complaint does not assert that the Defendants had an explicit agreement or that they explicitly communicated to coordinate their actions, it need not do so. Professor Egolf's burden at the pleading stage is only to allege circumstantial evidence from which a common intent can be gleaned. Halberstam v. Welch, 705 F.2d 472, 480 (D.C. Cir. 1983) (in most civil conspiracy cases, courts must infer an agreement from indirect evidence); Weishapl v. Sowers, 771 A.2d 1014, 1024 (D.C. 2001); Doe v. Roman Cath. Diocese of Greensburg, 581 F.Supp.3d 176, 212 (D.D.C. 2022); *see also* Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983) (proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement).

A plaintiff must "convey some sense that co-conspirators had a mutual understanding to try to accomplish a common and unlawful plan, thereby sharing in the general conspiratorial objective". Johnson v. Georgetown Univ., F.Supp.3d 133, 171 (D.D.C. 2026). Courts require "enough factual matter, taken as true, to suggest that an agreement was

made". *Thompson*, 590 F.Supp.3d at 97. The pleading standard demands only "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement". Id.

The allegations of the proposed amended complaint demonstrate coordinated conduct adequate to satisfy Professor Egolf's duty to allege facts from which an agreement to accomplish a common unlawful objective can be inferred. For example, Georgetown and Ms. Baron asserted the existence of an attorney-client privilege more than two years into the process and solely to avoid sharing details of the communications between them. That assertion of privilege contradicted the statements that Baron and Hodge-Wren had previously made that there was no attorney-client privilege.

Likewise, Ms. Baron and Ms. Hodge-Wren ignored the overwhelming evidence that Mr. Roe's relationship with Professor Egolf was entirely voluntary by stating conclusorily that the existence of a power dynamic between a professor and a student makes it impossible for any student to consent to a platonic friendship with a professor. Not coincidentally, University personnel *also* argued that the existence of a power differential would make it impossible for a student to consent. That the investigators and the University made the same contention suggests coordinated conduct, satisfying Professor Egolf's duty to allege an agreement to accomplish a common unlawful objective.

Similarly, Mr. Roe reported to Georgetown's the Title IX Coordinator, Samantha Berner, that Professor Egolf had never touched him inappropriately or propositioned him. Berner never disclosed that key fact to Professor Egolf. Mr. Roe made the same report to Ms. Baron—and she, too, withheld that fact from Professor Egolf. Again, this commonality of action suggests a common objective.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

In the same vein, the evidence demonstrated that Mr. Roe's relationship with Professor Egolf was completely platonic. There is no evidence that either of them took any actions to pursue a romantic relationship or even *wished for* a romantic relationship. Again, this commonality of action suggests a common objective—especially as to a factual issue which goes to the very heart of a sexual harassment charge.

Finally, the Provost's goal of firing Professor Egolf would not be achievable without the buy-in from his co-conspirators. The Provost's ability to strip Professor Egolf of tenure and fire him depended squarely on the investigators' agreement to find that he engaged in sexual harassment. But a finding of sexual harassment is flatly incompatible with the most fundamental requirements of a sexual harassment allegation; if the investigators had not been acting in concert with the University, therefore, they never would have concluded that platonic conduct which Mr. Roe explicitly welcomed amounted to sexual harassment. *See* McMullen v. Synchrony Bank, 164 F.Supp.3d 77, 97-98 (D.D.C. 2016) (noting that the fraudulent scheme described could not have operated without an agreement between the parties).

Professor Egolf has, therefore, presented circumstantial evidence of coordinated conduct which satisfies his duty to allege an agreement to accomplish a common unlawful objective. *See* Halberstam v. Welch, *supra*. By recounting that the Defendants engaged in undisclosed communications with one another, worked supposedly separately toward the same goal of finding the existence of sexual misconduct, and ignored facts and law which are anathema to the sought-after conclusion, Professor Egolf has alleged circumstantial evidence of a conspiracy agreement adequate to defeat the Defendants' opposition.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

***b***

***The Defendants Err in Their Argument that Amendment to Add the Conspiracy Count Would Be Futile Because it is Not Viable Under the Intracorporate Conspiracy Doctrine***

The Defendants invoke the intracorporate conspiracy doctrine to argue that Georgetown and individuals associated with Georgetown cannot, as a matter of law, conspire with one another. That contention fails—especially at the Rule 15 stage—because Professor Egolf's proposed conspiracy is not limited to Georgetown and its employees acting within the scope of their employment. The proposed amended pleadings allege concerted action that includes individuals who are not employees of Georgetown and who held themselves out as neutral third-party investigators—a posture that is incompatible with treating them as Georgetown's agents for purposes of barring a conspiracy claim.

**ii**

**The Intracorporate Conspiracy Doctrine Does Not Apply When the Agreement Includes Third Parties Who Are Not Employees of the Corporation**

The intracorporate conspiracy doctrine is premised on the notion that a corporation and its agents, acting within the scope of a single corporate enterprise, are legally incapable of forming the plurality of actors required for a conspiracy. Rawlings v. District of Columbia, 820 F.Supp.2d 92, 104 (D.D.C. 2011). But that rationale does not extend to cases in which the corporation conspired with persons outside the corporate enterprise. Lerner v. District of Columbia, 362 F.Supp.2d 149, 165 (D.D.C. 2005).

Here, the conspireacy included outside investigators—private attorneys—who were not Georgetown employees. The proposed amended complaint expressly alleges that these outside investigators are "attorneys in private practice hired by Georgetown" and "were not

employees of Georgetown University". Second Am. Compl. ¶ 11. When a conspiracy includes such non-employee third parties, it is not, by definition, an "intracorporate" conspiracy; the doctrine therefore does not bar suit as a matter of law. Id. And at minimum whether the alleged co-conspirators fall inside or outside the doctrine is a fact-bound inquiry ill-suited for resolution at the leave-to-amend stage. Plaintiff has plausibly alleged the necessary plurality of actors by alleging participation by non-employee outsiders, and the Defendants cannot use the intracorporate doctrine to defeat amendment as futile.

**ii**

**The Outside Attorney-Investigators Cannot Be Treated as Georgetown's "Agents" for Intracorporate-Conspiracy Purposes Because They Held Themselves Out As Neutral Third-Party Factfinders and Ethics Rules Render that Neutral Role Incompatible With Agency or Representation in the Same Matter**

The Defendants contend that the intracorporate conspiracy doctrine applies to Ms. Berner and Ms. Hodge-Wren because they were the university's agents. But that defense cannot stand when Berner and Hodge-Wren expressly disclaimed acting as counsel to Georgetown for purposes of the investigation and affirmatively represented that they were neutral factfinders.

Specifically, Plaintiff alleged that the investigators represented that they were "not acting as counsel to the University for purposes of this review and instead are acting as neutral fact-finders" and that there was "no attorney-client privilege" given their "role as neutral investigators". Second Am. Compl. ¶ 139. Those representations matter. The Defendants cannot simultaneously rely on the investigators' purported neutrality to justify their role in the process while also invoking an agency theory to collapse the conspiracy into a single actor for purposes of the intracorporate doctrine.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

That is particularly true because the District of Columbia Rules of Professional Conduct underscore that neutrality and client-agency are mutually exclusive. Under D.C. Rule of Professional Conduct 2.4, "[a] lawyer serves as a third-party neutral when the lawyer assists two or more persons who are not clients of the lawyer to resolve a dispute or other matter". Professor Egolf's conspiracy claim is grounded in the investigators' own description of their role as neutral factfinders. Their claimed neutral role presupposes that Georgetown was not their client in the investigation; a lawyer acting as a third-party neutral is not acting as a partisan advocate for a client in the matter. Accordingly, if the outside attorneys were acting as Rule 2.4 neutrals—as they expressly represented—then they were not acting as Georgetown's client-representatives in the investigation, and they cannot be treated as Georgetown's agents for purposes of applying the intracorporate conspiracy doctrine.

The proposed amended complaint also alleges that Georgetown asserted attorney-client privilege in connection with the investigators' work and that the lead investigator refused to answer questions during internal proceedings on the ground that doing so would invade attorney-client privilege—despite having earlier represented the opposite (that there was no privilege due to neutrality). Second Am. Compl. ¶ 138. This reflects a concealed or inconsistent attorney-client relationship that undermined the integrity of the process.

A lawyer who serves as a neutral and at the same time has an attorney-client relationship with one of the parties in the matter is serving in roles that are fundamentally conflicting. D.C. Rule 1.7 explicitly prohibits a lawyer from advancing adverse positions in the same matter. The "neutral investigator" posture simply cannot be reconciled with an attorney-client relationship in the same matter. Thus, because Rule 1.7 bars the investigators from serving as "neutral" factfinders while also serving as Georgetown's

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

attorneys, the Defendants cannot rely on the investigators as "agents" to gain the protection of the intracorporate conspiracy doctrine.

Nor, finally, is the Defendants' position saved by their reference to investigations conducted by in-house counsel serving in compliance roles. Those scenarios are markedly different because they involve lawyers serving their clients as "internal watchdogs" or in compliance capacities—i.e., as counsel furthering the client's legal interests—rather than lawyers holding themselves out as neutral investigators in an adversarial process with a faculty member who has opposing interests.

At core, the Defendants' attempt to categorize the investigators as Georgetown's "agents" for intracorporate-conspiracy purposes collapses under its own contradiction: Either the investigators were neutral third-party factfinders (and therefore not Georgetown's agents), or they were Georgetown's attorneys (in which case the neutrality representations alleged in the proposed amended pleadings were false and themselves support the plausibility of the alleged wrongful concerted action). Either way, under the facts of this case the intracorporate doctrine cannot defeat Plaintiff's conspiracy claim as a matter of law at the amendment stage.

## 3

## The Contract-Based Amendments Are Not Futile

In their opposition to the first proposed amended complaint, the Defendants argued that Professor Egolf's proposed breach of contract claim based on Georgetown's filing of its counterclaims and disclosures in violation of the 2015 settlement agreement is futile because the agreement expressly authorized Georgetown to use the information in litigation and because the Court previously declined to strike certain counterclaim exhibits.

Those arguments do not show futility as a matter of law.

First, the Defendants' position requires contract interpretation which cannot be resolved on a Rule 15 motion. Plaintiff's proposed amended pleadings allege Georgetown breached contractual non-disclosure and non-reliance obligations. The Defendants' reliance on a contractual exception raises, at most, an interpretive defense that turns on the scope of the exception and the nature and extent of the disclosures and reliance. That type of merits issue is not should be resolved at summary judgment or trial, not by a motion to amend.

Nor do this Court's prior rulings on sealing/striking immunize the Defendants from contractual liability. Whether a document may remain on a public docket is a different question from whether the Defendants' disclosure and use of the information breached contractual promises or constituted retaliation. The Defendants' argument conflates distinct legal standards and does not establish futility.

### 4

### The Defendants' Termination-Related Futility Arguments Do Not Justify Denying Leave to Amend

The Defendants argue that Professor Egolf has not adequately alleged causation adequate to support a retaliation claim based on the University's termination of his employment. They base that argument on the contention that the proposed amended complaint does not allege that Provost Colbert, who issued the termination decision, knew of any protected activity or that such activity substantially contributed to her decision.

That argument again seeks to litigate merits and proof on a Rule 15 motion.

Equally important, it lacks merit because the proposed second amended Complaint alleges that Provost Colbert's termination decision was based on the findings and recommendations of the Faculty Responsibilities Committee, IDEAA, and former Provost Groves, and it alleges that the termination violated Plaintiff's contractual and statutory

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

rights. Even presuming that Colbert acted entirely without retaliatory animus, her decision is not cleansed of its illegality when it was informed by people with retaliatory motivation. Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1311 (D.C. Cir. 1998).

And, of course, at the pleading stage, Plaintiff is not required to prove the ultimate mental state of a particular decisionmaker; it is enough to plead facts plausibly linking the challenged processes and retaliatory conduct to the termination decision.

## CONCLUSION

Professor Egolf's amended pleadings serve the core purposes of Rule 15: They clarify the allegations, add claims and parties tied to newly learned information, and update the complaint to include Professor Egolf's termination. The Defendants' oppositions do not demonstrate undue prejudice, bad faith, or futility. Instead, they seek premature adjudication of disputed legal and factual issues that should be addressed, if at all, on an appropriate motion directed to the operative amended complaint. For these reasons, and for the reasons stated in Plaintiff's earlier Rule 15 pleadings, which Plaintiff incorporates by reference, Plaintiff respectfully requests that the Court grant his motion for leave to amend, permit Plaintiff to file the proposed amended pleading, and permit the case to proceed on the merits as required by Rule 15 and principles of just adjudication.

Respectfully Submitted,

Dated: August 28, 2026



LIPPMAN, SEMSKER & SALB, LLC
Micah Salb, Esq. (Bar #453197)
msalb@lsslawyers.com
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
(301) 656-6905

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814

## CERTIFICATE OF SERVICE

I certify that on this the 28th day of August in the year 2026, a copy of the foregoing motion was served on counsel for the Defendants by the Court's electronic case filing system.

Micah Salb, Esq.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road
Suite 1100
Bethesda, Maryland 20814